**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN MCAULIFFE, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| MOBILEYE GLOBAL INC., AMNON SHASHUA, MORAN SHEMESH ROJANSKY, and ANAT HELLER, | |
| Defendants. | |

Plaintiff John McAuliffe ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Mobileye Global Inc. ("Mobileye" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Mobileye; and (c) review of other publicly available information concerning Mobileye.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Mobileye securities between January 26, 2023, and January 3, 2024, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Mobileye is a technology company engaged in the development and deployment of advanced driver assistance systems ("ADAS") and autonomous driving software and hardware products. The Company generates the majority of its revenue from the sale of EyeQ System-on-Chip ("SoCs").[1] The EyeQ SoCs is a computer chip used for driver-assistance and partial autonomous driving. Mobileye sells EyeQ SoCs to Tier 1 automotive suppliers who in turn sell to Original Equipment Manufacturers ("OEMs").[2]

---

[1] A System on Chip is an integrated circuit that combines all the components and functions of a computer or electronic system into a single chip. The EyeQ SoCs is a computer chip used for driver-assistance and partial autonomous driving.

[2] An automotive OEM is a company which designs, brands and distributes vehicles. For example Ford, BMW, or General Motors are OEMs.

3.     On January 4, 2024, before the market opened, Mobileye issued a press release disclosing that it had "become aware" of a build-up of excess inventory including an estimated 6-7 million units of EyeQ SoCs held by customers. The Company stated this was a result of "supply chain constraints in 2021 and 2022 and a desire to avoid part shortages" and "lower than-expected production at certain OEM's during 2023." The Company then disclosed "the lower-than-expected volumes in the EyeQ® SoC business will have a temporary impact on our profitability[.]" The Company also provided a preliminary financial outlook for 2024, in which it stated it "expect[s] Q1 revenue to be down approximately 50%, as compared to the $458 million revenue generated in the first quarter of 2023."

4.     On this news, Mobileye's stock price fell $9.75 per share, or 24.5%, to close at $29.97 per share on January 4, 2024, on unusually heavy trading volume.

5.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that, to avoid the shortages experienced amid supply chain constraints in 2021 and 2022, the Company's Tier 1 customers had purchased inventory in excess of demand during fiscal 2023; (2) that, as a result, the Company's customers had excess inventory on hand, including approximately 6-7 million units of EyeQ SoCs; (3) that, due to the build-up of inventory, there was a significant risk that the Tier 1 customers would buy less product, thus adversely impacting the Company's fiscal 2024 financial results; and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

7.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

10.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

11.    Plaintiff John McAuliffe, as set forth in the accompanying certification, incorporated by reference herein, purchased Mobileye securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

3

12.     Defendant Mobileye is incorporated under the laws of the Delaware with its principal executive offices located in Jerusalem, Israel. Mobileye's Class A common stock trades on the NASDAQ under the symbol "MBLY."

13.     Defendant Amnon Shashua ("Shashua") served as the co-founder, President, Director and a Chief Executive Officer ("CEO") at all relevant times.

14.     Defendant Moran Shemesh Rojansky ("Rojansky") served as the Company's Chief Financial Officer ("CFO") since September 11, 2023, and previously served as the Company's interim CFO from June 26, 2023 until September 11, 2023, and Vice President of Finance, Director of Finance and Corporate Controller from 2016 until June 26, 2023.

15.     Defendant Anat Heller ("Heller") served as the Company's CFO from 2018 until June 26, 2023.

16.     Defendants Shashua, Rojansky, and Heller (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Mobileye is a technology company engaged in the development and deployment of ADAS and autonomous driving technologies and solutions, including software and hardware technologies. The Company generates the majority of its revenue from the sale of EyeQ SoCs to OEMs through sales to automotive suppliers.

### Materially False and Misleading

### Statements Issued During the Class Period

18.     The Class Period begins on January 26, 2023. On that day, the Company issued a press release to announce its fourth quarter and full year 2022 results, stating, in relevant part:[3]

> "Our fourth quarter performance is an excellent example of how ***ramping volumes of our advanced solutions can impact financial performance, as higher average system price amplified strong volume growth, leading to 59% overall revenue growth,***" said Mobileye President and CEO Prof. Amnon Shashua.
>
> \*          \*          \*
>
> ***Business development activity was very robust in 2022. As disclosed in our CES presentation, projected future revenue (through 2030) from design wins achieved in just 2022 alone totaled $6.7 billion across 63.6 million incremental units.*** This is more than 3.5x the revenue we generated in 2022 and the projected average system price indicates strong traction for our advanced solutions.
>
> We continue to execute very well in our core ADAS business, as we launched systems into 233 distinct vehicle models in 2022 and pricing and gross profit per unit remained consistent with historical levels.
>
> \*          \*          \*
>
> ***Revenue of $565 million increased 59% as compared to fourth quarter of 2021. EyeQ® SoC-related revenue grew 48% in the quarter due to a combination of volume and ASP growth.*** The remaining growth was primarily generated by SuperVisionTM related revenue, despite this product being less than 1% of our overall unit volume.

---

[3] All bold and italicized emphasis herein is added unless otherwise noted.

19.   On March 9, 2023, the Company submitted to the SEC its annual report on Form 10-k for the fiscal year ended December 31, 2022 ("FY22 10-K"). The FY22 10-K reported

> **To mitigate these supply chain constraints, management is monitoring inventory levels on an ongoing basis.** Although we cannot fully predict the length and the severity of the impact these pressures will have on a long-term basis, **we do not anticipate that our current supply chain constraints would materially adversely affect our results of operations, capital resources, sales, profits, and liquidity on a long-term basis**.

> \*          \*          \*

> As of December 31, 2022, our solutions had been installed in approximately 800 vehicle models (including local country, year, and other vehicle model variations), and our System-on-Chips ("SoCs") had been deployed in over 135 million vehicles. **We are actively working with more than 50 Original Equipment Manufacturers ("OEMs") worldwide on the implementation of our ADAS solutions. For the year ended December 31, 2022, we shipped approximately 33.7 million of our EyeQ® SoC and SuperVision™ systems, of which the substantial majority were EyeQ® SoCs**. This represents an increase from approximately 28.1 million systems that we shipped in 2021 and approximately 19.7 million systems that we shipped in 2020

20.   On April 27, 2023 the Company issued a press release to announce its first quarter 2023 results and update fiscal 2023 guidance, stating, in relevant part:

> "The business performed very well in Q1, **including 16% revenue growth as both our EyeQ® and SuperVision business lines grew strongly**, significantly outperforming underlying global auto production growth.

> \*          \*          \*

> **Revenue of $458 million increased 16% compared to the first quarter of 2022. EyeQ® SoC related revenue grew 11% in the quarter due to a combination of volume and ASP growth**.

21.   On May 11, 2023, the Company submitted to the SEC its quarterly report on Form 10-Q for the period ended April 1, 2023 ("1Q21 10-Q"). The 1Q21 10-Q reported key factors affecting the Company's performance, including "**Supply and manufacturing capacity**" which stated in relevant part:

> To mitigate these supply chain constraints, **management is monitoring inventory levels on an ongoing basis**. Although we cannot fully predict the length and the severity of the impact these pressures will have on a long-term basis, **we do not anticipate that our current supply chain constraints would materially adversely**

***affect our results of operations, capital resources, sales, profits, and liquidity on a long-term basis.***

22.     The 1Q21 10-Q described the status of the Company's OEM facilities, and stated

in relevant part:

> ***We are actively working with more than 50 Original Equipment Manufacturers ("OEMs") worldwide on the implementation of our ADAS solutions. In the three months ended April 1, 2023, we shipped approximately 8.1 million of our systems, the substantial majority of which were EyeQ® SoCs.*** This represents an increase from the approximately 7.4 million of our systems that we shipped in the first three months of 2022.

23.     On July 27, 2023, the Company issued a press release announcing its second

quarter 2023 results and updated guidance, which stated in relevant part:

> "The business again performed well in Q2. Operating margin improved as compared to the first quarter of 2023 despite relatively consistent revenue and we're positioned well for the increased revenue growth in the 2nd half of 2023 indicated by our guidance," said Mobileye President and CEO Prof. Amnon Shashua.

*          *          *

> ***Revenue of $454 million decreased 1% compared to the second quarter of 2022. As noted on our prior earnings call, de-stocking of SuperVision units at our main customer was a headwind in the quarter.***

*          *          *

> ***Operating cash flow for the six months ended July 1, 2023 was $197 million. This included significant outflows related to re-building our strategic inventory of EyeQ chips which had been significantly reduced during the semiconductor supply chain crisis in 2021 and 2022. Cash used in purchases of property and equipment was $58 million for that same period.***

24.     On August 10, 2023, the Company submitted to the SEC its quarterly report on

Form 10-Q for the period ended July 1, 2023 ("2Q21 10-Q"). The 2Q21 10-Q described the

Company's supply and manufacturing capacity, and stated in relevant part:

> ***To mitigate these supply chain constraints, management monitors inventory levels on an ongoing basis.*** Although we cannot fully predict the length and the severity of the impact these pressures may have on a long-term basis, ***we do not anticipate that potential supply chain constraints would materially adversely affect our results of operations, capital resources, sales, profits, and liquidity on a long-term basis.***

7

25.     The 2Q21 10-Q reported the status of the Company's OEM facilities, stating in

relevant part:

> We are actively working with more than 50 Original Equipment Manufacturers
> ("OEMs") worldwide on the implementation of our ADAS solutions. ***In the six
> months ended July 1, 2023, we shipped approximately 16.4 million of our
> systems, the substantial majority of which were EyeQ® SoCs. This represents an
> increase from the approximately 15.9 million of our systems that we shipped in
> the six months ended July 2, 2022***.

26.     The 2Q21 10-Q cited key factors affecting the Company's performance, stating in

relevant part:

> In addition, ***in prior periods***, certain Tier 1 customers increased their orders for
> components and parts, including our solutions, to counteract the impact of supply
> chain shortages for auto parts, and ***we expect these Tier 1 customers will utilize
> accrued inventory on hand before placing new orders to meet the demand of
> OEMs in current or future periods. As a result, some demand for our solutions
> and the corresponding revenue from these customers were shifted to earlier time
> periods than otherwise would have occurred absent a general supply chain
> shortage and inflationary environment***. We cannot predict when the impact of
> these factors on global vehicle production will substantially diminish. However,
> ADAS volumes have grown faster in recent years than the overall automotive
> market as ADAS penetration rates have increased, and we believe that we will
> continue to benefit from that trend. Our revenue of $912 million in the six months
> ended July 1, 2023 was up 7% year-over-year.

27.     On October 26, 2023, the Company issued a press release announcing its third

quarter 2023 results and updated guidance, which stated in relevant part:

> "We are very pleased with Q3 results, as operating leverage on strong revenue
> growth has led to significant increases in operating income," said Mobileye
> President and CEO Prof. Amnon Shashua.
>
> *            *            *
>
> ***Revenue of $530 million increased by 18% compared to the third quarter of 2022,
> primarily due to a combination of volume and ASP growth in our EyeQ® chip
> related revenue***.
>
> *            *            *
>
> ***Operating cash flow for the nine months ended September 30, 2023 was $285
> million. This included significant outflows related to re-building our strategic
> inventory of EyeQ chips, which had been significantly reduced during the***

*semiconductor supply chain crisis in 2021 and 2022. Cash used in purchases of property and equipment was $75 million for that same period*.

28.      On November 9, 2023, the Company submitted to the SEC its quarterly report on Form 10-Q for the period ended September 30, 2023 ("3Q21 10-Q"). The 3Q21 10-Q reported the Company's supply and manufacturing capacity, and stated in relevant part:

> *To mitigate these supply chain constraints, management monitors inventory levels on an ongoing basis.* Although we cannot fully predict the length and the severity of the impact these pressures may have on a long-term basis, *we do not anticipate that potential supply chain constraints would materially adversely affect our results of operations, capital resources, sales, profits, and liquidity on a long-term basis*.

29.      The 3Q21 10-Q reported the status of the Company's OEM facilities, and stated in relevant part:

> We are actively working with more than 50 Original Equipment Manufacturers ("OEMs") worldwide on the implementation of our ADAS solutions. *In the nine months ended September 30, 2023, we shipped approximately 25.9 million of our systems, the substantial majority of which were EyeQ® SoCs. This represents an increase from the approximately 24.0 million of our systems that we shipped in the nine months ended October 1, 2022*.

30.      The 3Q21 10-Q stated the following key factors affecting the Company's performance, in relevant part:

> In addition, *in prior periods,* certain Tier 1 customers increased their orders for components and parts, including our solutions, to counteract the impact of supply chain shortages for auto parts, and we expect these Tier 1 customers will utilize accrued inventory on hand before placing new orders to meet the demand of OEMs in current or future periods. *As a result, some demand for our solutions and the corresponding revenue from these customers were shifted to earlier time periods than otherwise would have occurred absent a general supply chain shortage and inflationary environment*. We cannot predict when the impact of these factors on global vehicle production will substantially diminish. *However, ADAS volumes have grown faster in recent years than the overall automotive market as ADAS penetration rates have increased, and we believe that we will continue to benefit from that trend*. Our revenue of $1,442 million in the nine months ended September 30, 2023 was up 11% year-over-year.

31.      The above statements identified in ¶¶ 18-30 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations,

and prospects.   Specifically, Defendants failed to disclose to investors: (1) that, to avoid the shortages experienced amid supply chain constraints in 2021 and 2022, the Company's Tier 1 customers had purchased inventory in excess of demand during fiscal 2023; (2) that, as a result, the Company's customers had excess inventory on hand, including approximately 6-7 million units of EyeQ SoCs; (3) that, due to the build-up of inventory, there was a significant risk that the Tier 1 customers would buy less product, thus adversely impacting the Company's fiscal 2024 financial results; and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

32.     On January 4, 2024, before the market opened, Mobileye issued a press release, revealing it had "become aware" of a build-up of excess inventory including an estimated 6-7 million units of EyeQ SoCs held by customers and that as a result, "the lower-than-expected volumes in the EyeQ® SoC business will have a temporary impact on our profitability" such that the Company "expect Q1 revenue to be down approximately 50%, as compared to the $458 million revenue generated in the first quarter of 2023."

33.     The press release, entitled "Preliminary FY2023 Financial Results and Initial 2024 Outlook," stated in relevant part:

> As a result of our standard planning process for the upcoming year, including discussions with our Tier 1 customers to determine potential orders for 2024, *we have become aware of excess inventory at our customers*, *which we believe to be 6-7 million units of EyeQ® SoCs*. *Based on our discussions, we understand that much of this excess inventory reflects decisions by Tier 1 customers to build inventory in the Basic ADAS category due to supply chain constraints in 2021 and 2022 and a desire to avoid part shortages, as well as lower than-expected production at certain OEM's during 2023.* As supply chain concerns have eased, we expect that our customers will use the vast majority of this excess inventory in the first quarter of the year. *As a result, we expect that first quarter 2024 revenue will be significantly below first quarter 2023 revenues and that we will see revenue normalized during the remainder of 2024.*

In FY2024 we expect total revenue in the range of $1,830 - $1,960 million. This is underpinned by expected EyeQ® shipments of 31 – 33 million units (as compared to approximately 37m units in 2023) and SuperVision shipments of 175k – 195k units (as compared to approximately 100k units in 2023).

***We currently expect Q1 revenue to be down approximately 50%, as compared to the $458 million revenue generated in the first quarter of 2023.*** We also currently believe that revenue over the balance of the year will be impacted by inventory drawdowns to a much lesser extent. As a result, we expect revenue for Q2 through Q4 2024 on a combined basis to be roughly flat to up mid single-digits as compared to the same period in 2023, and we expect inventory at our customers to be at normal levels by the end of 2024.

***We anticipate that the lower-than-expected volumes in the EyeQ® SoC business will have a temporary impact on our profitability***. Similar to revenue, we expect Q1 profit levels to be significantly below the subsequent quarters. We expect Q1 2024 Operating Loss to be in the range of $257 to $242 million. Excluding amortization of intangible assets and stock-based compensation, we expect Adjusted Operating Loss in the range of $80 to $65 million in the first quarter of 2023.

34.     On this news, Mobileye's stock price fell $9.75 per share, or 24.5%, to close at $29.97 per share on January 4, 2024, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Mobileye securities between January 26, 2023, and January 3, 2024, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Mobileye's actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of

members in the proposed Class.  Millions of Mobileye shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Mobileye or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Mobileye; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

40.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

41.     The market for Mobileye's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Mobileye's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Mobileye's securities relying upon the integrity of the market price of the Company's securities and market information relating to Mobileye and have been damaged thereby.

42.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Mobileye's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Mobileye's business, operations, and prospects as alleged herein.

43.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Mobileye's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

44.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

45.     During the Class Period, Plaintiff and the Class purchased Mobileye's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

46.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Mobileye, their control over, and/or receipt and/or modification of Mobileye's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Mobileye, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

47.     The market for Mobileye's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Mobileye's securities traded at artificially inflated prices during the Class Period.  On January 15, 2023, the Company's share price closed at a Class Period high of $47.02 per share.

Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Mobileye's securities and market information relating to Mobileye and have been damaged thereby.

48.     During the Class Period, the artificial inflation of Mobileye's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Mobileye's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Mobileye and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

49.     At all relevant times, the market for Mobileye's securities was an efficient market for the following reasons, among others:

(a)     Mobileye shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Mobileye filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Mobileye regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Mobileye was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

50.     As a result of the foregoing, the market for Mobileye's securities promptly digested current information regarding Mobileye from all publicly available sources and reflected such information in Mobileye's share price. Under these circumstances, all purchasers of Mobileye's securities during the Class Period suffered similar injury through their purchase of Mobileye's securities at artificially inflated prices and a presumption of reliance applies.

51.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

52.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Mobileye who knew that the statement was false when made.

<u>**FIRST CLAIM**</u>

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

<u>**Against All Defendants**</u>

53.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Mobileye's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

55.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

17

maintain artificially high market prices for Mobileye's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Mobileye's financial well-being and prospects, as specified herein.

57.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Mobileye's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Mobileye and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

58.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's

management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

59.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Mobileye's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Mobileye's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Mobileye's securities during the Class Period at artificially high prices and were damaged thereby.

61.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Mobileye was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Mobileye securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

64.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.     Individual Defendants acted as controlling persons of Mobileye within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited

access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Mobileye and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: January 16, 2024

**GLANCY PRONGAY & MURRAY LLP**

By: <u>*/s/ Gregory B. Linkh*</u>
Gregory B. Linkh (GL-0477)
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com
        rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Counsel for Plaintiff John McAuliffe*

## SWORN CERTIFICATION OF PLAINTIFF

## MOBILEYE GLOBAL INC. SECURITIES LITIGATION

I, John McAuliffe, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase the Mobileye Global Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Mobileye Global Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

| | |
|---|---|
| 1/9/2024 | |
| _____ | _____ |
| Date | John McAuliffe |

**John McAuliffe's Transactions in Mobileye Global Inc. (MBLY)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 5/24/2023 | Bought | 240 | $41.29 |
| 6/14/2023 | Bought | 122 | $40.94 |
| 6/22/2023 | Bought | 185 | $37.77 |
| 7/13/2023 | Sold | -115 | $43.20 |
| 7/20/2023 | Sold | -122 | $40.87 |
| 7/27/2023 | Bought | 132 | $38.37 |
| 7/27/2023 | Bought | 50 | $38.36 |
| 7/28/2023 | Bought | 131 | $38.08 |
| 7/31/2023 | Sold | -264 | $37.82 |
| 8/10/2023 | Sold | -129 | $38.65 |
| 8/17/2023 | Sold | -230 | $36.62 |
| 8/31/2023 | Bought | 280 | $35.63 |
| 10/26/2023 | Bought | 267 | $37.40 |
| 11/7/2023 | Bought | 533 | $37.50 |
| 11/15/2023 | Bought | 122 | $40.83 |
| 12/6/2023 | Sold | -251 | $39.82 |