**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MOBILEYE GLOBAL SECURITIES LITIGATION | Case No. 1:24-cv-00310-DLC<br><br>CLASS ACTION<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**


PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934 .................... 1

I. INTRODUCTION .................... 1

II. JURISDICTION AND VENUE .................... 8

III. PARTIES .................... 8

A. Lead Plaintiff .................... 8

B. Defendants .................... 9

IV. SUMMARY OF THE FRAUD .................... 10

A. Mobileye's Background And Business .................... 10

B. The Automotive Supply Chain .................... 11

C. As The Class Period Begins, Defendants Report Record Revenue And Assure Investors That Mobileye Is Well-Positioned For Future Growth .................... 16

D. Unknown To Investors, Defendants Concealed Flagging Demand For The Company's EyeQ Chips And Inflated Mobileye's Short-Term Revenue By Forcing Its Customers To Accept Millions Of EyeQ Chips Decoupled From True Market Demand .................... 22

1. While Defendants Represented That Mobileye Only Shipped Product Based On "Market Conditions," Mobileye Imposed Minimum Commitments On Its Customers That Made It Impossible To Adjust To Declining Demand .................... 22

2. In 2022 And 2023, Mobileye Forced Millions Of Excess Chips Onto Its Customers, Allowing The Company To Hit Guidance And Meet Analyst Expectations .................... 25

E. Investors Begin To Learn The Truth In January 2024, When Defendants Admit That They Had Pushed Millions Of Excess EyeQ Chips Onto Mobileye's Customers For Years And As A Result, Mobileye's Revenue Would Decline .................... 33

F. The Full Truth Emerges As Defendants Reduce Guidance Even Lower From Reduced EyeQ Volume As They Are No Longer Able To Force Excess Inventory Onto The Company's Customers .................... 41

V. ADDITIONAL ALLEGATIONS OF SCIENTER .................... 43

A. Defendants Knew That The Company Had Departed From Its Ordinary Sales Practices And Forced "Obligations" Onto Its Tier 1 Customers, Which Decoupled Sales From Demand And Resulted In The Inventory Build-up ..... 43

B. Defendants Possessed Contemporaneous Knowledge That Mobileye's Customers Had Excess Inventory ..... 45

C. The Concealed Sales Practices Enabled Defendants To Consistently Hit Guidance And/Or Analyst Consensus Expectations ..... 49

D. The EyeQ Is A Core Operation To Mobileye ..... 50

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ..... 50

A. Defendants' False And Misleading Statements In The Company's Form 10-K and Forms 10-Q ..... 51

B. Defendants' False And Misleading Misrepresentations In Earnings Releases, Investor Conferences, And Other Public Statements ..... 54

1. Misrepresentations In The Q4 2022 Earnings Release And Call ..... 54

2. Misrepresentations During The February 2023 Wolfe Research Conference ..... 57

3. Misrepresentations During The March 2023 Raymond James Conference ..... 58

4. Misrepresentations At The March 2023 Morgan Stanley Conference ..... 59

5. Misrepresentations At The April 2023 Bank Of America Conference ..... 60

6. Misrepresentations In The Q1 2023 Earnings Release And Call ..... 60

7. Misrepresentations In The Q2 2023 Earnings Release And Call ..... 63

8. Misrepresentations During The September 2023 Goldman Sachs Conference ..... 65

9. Misrepresentations In The Q3 2023 Earnings Release And Call ..... 66

10. Misrepresentations In The Q4 2023 Earnings Release And Call ..... 68

11. Misrepresentations In The Q1 2024 Earnings Call ..... 69

12. Misrepresentations During The June 2024 Deutsche Bank Conference ........ 69

VII. ADDITIONAL LOSS CAUSATION ALLEGATIONS ........ 70

VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 72

IX. PRESUMPTION OF RELIANCE ........ 73

X. EXCHANGE ACT CLASS ACTION ALLEGATIONS ........ 74

XI. EXCHANGE ACT CAUSES OF ACTION ........ 76

COUNT I ........ 76

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Against Mobileye and the Executive Defendants ........ 76

COUNT II ........ 78

For Violations of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) Against the Exchange Act Defendants ........ 78

COUNT III ........ 80

For Violations of Section 20(a) of the Exchange Act Against the Executive Defendants ........ 80

PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933 ........ 82

XII. INTRODUCTION TO THE SECURITIES ACT CLAIMS ........ 82

XIII. JURISDICTION AND VENUE ........ 82

XIV. THE SECURITIES ACT PLAINTIFF ........ 83

XV. THE SECURITIES ACT DEFENDANTS ........ 83

XVI. THE SECONDARY PUBLIC OFFERING ........ 84

XVII. THE FACTS MISSTATED OR OMITTED IN THE OFFERING DOCUMENTS ........ 85

A. Background ........ 85

B. Mobileye's Offering Documents Described And Assured Investors About Mobileye's EyeQ Revenue, Volumes, And Customers ........ 90

C. The Offering Documents Misstated And Omitted Material Information ........ 91

XVIII. THE OFFERING DOCUMENTS CONTAINED MATERIAL

MISSTATEMENTS AND OMISSIONS .......................................................................... 97

A. Untrue Or Misleading Statements Concerning Mobileye's Customer Contracts ........................................................................................................ 97

B. Untrue Or Misleading Statements Concerning Mobileye's Growth..................... 99

C. Untrue Or Misleading Statements Concerning Demand For Mobileye's Products.................................................................................................................99

D. The Offering Documents Violated Regulation S-K By Failing To Disclose Material Adverse Trends And The Risks Facing Mobileye ................................ 101

XIX. THE SECURITIES ACT DEFENDANTS FAILED TO EXERCISE REASONABLE CARE OR CONDUCT A REASONABLE INVESTIGATION IN CONNECTION WITH THE OFFERING.............................................................. 102

XX. SECURITIES ACT CAUSES OF ACTION .............................................................. 103

XXI. SECURITIES ACT CLASS ACTION ALLEGATIONS.............................................. 107

THE FOLLOWING SECTION APPLIES TO BOTH THE EXCHANGE ACT AND SECURITIES ACT CLAIMS.......................................................................... 108

XXII. PRAYER FOR RELIEF ......................................................................................... 108

XXIII. JURY DEMAND........................................................................................................ 109

Lead Plaintiff The Retirement Plan for Chicago Transit Authority Employees ("Chicago Transit" or "Lead Plaintiff") and Additional Named Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters," and together with Chicago Transit, "Plaintiffs"), by and through their counsel, bring this action based on violations of the federal securities laws, on behalf of all investors who (i) purchased or otherwise acquired securities of Mobileye Global Inc. ("Mobileye" or the "Company") during the period from January 26, 2023 through August 1, 2024, inclusive (the "Class Period"), and/or (ii) purchased or otherwise acquired Mobileye securities in the Company's June 2023 Secondary Public Offering (the "Offering"), and were damaged thereby (the "Class").

The allegations in this Complaint are based upon Plaintiffs' personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, *inter alia*, counsel's investigation, which includes: (a) review and analysis of regulatory filings made by Mobileye with the SEC; (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Mobileye; (d) other public information concerning Mobileye; (e) transcripts of Mobileye's investor and analyst conference calls; (f) Lead Counsel's review and analysis of trading data for Mobileye securities and related documents; (g) consultations with relevant experts and consultants; (h) Lead Counsel's communications with knowledgeable individuals, including former employees of Mobileye and the Company's customers; and (i) other sources.

## <u>PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934</u>

## I. INTRODUCTION

1. This action arises from a series of material misrepresentations by Mobileye and its senior executives. Throughout the Class Period, Defendants made false and misleading statements assuring investors that Mobileye's sales were based on true market demand, and in turn touting

Mobileye's "record" sales volume and revenue growth. In reality, Mobileye had experienced stalling demand for its flagship product, and Defendants were engaged in a channel stuffing scheme, by which they shipped millions of units (and recognized hundreds of millions of dollars in revenue) above true market demand for the product, and even over the objections of Mobileye's customers. When the full truth emerged, the Company's sales plummeted, and Mobileye's stock price collapsed by 70%, erasing all gains it had experienced since the Company's Initial Public Offering two years earlier.

2. Mobileye is the dominant provider of advanced driver-assistance systems ("ADAS"). ADAS refers to technology incorporated into cars and other automobiles to provide safety features, such as lane departure warnings and alarms that alert drivers to obstacles. Mobileye designs and sells software and hardware that implements those features on vehicles. Approximately 90% of Mobileye's revenue came from the Company's proprietary "EyeQ" silicon chips. Mobileye's primary customers for those chips are a handful of "Tier 1" suppliers, companies in the automotive supply chain that work directly with automobile Original Equipment Manufacturers ("OEMs").

3. For decades, suppliers and manufacturers in the automotive supply chain have focused on improving efficiency and minimizing disruptions to the supply chain by implementing standardized protocols to regularly exchange information concerning near- and long-term manufacturing demands and the inventory on hand available to satisfy those demands. These processes and communications became even more important following disruptions from the COVID-19 pandemic, with key players up and down the supply chain publicly emphasizing the need for even greater communication to ensure effective operations.

4. The Class Period begins on January 26, 2023, when Mobileye announced its year-end 2022 earnings. That day, Defendants touted "better than expected" revenue growth, driven in large part by increased sales of the Company's flagship EyeQ chips. Defendants also provided positive financial guidance for 2023, guiding the market to approximately a 20% increase in revenue year-over-year, which they stated was actually "conservative." These representations were particularly meaningful to investors because Mobileye had only just been spun off from Intel Corporation into an independent public company three months earlier, and this was Mobileye's first full reporting period earnings release and first full-year guidance since the spin-off. Thus, investors looking to value the Company focused particularly on the Company's historical and expected growth, which the market understood to reflect the demand for Mobileye's products.

5. Throughout the Class Period, Defendants touted their visibility into demand for Mobileye's products and existing inventory levels. Defendants repeatedly reassured the market that they were "monitoring inventory levels on an ongoing basis" and analyzing demand for Mobileye's EyeQ chips. Defendants also represented to investors that Mobileye's customers had "so much capacity" to buy more of Mobileye's products. This, combined with Defendants' frequent representations that they were in "continuous contact with customers" to "balance" and "stabilize" the quantities of product shipped to customers, conveyed to investors that (i) Mobileye's customers had not reached their capacity for EyeQ chips; and (ii) Mobileye was tracking demand for the EyeQ chip and matching its shipments to that demand.

6. In fact, Mobileye assured investors it did exactly that: from the beginning of the Class Period, Defendants told investors that the number of chips that Mobileye shipped would "depend upon market conditions." These representations were important to investors because they reassured the market that Mobileye's sales to its customers were based on actual demand. Thus,

these statements provided assurance as to the quality and nature of Mobileye's present revenue, as well as to the sustainability of the Company's growth, which was critical to the market's valuation of this newly-launched Company.

7. Mobileye's strong outlook, growth story, and Defendants' assurances about their visibility into the demand for the Company's products impressed analysts and investors. As a result, Mobileye's stock price climbed.

8. Unknown to investors, however, Defendants' statements were false. In truth, Mobileye's shipments ***did not*** "depend upon market conditions." Instead, Mobileye's recent success was built on a multi-year channel stuffing scheme.

9. The scheme was simple: to insulate Mobileye from the risks of market fluctuations caused by pandemic-era supply chain constraints in the leadup to the Company's IPO, Defendants abandoned Mobileye's historical practices of taking ***quarterly*** orders from its Tier 1 customers, and instead forced customers to enter into ***annual*** minimum quantity purchasing commitments. In 2022, Mobileye began to require its customers to commit to buying a minimum number of EyeQ chips at the beginning of the year—regardless of what demand would actually be. As Defendants would later admit, these minimum commitment deals made it "impossible" for the Tier 1 customers to adjust orders to demand during the year. Throughout 2022 and 2023, Mobileye refused to adjust the commitment quantities, even as the market for ADAS chips fell precipitously and Mobileye's customers complained repeatedly. If Tier 1 customers had not ordered enough EyeQ chips to satisfy their minimum commitments by the end of the year, Mobileye would simply ship the number of chips remaining under these commitments, even when the customer did not order those chips and had no demand for them. These facts are confirmed by well-placed witnesses both inside of Mobileye and at one of Mobileye's largest customers.

10. The scheme was effective: by untethering supply from demand, Mobileye sold more EyeQ chips and generated more revenue than ever in 2022, leading to a successful IPO. By the start of the Class Period in January 2023, Defendants had shipped four to five million EyeQ chips in excess of market demand. Without the volume and revenue from these forced sales, Mobileye would have missed guidance and analyst predictions. Buoyed by this achievement, Mobileye required its customers to sign another year of minimum commitment deals in 2023. Once again, artificially propped up by these imposed and atypical agreements, Mobileye shattered its sales and revenue records as it shipped an additional two to three million EyeQ chips in excess of demand and which its customers did not need or want. All told, Mobileye recognized ***hundreds of millions of dollars*** in revenue by shipping excess inventory that its customers did not need or want. These preordained sales grossly exaggerated Mobileye's growth and enabled the Company to precisely meet guidance and analyst expectations during each quarter of 2023—but only by secretly cannibalizing future revenue.

11. The scheme, however, unraveled: by January 2024, Defendants' channel-stuffing scheme began to fall apart as customers had built up too much inventory and stopped signing annual agreements. On January 4, 2024, Defendants announced that the Company's 2024 revenue would actually stall and even decline compared to 2023, because Mobileye had for years shipped millions of EyeQ chips more than the market could bear. As a result of Defendants' scheme, customers refused to buy more chips from Mobileye until they worked through the considerable excess inventory that Mobileye had forced into the channel.

12. Analysts were stunned. Just the day before this announcement, *CNBC* had published an article lauding Mobileye's "rare secular growth story" and valuable "long-term growth prospects," quoting (among others) an analyst from Deutsche Bank, who praised Mobileye

as "the stock that'll be the 'last man standing' in autonomous driving." But in response to Defendants' unexpected revelation about the excess inventory, that same analyst at Deutsche Bank immediately recognized that Mobileye's revenue had for years been "***inflated compared with real demand***," and explained that Defendants had provided "***no advance notice*** of any building inventory issues." Likewise, analysts at TD Cowen "struggle[d] with how Mobileye could so poorly align its EyeQ shipments with end vehicle production to this extent," while Morgan Stanley exclaimed: "We cannot recall another example of an established supplier guiding down 50pct for a quarter . . . due to excess inventory in the channel." As a result of this revelation, Mobileye's stock price fell $9.75 per share, or 24.5%, to close at $29.97 per share on January 4, 2024, on unusually heavy trading volume.

13. The shocked reaction by analysts—and exasperation that Defendants had provided no advance notice of the buildup—reflected in part that widely-adopted industry standards and practices within the automotive supply chain had for decades required regular communications within all levels of the supply chain as to the inventory on-hand and forecasted demand. Several of Mobileye's top Tier 1 customers publicly affirmed their adherence to, and insistence on, these industry practices. Based on industry standard practices—and reassured by Defendants' statements—the market expected that Defendants should have known throughout the Class Period that its customers had more inventory than needed.

14. On January 25, 2024, Defendants held their first earnings call after revealing the devastating impact to revenue caused by the excess inventory. Defendants revealed that they had been able to force Mobileye's customers to accept this excess inventory because the annual minimum commitment deals made it "impossible" for its customers to "adjust[] . . . the quantities" of EyeQ order volumes to correspond to market conditions. During this call, Defendants went out

of their way to assure investors that the risks of buildup from these mandatory commitments—the scope of which Defendants had only just now revealed to investors—were nonetheless "no longer relevant," because Mobileye had reverted to its traditional practice of only taking quarterly orders from its customers, which would allow customers to adjust their purchases to changing demand levels. In truth, the quarterly deals simply made it harder for Defendants to shift the risk of changing market conditions—and declining ADAS market share—onto Mobileye's customers.

15. Defendants continued to conceal the full scope and impact of their scheme, claiming that the inventory buildup was created by purposeful decisions on the part of the Tier 1 customers, and assuring investors that customers would work through the excess inventory within months.

16. On August 1, 2024, Defendants were forced to reveal that these assurances were false. That day, Defendants shockingly reduced their 2024 revenue guidance even lower, yet again with the EyeQ as the cause: unable to force millions of chips onto its customers as they had for years, EyeQ volumes and orders remained low.

17. Analysts were once again floored by Defendants' announcement and quickly connected the news to the excess inventory previously announced. They harshly criticized Defendants' latest disclosure, stating that there was "No way to sugarcoat it—we struggle to rationalize a second material cut to 2024 guidance this year" and that "Another significant guide down following the miss entering the year is tough to swallow." Analysts lamented that the repeated guidance reduction for EyeQ chip sales was the "particular disappointment" of Defendants' announcement and noted that "the shock from the January 2024 guide down on an outsized inventory build at customers in MBLY's core EyeQ business was a clear negative for the credibility of mgmt with investors." They further lamented that Mobileye was "increasingly being

seen as a market-share loser in base ADAS." On this news, Mobileye's stock price fell $4.72 per share, or 22.5%, to close at $16.28 per share on August 1, 2024, on unusually heavy trading volume.

18. As a result of these disclosures, Mobileye's stock price declined by almost 70% in total from its Class Period high, and has not recovered to this day.

## II. JURISDICTION AND VENUE

19. This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

20. This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b) and (c). At all relevant times, Mobileye conducted substantial business here. In addition, many of the acts alleged herein occurred in this District.

22. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

### A. Lead Plaintiff

23. Lead Plaintiff The Retirement Plan for Chicago Transit Authority Employees (defined above as "Chicago Transit" or "Lead Plaintiff") is a pension fund organized for the benefit of eligible employees of the Chicago Transit Authority. As of September 30, 2023, Chicago Transit managed approximately $1.9 billion in assets. As indicated in the certification filed as Exhibit A

to this Complaint, Chicago Transit purchased shares of Mobileye Class A common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Defendants**

24. Defendant Mobileye Global Inc. ("Mobileye") is incorporated under the laws of the State of Delaware, with its principal executive offices located in Jerusalem, Israel. Mobileye's Class A common currently stock trades on NASDAQ under the ticker symbol "MBLY."

25. Defendant Amnon Shashua ("Shashua") is the co-founder, President, Director and Chief Executive Officer ("CEO") of Mobileye.

26. Defendant Moran Shemesh Rojansky ("Rojansky") has been Mobileye's Chief Financial Officer ("CFO") since September 11, 2023. Prior to that, Defendant Rojansky was the Company's interim CFO from June 26, 2023 until September 11, 2023, and Vice President of Finance, Director of Finance and Corporate Controller from 2016 until June 26, 2023.

27. Defendant Anat Heller ("Heller") was Mobileye's CFO from 2018 until June 26, 2023. Prior to that, she held various positions with the Company beginning in 2016, including as Vice President of Finance, Director of Finance and Corporate Controller.

28. Defendant Daniel Galves ("Galves") has been Mobileye's Chief Communications Officer since March 2022. He originally joined Mobileye in early 2016 and led Investor Relations and Communications for Mobileye until 2018. After the Intel acquisition, he worked for Wolfe Research before eventually returning to Mobileye in 2022.

29. Defendants Shashua, Rojansky, Heller, and Galves are collectively referred to herein as the "Executive Defendants" and, together with Mobileye, as the "Defendants." The Executive Defendants directly participated in the management of Mobileye's operations, had direct and supervisory involvement in Mobileye's day-to-day operations, and had the ability to

control and did control Mobileye's statements to investors. They were each involved in drafting, reviewing, publishing, and/or making the Company's statements, including the false and misleading statements and omissions alleged herein.

## IV. SUMMARY OF THE FRAUD

### A. Mobileye's Background And Business

30. Founded in 1999, Mobileye is a technology company that develops and deploys ADAS—which includes safety features such as emergency brake assistance, as well as lane-departure and blind-spot warnings—along with other autonomous driving technologies and solutions.

31. Mobileye first went public in 2014 but was subsequently acquired by Intel Corporation in 2017. Several years later, in October 2022, Intel spun Mobileye off and Mobileye became a standalone public company again (the "IPO").

32. At all relevant times, Mobileye was the incumbent and dominant player in the ADAS market, repeatedly touting that it held approximately 70% of the market share in the growing ADAS market. Mobileye's competitors also repeatedly acknowledged Mobileye as the biggest player in the ADAS market. For instance, in its SEC filings, Mobileye identifies Qualcomm and Ambarella as two of its largest competitors. Just before the start of the Class Period, Qualcomm's CFO described Mobileye as the "***incumbent clearly in ADAS***." Likewise, during the Class Period, the CEO of Ambarella readily admitted that Mobileye "***really dominate[s] this market***."

33. Based on Mobileye's overwhelming dominance in ADAS, analysts believed that Mobileye was uniquely positioned to capture even more of the growing ADAS market and concluded that Mobileye's ADAS market dominance justified a premium price for Mobileye stock. For instance, when they initiated coverage of the Company, analysts from Tigress Financial

Partners took note of the "increasing demand for ADAS capabilities" and wrote that Mobileye's "significant R&D investments, first-mover advantage, and industry-leading product portfolio combined with significant OEM relationships, well-position it to capitalize on a massive market opportunity." Analysts from Cowen likewise lauded Mobileye as a "rare scaled pure-play and beneficiary of ADAS/autonomy," stating that Mobileye's "[s]trong growth and a wide data moat" meant that it would be difficult for competitors to steal business from Mobileye.

34. Nearly all of Mobileye's revenue comes from the Company's proprietary EyeQ system-on-chip (the "EyeQ"). First launched in 2007, the EyeQ is essentially a combination of hardware and software which allows car manufacturers to implement ADAS features into their vehicles. While the EyeQ is not Mobileye's only product, the EyeQ is "fundamental to [Mobileye's] leadership position in ADAS," as the Company has explained, and critical to its performance. For instance, in 2022, Mobileye sold approximately 33 million EyeQ chips, which made up 89% of its reported revenue of $1.9 billion. Almost all of the Company's remaining revenue comes from sales of Mobileye's SuperVision system, a more advanced autonomous driving system which itself utilizes EyeQ technology. In other words, EyeQ chips drive nearly all of Mobileye's revenue.

## B. The Automotive Supply Chain

35. Mobileye primarily sells the EyeQ chip to "Tier 1" automotive suppliers, who function essentially as intermediaries between Mobileye (a "Tier 2" supplier) and car manufacturers (known as Original Equipment Manufacturers or "OEMs"), which include companies such as Ford or Volkswagen. The graphic below illustrates the relevant portion of the Mobileye and EyeQ supply chain.




36. As Mobileye disclosed in its SEC filings, the Company relied significantly on sales to a handful of Tier 1 customers, including Aptiv PLC, Magna International, Valeo, and ZF Group. The overwhelming majority of Mobileye's revenue comes from sales to these Tier 1 suppliers. For example, in 2023, ZF Group, Valeo, and Aptiv were Mobileye's three biggest customers and generated nearly 70% of Mobileye's revenue.

37. Over decades, suppliers and manufacturers in the automotive industry have developed and implemented standards and practices to coordinate and streamline the distribution of components needed to manufacture automobiles. Among other things, these standards dictate that suppliers engage in a near-constant exchange of information, which allows each part of the supply chain to manage its inventory levels. As a May 2017 article from Automotive Logistics explained: "The typical automotive supply chain is an extended global network of suppliers, 3PLs [logistics providers], forwarders and carriers. Each company in this chain has their own systems in their silos. They work off forecasts, schedules and orders communicated by the OEM which are cascaded down to each tier of suppliers." Tier 1 suppliers indicated that they followed industry practices with respect to supply chain management, including with regard to inventory reporting and disclosure.

38. These supply chain management practices typically include the electronic exchange of information, including inventory levels and forecasted demand data between suppliers, in order to optimize inventory levels commensurate with manufacturing demand. Tier 1 customers typically placed orders using Electronic Data Interchange ("EDI") systems, a specialized

electronic industry platform that replaces paper-based documents for purchase orders or invoices and allows for instant electronic communication up and down the supply chain.

39. The onset of the COVID-19 pandemic in 2020 and the accompanying supply chain shortages caused participants to further focus on the importance of managing inventory levels across the supply chain. For example, according to a November 2021 report issued by OpenText, an information management solutions company, the "COVID-19 pandemic exposed major vulnerabilities in widely used business models. For industries across the world, standard approaches such as just-in-time and build-to-order were found wanting. To build resilience and agility, the focus has turned to demand planning and forecasting to better match inventory to actual customer requirements." As another example, in 2023, the Automotive Industry Action Group ("AIAG")—an automotive trade association that, among other things, sets forth industry standards and practices to execute on the industry standards to provide regular exchange of inventory and demand information—issued a "Best Practices for Responding to Supply Chain Disruptions" guide, in which AIAG stressed the need to "establish specific parts forecast vs. firm orders [] to avoid oversupply of outdated/soon-to-be-outdated parts," engage in "transparent communication with the suppliers," use "EDI messaging," and generally to "proactively communicate with suppliers on current expectations."

40. While there are several different processes used in supply chain management across the automotive industry, these systems all share key features, including that information concerning inventory levels and demand forecasts be exchanged frequently. As described below, Mobileye's major customers all utilized some form of communication with other supply chain participants and/or otherwise expressly affirmed their observance of the industry standards

described above, meaning that Defendants at all times received regular reports about inventory and demand from customers.

41. ***ZF Group***. Mobileye's largest Tier 1 customer during the Class Period, ZF Group, publicly provides a "Global Logistics Directive," which applies to "all production materials and the associated spare parts purchased by the locations of ZF Group worldwide," as well as "to all suppliers providing those production materials and associated spare parts to ZF." Under this directive, ZF expressly adopts for use with suppliers different standards for communication regarding inventory and demand levels. As the Global Logistics Directive makes clear, "The overall obligation of ZF's suppliers is to secure the delivery of ZF. This requires supplier to make a regular comparison between the MRP [material requirement planning] data from ZF and supplier's available short-, mid- and long-term capacities . . . Supplier shall take also such additional demand data into consideration for its capacity planning." Under each standard, described as "call-off procedures," the supplier is given detailed information regarding ZF's demand needs.

42. ***Valeo***. Another of Mobileye's three largest Tier 1 customers, Valeo, states in its publicly available materials that it implements EDI communications to regularly report inventory and demand information to its suppliers. For example, under the publicly-available Valeo Supply Agreement Schedule that Valeo used in the ordinary course during the Class Period with its Tier 2 suppliers (such as Mobileye), Valeo each week provides its Tier 2 suppliers with materials requirement forecasts for the following two months, at minimum.

43. ***Aptiv***. Another of Mobileye's top Tier 1 customers, Aptiv, stated in its "Customer Specific Requirements" effective June 20, 2022—which applied to "Suppliers that provide direct products or materials for Aptiv," (such as Mobileye)—that the supplier needs to be certified "as a

capable and compliant EDI trading partner," meaning, use the industry standard EDI protocol. The requirements further indicate that Aptiv provided information to suppliers as to expected production scheduling for the next 2-4 weeks, as well as information beyond four weeks "for planning purposes." FE 1,[1] an Aptiv former employee, corroborated that Aptiv used EDI with Mobileye, including specifically to provide Mobileye with both (i) 18-month forecasts, which projected demand over the long-term, and (ii) firm orders every two weeks, ensuring that Mobileye knew Aptiv's immediate demand for the EyeQ chip throughout the Class Period.

44. ***Magna.*** Finally, as to Magna—another of Mobileye's largest Tier 1 customers—Mobileye had in July 2014 attached to its public Form F-1 filed with the SEC a purchase schedule between the Company and Magna, which expressly stated that Magna would on a regular basis provide Mobileye with a "items identified as 'FORECAST' on a Purchase Schedule [that] are for planning purposes," thus indicating Mobileye and Magna complied with industry-standard communications around inventory and demand.

45. Magna's insistence on these practices is further corroborated by Magna's publicly-available "Magna Global Supply Chain Requirements" manual, dated March 30, 2017, which was "applicable to all suppliers providing materials, products and services to any Magna manufacturing facility." That manual sets forth specific requirements that forecasting information be sent "to the suppliers through their regularly scheduled releases."

46. Moreover, Magna is a member of AIAG, the automotive trade association described above that sets forth industry standards, and practices to execute on those standards, to provide

[1] FE 1 worked as a Procurement Manager from August 2003 until March 2011; a Central Procurement and Customer Logistics Manager from March 2011 until May 2017; and a Production Planning and Customer Logistics Manager from May 2017 until February 2024. In each role at Aptiv, she focused on logistics, including procurement, production planning, supply chain, and customer service. FE 1 specifically said that she had direct communication with Mobileye at times, and that her group had to monitor Mobileye very closely.

regular exchange of inventory and demand. This included issuing the "best practices" in 2023 that specifically advised "to avoid oversupply of outdated/soon-to-be-outdated parts" through "transparent communication with the suppliers," the use of "EDI messaging," and "proactively communicat[ion] with suppliers on current expectations."

47. In all respects, the fact that all of Mobileye's customers regularly communicated with Mobileye regarding their inventory levels and current demand is corroborated by, among other things, Mobileye's own statements throughout the Class Period, which touted their "continuous contact with customers." Moreover, this is also confirmed by FE 2,[2] who explained that all of Mobileye's Tier 1 customers provided reports to Mobileye, which among other things, would update Mobileye on a change in the needs of the Tier 1 customers. These reports, FE 2 explained, were received by Mobileye's entire commercial team.

### C. As The Class Period Begins, Defendants Report Record Revenue And Assure Investors That Mobileye Is Well-Positioned For Future Growth

48. The Class Period begins on January 26, 2023, when Defendants issued a press release announcing Mobileye's preliminary fourth quarter and full year 2022 financial results. Mobileye announced $1.9 billion in revenue for 2022—35% year-over-year growth—driven by a significant increase in EyeQ revenue. The press release stated that Mobileye "continue[d] to execute very well in our core ADAS business" and specifically that EyeQ-related "revenue grew 48% in the [fourth] quarter due to a combination of volume and ASP growth." Defendants attributed the Company's success to a host of legitimate factors, including additional "Volume and ASP [average system price] growth." Based on these revenue drivers, Defendants asserted that Mobileye had "significantly outperform[ed] underlying global auto production growth."

---

[2] FE 2 worked in several roles at Mobileye since joining the Company in 2010, and was Mobileye's Vice President of ADAS Business Development from September 2020 until the end of 2022, when she left the Company. In that role, she focused on securing business from Tier 1 customers and OEMs.

49. During the Company's earnings call with analysts that day, Defendant Heller again touted the Company's 48% revenue growth from EyeQ sales, while Defendant Shashua further boasted that the Company had grown "revenue with every one of our top 10 customers in 2022" in its core EyeQ business segment.

50. That day, Mobileye also issued impressive financial guidance for 2023, projecting revenue between approximately $2.2 and $2.3 billion, indicating more than 20% year-over-year growth. In issuing this guidance, Defendants assured the market that it was "conservative." Discussing further during the earnings call, Defendant Heller stated that Mobileye's guidance "assum[ed] EyeQ volume that is somewhat below the commitment that we have received from our customers for 2023. We want to remain conservative and acknowledge that the macro uncertainty remains elevated." Defendants did not provide any further detail as to these commitments. Rather, in saying that Defendants chose to be "conservative" in their guidance by assuming growth ***below*** those "commitments," Defendants indicated that the volumes Mobileye shipped ***could*** change based on market conditions throughout the year.

51. Defendants also guided that revenue for the first quarter of 2023 would be lower than the just-announced fourth quarter 2022 revenue. Defendant Heller told investors that this was due to two factors: "general conservatism on the part of [Mobileye's] customers" and higher purchases of EyeQ chips by Mobileye's customers in late 2022 before Mobileye raised prices for the EyeQ at the start of January 2023. Defendants told investors that customers were therefore entering the Class Period with somewhat elevated levels of inventory following extra purchases during the fourth quarter of 2022, specifically because Mobileye was planning to increase prices and Mobileye's customers wanted to take advantage before the new prices were in effect.

52. While Defendants claimed to know ***why*** inventory levels may have been elevated, Defendants never disclosed ***by how much*** inventory had increased. In any event, Defendants assured the market that this dip in revenue growth for the first quarter of 2023 would only be temporary, and reiterated their guidance that the Company would still post 20% growth in 2023 overall, with approximately 60% of Mobileye's 2023 revenue coming in the second half of the year. This conveyed to investors that, to the extent there were any elevated inventory levels at its customers at that time, those inventories would quickly dissipate and not impact the Company's growth.

53. Analysts lauded Mobileye's strong 2022 results and positive 2023 guidance, particularly against the backdrop of the supply chain ***constraints*** in recent years. For example, analysts from J.P.Morgan raised their price target for Mobileye and declared that "***Mobileye's 4Q22 results served to alleviate investor concerns*** around the broader implications of a tough macro backdrop and the reverberating headwinds." The analysts also lauded that Mobileye had "bak[ed] in conservatism even at the high end of the guidance range." Analysts from Deutsche Bank similarly cheered Mobileye's "better-than-expected 4Q22 operating results versus expectations across the board" and their announced 2023 guidance that had exceeded the street's estimates. Morgan Stanley analysts who reported on Mobileye's "Big 4Q Beat," credited Mobileye's 2023 projections as "a conservative guide," and said they were "***prepared to see quarterly beats along the way*** in 2023," confirming the market's understanding that volumes shipped would track market conditions.

54. In response to Defendants' positive representations, Mobileye's stock price rose from a close of $33.95 on January 25, 2023 to close at $35.97 on January 26, 2023—an increase of approximately 6% in a single trading day.

55. As the year continued, Defendants stated that the Company would continue to grow volumes and revenue in light of growing demand, even in the face of supply chain pressures.

56. On March 9, 2023, Mobileye filed its Annual Report on Form 10-K, in which Defendants stated that, to counteract supply chain shortages, "certain Tier 1 customers [had] increased their orders for components and parts" in certain unspecified prior periods. However, while the Form 10-K suggested some "increased" sales had "shifted to earlier time periods," "some demand . . . and corresponding revenue," Defendants did not provide further detail. Instead, Defendants reassured investors that, in any event, they expected demand to continue to grow, stating that "ADAS volumes have grown faster in recent years than the overall automotive market as ADAS penetration rates have increased," Mobileye was "outperforming the increase of global automotive production," and Mobileye "believe[d] that we will continue to benefit from that trend."

57. In all events, Defendants further assured investors that the volume of Mobileye's shipments to its customers would "depend upon market conditions," and that "to mitigate [] supply chain constraints, management is monitoring inventory levels on an ongoing basis." These representations provided assurances to investors that Mobileye's sales related to actual market demand, and therefore further assured investors as to the quality and nature of its present revenue as well as the sustainability of Mobileye's growth, which was critical to the market's valuation of the Company.

58. Inventory and volumes were of particular interest to analysts, who asked questions about the issues throughout the Class Period, and in response Defendants spoke frequently on the subjects. For instance, Mobileye held its earnings call for the first quarter of 2023 on April 27, 2023. During that call, Defendant Heller told analysts that "based on the latest indications from

Tier 1[s]," Mobileye had "seen some movements of volumes out of Q2 and into the second half of the year"—in other words, certain customers postponed orders of EyeQ chips until the second half of 2023. An analyst from Goldman Sachs asked Defendants to "elaborate a little bit more on what might be happening there." In response, Defendant Heller indicated that Defendants analyzed shipments relative to demand, noting that the decision by the Tier 1 customers was "probably something to do about their inventory levels and considerations versus demand," based on "the information that" Mobileye had, but assured this analyst that the amount of volume that Mobileye's Tier 1 customers had moved to the second half of 2023 was "not very significant." Defendant Shashua jumped in and further assured investors that "we are in a very good discussions and trying to balance their commitment from quarter to quarter rather than lumping it into one or two quarters towards the end of the year. And we managed quite successfully to reach a point in which the change in second quarter is really minimal."

59. Defendants' assurances about Mobileye's continued growth and focus on balancing supply to its customers encouraged the market. Analysts from Barclays wrote that "the growth opportunity is very much intact." Likewise, analysts from Cowen noted that the "[o]verall thesis and Mobileye's content/vehicle expansion [was] firmly intact."

60. On July 27, 2023, Mobileye announced financial results for the second quarter of 2023. The Company again assured investors that Mobileye was "positioned well for the increased revenue growth in the 2nd half of 2023 indicated by our guidance," though Defendants reported lower year-over-year revenue for the second quarter.

61. In both the press release and during the earnings call later that day, Defendants described a "headwind" to second quarter revenue from "de-stocking" of SuperVision inventory levels (meaning, the reduction of orders to account for a buildup of excess supply) by a specific

customer during the prior period. Specifically, Defendant Rojansky explained that, in first quarter of 2023, Mobileye had shipped SuperVision units that were "significantly higher than end market volumes." Thus, Defendant Rojansky's comments indicated to investors that, consistent with industry standards, Defendants monitored Mobileye's outgoing shipments and analyzed how those shipments compared to "end market volumes."

62. Defendants further explained that Defendants subsequently corrected this inventory build-up and the mismatch between volumes shipped and end market demand. Specifically, Defendant Rojansky explained that during the second quarter, Mobileye proactively "fully reduce[d]" that "inventory build from Q1" using "intentionally low shipments [that] accomplished this goal." Thus, while this "destocking of inventory with our Tier 1 customers impacted the growth rate in both Q1 and more sharply in Q2," as Defendant Shashua said, inventory buildup had "stabilized." Defendants again claimed that any elevated EyeQ chip inventory levels in 2022 and early 2023 had resulted "from [Defendants] increasing the price in – the price increases at the beginning of 2023." Once again, Defendants did not disclose how many excess chips had been purchased.

63. Defendants further assured investors that any excess inventory was limited, resolved, and did not impact demand. They affirmed that the Company "will be back to meaningfully outperforming industry production volumes" in the remaining two quarters of 2023. Moreover, Defendants emphasized that the buildup and "destocking" was specific to the Company's SuperVision product—not the core EyeQ product—and involved a specific Tier 1 customer. Indeed, Defendants indicated that there were no comparable problems with EyeQ, stating affirmatively that Defendants no longer saw "any request to push volumes from quarter to

quarter." In other words, shipments corresponded as the market expected and understood with the underlying demand.

64. Analysts credited Defendants' representations. For example, analysts from Bank of America concluded that "demand for MBLY's ADAS products remains strong even as SuperVision volumes have been impacted by destocking at its main customer." On October 26, 2023, analysts from Canaccord noted with approval that "inventory destocking headwinds following the COVID-induced chip shortage are largely behind the company (inline with previous management commentary)."

65. Likewise, mainstream news media reported bullishly on Mobileye's prospects. On January 3, 2024—hours before Mobileye revealed for the first time that its customers had accrued millions of excess EyeQ units—*CNBC* published an article describing Mobileye as "the stock that'll be the 'last man standing' in autonomous driving." The article quoted and referred extensively to several securities analysts (including Deutsche Bank and RBC Capital) who anticipated significant upside for the value of Mobileye and its stock. Neither the *CNBC* article nor any of the analysts it referenced gave any indication of awareness—much less concern—that Mobileye's "rare secular growth story" was premised on years of channel-stuffing, or of the risks to its valuable "long-term growth prospects" from its customers' accrual of excess inventory.

### D. Unknown To Investors, Defendants Concealed Flagging Demand For The Company's EyeQ Chips And Inflated Mobileye's Short-Term Revenue By Forcing Its Customers To Accept Millions Of EyeQ Chips Decoupled From True Market Demand

#### 1. While Defendants Represented That Mobileye Only Shipped Product Based On "Market Conditions," Mobileye Imposed Minimum Commitments On Its Customers That Made It Impossible To Adjust To Declining Demand

66. During 2023, Defendants told investors that they "generally do not have contracts with customers that require them to purchase our solutions in any certain quantity," though they

had "been working with our customers to ensure they commit to certain volumes," and some of the Company's customers had agreed to purchase minimum quantities of "certain solutions" in 2023 as a result of "global shortages." Significantly, Defendants maintained that the Company had no commitment on its side to ship any set quantity of its product to the Tier 1 customers and in fact would ship volumes only based on "market conditions," indicating that volumes shipped would correspond to demand. The Company also represented to investors that its Tier 1 customers had substantial capacity to take on Mobileye's products, indicating that inventory levels were under control.

67. Indeed, throughout the year, Mobileye indicated—consistent with those disclosures—that it took steps to "balance" the amounts shipped to customers taking into consideration "their inventory level and considerations versus demand." As noted above, Defendants even stated that they had shipped "intentionally low" amounts of product during the second quarter of 2023 to address an "inventory build" at one customer, after Mobileye determined it had shipped inventory "significantly higher than end market volumes" for its SuperVision product.

68. Given these assurances, the market did not have any impression that Mobileye faced material risk from its customers accruing excess inventory or shipments exceeding demand. To the contrary, in a June 5, 2023 report, investment analysts at Wells Fargo stated that a risk to Mobileye was the ***opposite***—that "[t]he company has had past issues securing adequate supply to ***meet demand***."

69. In reality, Mobileye forced its top customers into contracts that enabled Mobileye to ship excessive volumes of inventory untethered from true demand levels. Contrary to Defendants' claims that they "generally" did not require minimum commitments from their

customers, in fact in both 2022 and 2023, Mobileye entered into contracts that imposed minimum order requirements on its customers, including Mobileye's top three Tier 1 customers who generated 70% of Mobileye's annual revenue. As Defendants only later admitted, these obligations gave its critical Tier 1 customers "less ability from their side to adjust purchases to demand as they did pre-COVID period," a fact Defendants candidly admitted made it "***impossible***" to match market conditions.

70. FE 1, who worked at Aptiv, one of Mobileye's largest Tier 1 customers, explained how the minimum commitment deals between Mobileye and Aptiv operated. According to FE 1, because there was no alternative for the EyeQ chip, there was "no other way" for Aptiv to ensure its access to the EyeQ chips it needed other than agreeing to the minimum commitment agreements demanded by Mobileye, and Mobileye could do whatever it wanted. The contracts did not allow Aptiv to adjust the quantity of chips purchased under the agreement, even as end demand from car manufacturers decreased. FE 1 explained that Aptiv did not really like to have these agreements because then they lose flexibility with cancelling and following up with customers' demands. FE 1 also explained that Aptiv could not cancel any orders it made pursuant to the minimum commitment contracts. This meant that Aptiv ultimately had to accept more EyeQ chips than it wanted or needed throughout the Class Period. FE 1 confirmed that even if Aptiv showed Mobileye that business was going down and that the OEMs (Aptiv's direct customers) were placing fewer orders (as was the case during the Class Period), Mobileye would not allow Aptiv to adjust the volumes of its orders.

71. According to FE 1, Aptiv wanted to cancel orders because it did not want to build up excess inventory of the EyeQ chips, but Mobileye "forced us to make overstock" because Mobileye would not allow any cancellations. While Aptiv would postpone orders in the short-

term, it was obligated to accept the full sum of EyeQ chips agreed to under the minimum commitment contract before the end of the year. FE 1 explained that if Aptiv did not affirmatively order enough EyeQ chips to meet its minimum commitment requirement, Mobileye would simply deliver the remaining chips, "without question," in November or December.

72. Indeed, consistent with FE 1's account, Mobileye's EyeQ sales volumes spiked dramatically at the end of 2022 and 2023. Specifically, Q4 2022 volumes were 18.2% higher than Q3 2022 volumes, and Q4 2023 volumes were 23.4% higher than Q3 2023 volumes. Defendants publicly acknowledged the spike in volumes at year-end, but misled investors as to the cause, claiming that the purchases related to legitimate activities from "pricing changes" and suggested that at most this would cause "a hangover effect" in the following quarter. Contrary to Defendants' statements, these spikes related to having shipped millions more EyeQ units beyond demand, which would reverse years of revenue growth.

### 2. In 2022 And 2023, Mobileye Forced Millions Of Excess Chips Onto Its Customers, Allowing The Company To Hit Guidance And Meet Analyst Expectations

73. As Mobileye reported in its SEC filings, the Company sold approximately 62 million EyeQ chips during 2021 and 2022, the two years just before the start of the Class Period. In reality, as Defendants would later admit, approximately 4-5 million of those chips—at least 6-8% of the Company's shipped volume for those two years—were excess inventory beyond the true demand for the chips.

74. Then, in 2023, Mobileye shipped more EyeQ chips than it had in ***any other prior year***—37 million units. As Defendants later admitted, this volume included yet another 2-3 million in excess EyeQ chips beyond demand—5-8% of the Company's total shipped volume during 2023.

75. While Defendants repeatedly touted their revenue, growth, and visibility into Mobileye's sales pipeline throughout 2023, at the same time, Mobileye received—but did not

disclose to investors—regular signals about the excess inventory at its key Tier 1 customers. As explained above, industry standard information exchanges throughout the automobile supply chain ensured that Mobileye was aware of inventory levels at the Company's Tier 1 customers on a regular basis during the Class Period.

76. A senior Mobileye former employee in a key position further confirmed that Defendants knowingly shipped excess inventory. FE 2 was Mobileye's Vice President of ADAS Business Development from September 2020 until the end of 2022, when she left the Company. FE 2 reported to Mobileye's Executive Vice President, Eres Dagan, who in turn reported directly to Defendant Shashua. In her role as VP of ADAS Business Development, FE 2 was responsible for winning ADAS business from both OEMs and Tier 1 suppliers. FE 2 confirmed that the excess inventory at Mobileye's Tier 1 customers existed "across the board" during her tenure, and that the inventory buildup was already "significant" when she left the Company at the end of 2022. FE 2 explained that she learned of the excess inventory because the team that she oversaw received reports from the Tier 1 suppliers. FE 2 explained that during the COVID-19 pandemic, some of the OEMs that Mobileye worked with reduced the number of units that they wanted to acquire. Despite this development, Mobileye told the Tier 1 suppliers that they still had to buy the amount of product that they had previously committed to, and that they should just keep it and store it for the future. FE 2 explained that these conversations with Tier 1 suppliers were already happening when she left the Company at the end of 2022. Members of FE 2's team were responsible for leading the discussions with the Tier 1 customers and reported to FE 2. FE 2 explained that Dagan (who reported directly to the c-Suite) told her that the conversations with the Tier 1 suppliers should be handled in that manner. FE 2 stated directly that Defendant Shashua was aware of the

excess inventory, stating that the decision to push inventory to the Tier 1 customers "went up to Amnon" (Defendant Shashua).

77. FE 2's team would report to her that those conversations with the Tier 1 suppliers took place, and FE 2 would report to more senior executives if something was not as planned. FE 2's team was told that they needed to ensure that Tier 1 customers purchased the amount of product they had previously committed to. Thus, Mobileye told the Tier 1s that they cannot ***not*** buy those amounts. FE 2 explained that usually, however, those conversations (which FE 2 confirmed were happening before she left the Company, i.e., during 2022) with the Tier 1 suppliers did not go well because the Tier 1 suppliers were not very satisfied with Mobileye's requests for them to take on the volume. FE 2 recalled escalating instances to her supervisor (who reported directly to the c-Suite) in which Tier 1 suppliers did not want to buy the same amount of volume. However, as noted above, FE 2 explained that Mobileye told the customers that they had to buy the amount of product that they had previously committed to, and that they should just keep it and store it for the future.

78. Thus, FE 2 also confirmed that Defendant Heller would have been aware of the excess inventory. Specifically, FE 2 explained that each Tier 1 supplier would update Mobileye if there was a change in their needs for product. FE 2 stated that there were quarterly meetings that executive management, including Mobileye's CFO (at the time, Defendant Heller) would attend. During these meetings, FE 2 explained, anything out of the ordinary at the Company would be discussed, which could include the Tier 1 customers or the reports from the Tier 1 customers when there were issues or things were not going as planned. FE 2 explained that the excess inventory was, in part, obvious to her because OEMs were reducing their orders and Tier 1 suppliers were still being encouraged to order the same amount of product.

79. FE 1 confirmed that Aptiv, one of Mobileye's biggest Tier 1 customers, regularly provided Mobileye with information concerning its demand and forecast. FE 1's account corroborates that Defendants—who knew at all times the volumes Mobileye shipped to Aptiv and the other Tier 1s—knew about the growing excess inventory at Aptiv. FE 1 explained that throughout the Class Period, Aptiv provided Mobileye with firm orders for the following two weeks along with 18-month forecasts, showing that the demand for EyeQ chips was far below the volume that Mobileye was forcing Aptiv to purchase. Because of these routine forecasts that were provided to Mobileye as part of standard industry practices, FE 1 explained, Mobileye would have known that it was pushing more inventory than its Tier 1 customers could sell to OEMs.

80. Despite communications from Mobileye's Tier 1 customers indicating that they were accumulating more inventory than they could sell, Defendants continued throughout 2023 to push millions of additional EyeQ chips onto Mobileye's customers. Altogether, as Defendants would eventually disclose in January 2024, Defendants saddled their Tier 1 customers with 6-7 million excess EyeQ chips over several years, including 2-3 million in 2023 alone.

81. Defendants' undisclosed practice of shipping EyeQ chips to Tier 1 customers in volumes that exceeded market demand boosted the Company's reported revenue by hundreds of millions of dollars before and during the Class Period. Defendants would have fallen short of their revenue guidance for their first annual reporting period without the excess inventory. Defendants had guided 2022 year-end revenue of $1.84 billion at the midpoint. At the start of the Class Period, Defendants reported triumphantly that they had met that guidance, announcing $1.87 billion in revenue for the year. However, as Defendants later admitted, they had oversold 4-5 million excess EyeQ units during 2021-2022. While Defendants did not further specify how many of those chips were sold in each year, assuming that they were split evenly between the years, approximately

2.25 million units were sold each year. Based on disclosures around Mobileye's average 2022 unit price, this translates to approximately $111 million in excess revenue for 2022 alone. In other words, without the excess revenue, Mobileye's first annual earnings would have missed its own revenue expectations by ***nearly $82 million***. Alternatively, assuming the excess units were shipped proportionally to the total yearly revenue for 2021-2022, Defendants would have shipped approximately 2.6 million excess units in 2022, contributing $127.5 million in revenue in 2022; thus, without this revenue, Defendants would have missed their first annual earnings target by ***nearly $98 million.***

82. Defendants' scheme to push inventory onto Mobileye's Tier 1 customers further enabled Mobileye to meet its purportedly "conservative" revenue guidance in 2023. On January 26, 2023, Mobileye provided the market with revenue guidance for the year, guiding that they expected revenue of $2.28 billion, indicating an increase of 21% year-over-year from 2022. Defendants later revised this guidance down twice. First, on April 27, 2023, they reduced their 2023 revenue guidance to approximately $2.11 billion. Then, on October 26, 2023, they reduced it further, to $2.078 billion at the midpoint. In both instances, Defendants explained the reduction of guidance related to the Company's SuperVision product line, and not from any slowdown in demand for EyeQ or other EyeQ-related issues. On January 4, 2024, Defendants announced that they just barely met their guidance from October 2023, reporting estimated revenue of $2.078 billion at the midpoint for the 2023 fiscal year.

83. Even after the reductions, Defendants would have fallen short of their revenue guidance but for the 2-3 million excess EyeQ chips they admitted to having shipped in 2023. The Company generated approximately $123 million in revenue from these excess chips, as calculated based on the Company's disclosures of its unit price and volumes during the year. In other words,

without shipping excess inventory beyond true demand, Mobileye would have only achieved revenue of $1.955 billion, meaning that Defendants ***would have missed their guidance by $120 million, or more than 5%.***

84. Defendants' scheme also allowed Mobileye to meet analyst consensus expectations for the Company's quarterly revenue in 2023. While the Company did not provide quarterly guidance concerning its expected revenue, analysts developed consensus expectations for Mobileye's performance. During three of the four quarters in 2023, Mobileye met precisely analyst revenue consensus; during one quarter, the Company exceeded consensus estimates by approximately $3 million. Below, for illustrative purposes, are estimates of how much Mobileye's scheme inflated the Company's quarterly revenue and allowed the Company to meet analyst expectations.

85. Because the Company provided only annual numbers of excess units, the first illustration below assumes that Mobileye's scheme was carried out in equal measure throughout 2023—in other words, that the Company shipped an equal number of EyeQ chips in excess of demand in each quarter.[3]

- On April 27, 2023, Mobileye reported quarterly revenue of $458 million, barely exceeding analyst consensus of $455 million. Based on Defendants' subsequent admissions, however, Mobileye shipped approximately 625,000 EyeQ chips in excess of market demand to its Tier 1 customers during that quarter, which provided approximately ***$31.2 million*** in revenue. In other words, had Mobileye not pushed excess EyeQ chips onto its customers beyond their true demand for those chips, the Company's revenue would have been just $426.8 million, meaning it would have missed analyst consensus by approximately ***$28.2 million***.

- On July 27, 2023, Mobileye reported quarterly revenue of $454 million precisely meeting analyst consensus of $454 million. Based on Defendants' subsequent admissions, however, Mobileye shipped approximately 625,000

[3] Based on Mobileye's assertion that it had shipped 2-3 million chips in excess of market demand in 2023, Lead Plaintiff assumes for illustrative purposes only that the Company shipped 625,000 excess chips during each quarter of 2023 (for a total of 2.5 million chips, i.e., the midpoint).

EyeQ chips in excess of market demand to its Tier 1 customers during that quarter, which provided approximately ***$31.5 million*** in revenue. In other words, had Mobileye not pushed excess EyeQ chips onto its customers beyond their true demand for those chips, the Company's revenue would have been just $422.5 million, meaning it would have missed analyst consensus by approximately ***$31.5 million***.

- On October 26, 2023, Mobileye reported quarterly revenue of $530 million, precisely meeting analyst consensus of $530 million. Based on Defendants' subsequent admissions, however, Mobileye shipped approximately 625,000 EyeQ chips in excess of market demand to its Tier 1 customers during that quarter, which provided approximately ***$31.5 million*** in revenue. In other words, had Mobileye not pushed excess EyeQ chips onto its customers beyond their true demand for those chips, the Company's revenue would have been just $498.5 million, meaning it would have missed analyst consensus by approximately ***$31.5 million***.

- On January 25, 2024, Mobileye reported quarterly revenue of $637 million, again nearly precisely meeting analyst consensus of $636 million. Based on Defendants' subsequent admissions, however, Mobileye shipped approximately 625,000 EyeQ chips in excess of market demand to its Tier 1 customers during that quarter, which provided approximately ***$30.2 million*** in revenue. In other words, had Mobileye not pushed excess EyeQ chips onto its customers beyond their true demand for those chips, the Company's revenue would have been just $606.8 million, meaning it would have missed analyst consensus by approximately ***$29.2 million***.

86. As an alternative, the next illustration allocates the amount of excess units each quarter proportionally to that quarter's relative contribution to the annual revenue—in other words, that the number of EyeQ chips shipped in excess of demand in each quarter was proportionate to the revenue contribution from that quarter to total 2023 results.[4]

- On April 27, 2023, Mobileye reported quarterly revenue of $458 million, exceeding analyst consensus of $455 million. This quarterly revenue provided 22% of the Company's reported annual 2023 revenue. Assuming therefore that 22% of the ~2.5 million excess EyeQ units Defendants admitted were shipped in 2023 were shipped that quarter (i.e., ~550,000 excess units), these excess units would have provided approximately ***$27.5*** million in revenue. In other words, had Mobileye not pushed these excess EyeQ chips onto its customers beyond their true demand for those chips, the Company's revenue would have

[4] Based on Mobileye's assertion that it had shipped 2-3 million chips in excess of market demand in 2023, Lead Plaintiff assumes for illustrative purposes the midpoint, i.e., a total of 2.5 million chips.

been just $430.5 million, meaning it would have missed analyst consensus by approximately ***$24.5*** million.

- On July 27, 2023, Mobileye reported quarterly revenue of $454 million, precisely meeting analyst consensus of $454 million. This quarterly revenue provided 22% of the Company's reported annual 2023 revenue. Assuming therefore that 22% of the 2.5 million excess EyeQ units Defendants admitted were shipped in 2023 were shipped that quarter (i.e., ~550,000 excess units), these excess units would have provided approximately ***$27.5*** million in revenue. In other words, had Mobileye not pushed these excess EyeQ chips onto its customers beyond their true demand for those chips, the Company's revenue would have been just $426.5 million, meaning it would have missed analyst consensus by approximately ***$27.5*** million.

- On October 26, 2023, Mobileye reported quarterly revenue of $530 million, precisely meeting analyst consensus of $530 million. This quarterly revenue provided 26% of the Company's reported annual 2023 revenue. Assuming therefore that 26% of the 2.5 million excess EyeQ units Defendants admitted were shipped in 2023 were shipped that quarter (i.e., ~637,000 excess units), these units would have provided approximately ***$32*** million in revenue. In other words, had Mobileye not pushed these excess EyeQ chips onto its customers beyond their true demand for those chips, the Company's revenue would have been just $497 million, meaning it would have missed analyst consensus by approximately ***$32*** million.

- On January 25, 2024, Mobileye reported quarterly revenue of $637 million, almost precisely meeting analyst consensus of $636 million. This quarterly revenue provided 31% of the Company's reported annual 2023 revenue. Assuming therefore that 31% of the 2.5 million excess EyeQ units Defendants admitted were shipped in 2023 were shipped that quarter (i.e., ~766,000 excess units), these units would have provided approximately ***$37*** million in revenue. In other words, had Mobileye not pushed these excess EyeQ chips onto its customers beyond their true demand for those chips, the Company's revenue would have been just $600 million, meaning it would have missed analyst consensus by approximately ***$35*** million.

87. Thus, as illustrated by both examples above, without secretly forcing excess inventory onto its customers, Mobileye would not have met analyst consensus for ***any*** quarter throughout the Class Period and would not have met its 2023 revenue guidance.

### E. Investors Begin To Learn The Truth In January 2024, When Defendants Admit That They Had Pushed Millions Of Excess EyeQ Chips Onto Mobileye's Customers For Years And As A Result, Mobileye's Revenue Would Decline

88. The truth began to emerge on January 4, 2024. That day, before the market opened, Mobileye issued a press release, disclosing for the first time that it had shipped massive amounts of excess inventory to its customers, including approximately ***6-7 million*** EyeQ chips. As a result, Mobileye revealed, EyeQ sales would dramatically decline in 2024. The impact was so severe that, as Mobileye disclosed, the Company "***expect[ed] Q1 revenue to be down approximately 50%***, as compared to the $458 million revenue generated in the first quarter of 2023." As a result, Mobileye projected revenue dropping nearly 15% in 2024 compared to 2023, from approximately $2.1 billion in 2023 to as low as almost $1.8 billion in 2024.

89. The press release, titled "Preliminary FY2023 Financial Results and Initial 2024 Outlook," stated:

> As a result of our standard planning process for the upcoming year, including discussions with our Tier 1 customers to determine potential orders for 2024, ***we have become aware of excess inventory at our customers, which we believe to be 6-7 million units of EyeQ® SoCs.*** Based on our discussions, ***we understand that much of this excess inventory reflects decisions by Tier 1 customers to build inventory in the Basic ADAS category due to supply chain constraints in 2021 and 2022 and a desire to avoid part shortages, as well as lower than-expected production at certain OEM's during 2023. As supply chain concerns have eased, we expect that our customers will use the vast majority of this excess inventory in the first quarter of the year. As a result, we expect that first quarter 2024 revenue will be significantly below first quarter 2023 revenues*** and that we will see revenue normalized during the remainder of 2024.
>
> ***In FY2024 we expect total revenue in the range of $1,830 - $1,960 million***. This is underpinned by expected EyeQ® shipments of 31 – 33 million units (as compared to approximately 37m units in 2023) and SuperVision shipments of 175k – 195k units (as compared to approximately 100k units in 2023).
>
> ***We currently expect Q1 revenue to be down approximately 50%, as compared to the $458 million revenue generated in the first quarter of 2023***. We also currently believe that revenue over the balance of the year will be impacted by inventory drawdowns to a much lesser extent.

90. Notably, this revelation from Defendants called into question their shifting explanations and reassurances throughout the Class Period regarding inventory levels and demand, including Defendants' claims that increases in customer inventory had been minor and done by customers to avoid price increases.

91. Financial news reports picked up on this bombshell disclosure from Mobileye. *Globes*, a financial newspaper in Israel, noted: "***It is most surprising that a large company like Mobileye had not identified over the past year*** the slowdown in demand for products and had not prepared for this. Last April Mobileye did speak about problems in cancelled subsidies and a fall in performance in China, but ***we are now talking about a more complicated scenario***."

92. Analysts were likewise stunned by this disclosure, with analysts from Deutsche Bank stating that they expected "a meaningfully negative reaction to the stock." Those analysts noted with incredulity "***this large 2024 warning by the company, with no advance notice of any building inventory issues***[.]"Analysts from TD Cowen also "struggled with how Mobileye could so poorly align its EyeQ shipments with end vehicle production to this extent." Analysts from Morgan Stanley bluntly said: "***We cannot recall another example of an established supplier guiding down 50pct for a quarter*** (excluding exogenous shock/marco [sic] event) ***due to excess inventory in the channel***. May raise questions about the efficacy of business processes/systems at the company. It may take until deep into 2H24 to rebuild the market's confidence." The Morgan Stanley report also put the "magnitude" of the revelation in context, observing that the 6-7 million excess chips amounted to a stunning 16% of the entire 2024 forecast that the firm had previously estimated for Mobileye. Analysts from Bank of America described the significance of this disclosure while downgrading the stock: "***This is disappointing for investors that have been debating how fast revenue will grow, but now must struggle with what the 'actual' results were***

***in 2023, what 2024 results would have been, and implications for future growth***." An analyst at New Street Research expressed his surprise following Mobileye's announcement, citing a "belief among analysts and investors that Mobileye would be pretty immune to inventory corrections" based on the Company's previous disclosures. Likewise, analysts from Canaccord Genuity Capital Markets recognized that "Mobileye's true market demand" had been overstated and impacted for years:




93. Analysts swiftly adjusted their 2024 revenue estimates for Mobileye downward, further reflecting that prior to this announcement, they had been unaware that any inventory buildup, or risks that demand had been inflated, would impact Mobileye's business. For instance, as recently as December 2023, RBC Capital Markets had estimated that Mobileye would achieve approximately $2.6 billion in revenue and EPS of $0.87 during 2024. On the day of Mobileye's announcement, RBC immediately lowered its revenue expectations by more than 25%, down to $1.9 billion, and its EPS by ***62%***, down to just $0.33. Indeed, other analysts covering the Company also similarly reduced drastically their estimates for the Company's earnings, further reflecting that the market had been unaware of the issue and the threat it posed to the Company's growth:

| Analyst | 2024 Estimates Before January 4, 2024 Corrective Disclosure | Reduced 2024 Estimates After January 4, 2024 Corrective Disclosure | % Reduction in 2024 Estimates |
|---|---|---|---|
| Deutsche Bank | Revenue: $2.562b<br>EPS: $0.96 | Revenue: $1.885b<br>EPS: $0.35 | Revenue: -27%<br>EPS: -64% |
| TD Cowen | Revenue: $2.44b<br>EPS: $0.70 | Revenue: $1.890b<br>EPS: $0.36 | Revenue: -23%<br>EPS: -49% |
| Morgan Stanley | Revenue: $2.52b<br>EPS: $0.81 | Revenue: $1.875b<br>EPS: $0.29 | Revenue: -26%<br>EPS: -64% |
| Bank of America | Revenue: $ $2.785b<br>EPS: $0.80 | Revenue: $ 1.830-1.96b<br>EPS: $0.36 | Revenue: -32%<br>EPS: -55% |
| Canaccord Genuity Capital Markets | Revenue: $2.64b<br>EPS: Did not report | Revenue: $1.83B-$1.96b<br>EPS: Did not report | Revenue: -28%<br>EPS: Did not report |

94. Further demonstrating that Defendants had not adequately disclosed these issues to the market, after the January 4, 2024 announcement, analysts began to expressly refer to the excess inventory and risks it posed to their evaluation of the Company. For instance, after the January 2024 announcement, Goldman Sachs added the risk of "supply chain ***and inventory visibility***" to its list of "Key downside risks to our Buy thesis."

95. As a result of the January 4 disclosure, Mobileye's stock price fell $9.75 per share, or 24.5%, to close at $29.97 per share on January 4, 2024, on unusually heavy trading volume.

96. In the aftermath, Mobileye's management met with analysts to provide additional details. Analysts from Deutsche Bank published an updated report in which they explained that based on a "follow-up conversation with the company," they had learned that approximately two-thirds of the 6-7 million chip build up actually "accumulated during the 2021-2022 period" and that one-third was "generated during 2023." These analysts quickly connected the dots and recognized that Mobileye's sales "volume in the last few years,"—and as a result, Mobileye's financial results—had been "***inflated compared with real demand***."

97. Analysts also questioned Defendants' assertion in the January 4 press release that the inventory glut was the result of "decisions by Tier 1 customers to build inventory." As UBS

noted in a report, "***Why*** did Tier 1s continue to take more inventory?" Just a few weeks later, another analyst from RBC—who covered both Mobileye and Magna, one of the Company's primary Tier 1 customers—seemingly put the question directly to Magna during its earnings call for the fourth quarter of 2023. During that call, the analyst referred to "some inventory build chatter from a particular supplier in 2023 that impacted their 2024 kind of guidance"—a clear reference to Mobileye—and asked whether Magna was seeing a similar inventory build at its customers that "might be impacting your 2024 outlook, or are you not seeing that?" In response, Magna's CFO bluntly explained that "***We don't have the ability to do what they're doing***. We're in a pull system, so we're only able to sell to our customers what they call off. So, we don't have ***an ability to push stuff into the supply into our customers compared to that company you're referring to***." In other words, contrary to Defendants' assertion that Mobileye's customers had made a deliberate "decision" to build up inventory, Magna's CFO made clear that it was Mobileye who had "push[ed] stuff into the supply into [its] customers."

98. Just weeks later, on January 25, 2024, Defendants publicly confirmed what they had privately told analysts earlier that month. That day, Mobileye held its earnings call for the fourth quarter of 2023. During that call, an analyst from Deutsche Bank specifically asked: "My first question is around the chip destocking situation ***that you flagged a few weeks or so ago***. ***Can you maybe just go back over how you became aware of it***? ***How do you get confidence around the magnitude of the issue and the timing of it being resolved*** in line with what you reiterated today, please?" The nature of the analyst's question further demonstrates that the inventory build—and the full truth around any demand having been pushed to prior periods—and had not been disclosed prior to the January 4 announcement, and that there were still lingering concerns around Mobileye's ability to adequately assess the "magnitude" of the problem.

99. In response, Defendant Rojansky admitted that the "inventory buildup issue started actually three years" prior, in 2021. Defendant Rojansky admitted for the first time that Mobileye had required its customers to "make full-year commitment[s]" for 2022 and 2023, that gave "less ability from their side to adjust purchases to demand as they did pre-COVID period"–in fact, Defendant Rojansky admitted Defendants had made it "***impossible***" for Mobileye's customers to "adjust[] . . . the quantities" to match market conditions during 2022-2023 because they were "obligated with commitments" to Mobileye.

100. During this earnings call, an analyst asked Defendants to do some "cleanup here on the ADAS TAM" (total addressable market). The analyst asked whether it was "fair to see your 55% to 70% historical share maybe move to this, I don't know, 64%, 65%[.]" In other words, the analyst asked whether Mobileye's true market share was substantially lower than what Defendants had previously claimed. In response, Mobileye's Executive Vice President of Strategy and Business Development also admitted that the excess inventory buildup (that had been caused and concealed by Defendants) could require a "***correction to the market share***" that Defendants had touted. In an effort to minimize the impact of Defendants' channel-stuffing scheme on the Company's statements purportedly describing its overall share of the ADAS market, this executive re-emphasized that "the inventory levels that we've disclosed were accumulated over a period of time that is longer than a year," and suggested that this would only "account[] for maybe 1%, 2% of the market share calculation that we have had in the past." While this executive suggested he disagreed with the analyst's numbers, his explanation failed to rebut the analyst's conclusion.

101. In 2021 and 2022, Defendants sold approximately 62 million units of EyeQ chips, of which 4-5 million were excess units. As one analyst explained, the "true market" for Mobileye's chips was therefore 57-58 million units. *See* ¶92 (graphic). Mobileye thus inflated its sales figures

by ***more than 7%*** those years. Then, in 2023, Defendants sold another 37 million units, 2-3 million of which were excess, again inflating sales ***by approximately 7%***.

102. Defendants also admitted that at the end of 2023, customers had stopped making year-long commitments and that Mobileye had reverted to its traditional practice of taking "quarterly orders" from its customers. Defendants assured investors that this change enhanced the Company's visibility into its volume pipeline, stating that visibility "since January 4th has improved because we have commitments for Q1," and that Defendants also had "more visibility in terms of Q2 starting to adjust into commitments."

103. Analysts understood immediately that the year-long mandatory commitments had decoupled inventory from true demand. For instance, Fox Advisors noted that Mobileye was "now receiving customer orders on a quarterly basis, which it thinks align to vehicle demand expectations." Analysts from BNP Paribas similarly noted that Mobileye's customers had "transitioned back to quarterly volume agreements, which should significantly mitigate the magnitude risk of channel inventory surprises." In other words, analysts now appreciated that the annual commitments—the extent of which had never been previously disclosed in full—had decoupled sales from demand. Conversely, quarterly purchase orders—consistent with industry practices and which Defendants themselves had indicated was their normal practice—would allow Tier 1 customers to respond to changing levels of demand and accordingly realign sales with true market conditions.

104. Defendants, however, continued to conceal the full extent of the impact from their abuse of the minimum commitment deals. Specifically, Defendants claimed during the call to have "implemented additional processes to more closely monitor shipments versus demand," and

assured investors that the "the majority of the excess inventory should be cleared by the end of Q1." Defendant Rojansky further stated that:

> ***At the end of the day, we had a very thorough analysis of again ADAS production per OEM*** to understand that in order to meet the production of this year, that's what we need to provide, of course, taking into account the inventory issue. ***So we have better visibility***. We also, of course, we've mentioned Q1, we have also some visibility to Q2 that we said will be at least 100% higher than Q1. ***And for the rest of the year, again, in line with production expectation and the analysis and what we heard from our customers***, that's where we think we're going to land."

105. Thus, Defendants reiterated Mobileye's revenue guidance for fiscal year 2024, projecting revenue between approximately $1.83 and $1.96 billion, assuring investors the surprises were over.

106. Shortly thereafter, Mobileye filed its next Form 10-K on February 23, 2024. That filing now included language stating that "In late 2023, we returned to our pre-global material shortage practice of having customers commit to certain quarterly volumes," and that the Company's customers had "generally reverted to our customary practice of committing to purchase quantities of our solutions on a quarterly basis."

107. On April 25, 2024, Mobileye held its earnings call for the first quarter of 2024, during which Defendants announced revenue results consistent with expectations and continued to assure investors that the "inventory consumption process is on track" at its customers, and thus that Mobileye sales would quickly resume as Defendants had previously guided. Defendant Rojansky specifically assured that this guidance continued to be "supported by regularly updated indication from our customers, which have been quite stable over the last couple of months. And it also appears to be reflective of the true level of demand in the back half of 2024 based on our own analysis of OEM production forecast." Defendant Shashua also assured investors that Mobileye's first quarter 2024 performance "***should address any open question on whether the***

***excess inventory indicated some weakening of our position and opportunities for a continued growth***," asserting emphatically: "***It did not***."

108. Analysts were comforted by Defendants' reaffirmed guidance, which they understood to be backed by Mobileye's communication with Tier 1 customers and independent analyses. For example, analysts from Barclays noted that "While there were some concerns into the print that MBLY would need to cut guidance amid a need for further restocking, MBLY importantly noted that 'inventory consumption and the expected quarterly cadence of EyeQ SoC deliveries over the course of 2024 remains on track with our prior guidance.'"

### F. The Full Truth Emerges As Defendants Reduce Guidance Even Lower From Reduced EyeQ Volume As They Are No Longer Able To Force Excess Inventory Onto The Company's Customers

109. On August 1, 2024, investors finally learned the full truth that had been concealed by Defendants' illicit scheme. On that day, Mobileye shockingly announced they were reducing guidance for the year, even below the guidance that they had provided since January 2024 and consistently affirmed since. Specifically, Defendants significantly reduced revenue guidance for the 2024 fiscal year by another ***13%***, from a range of $1.83 billion to $1.96 billion (as provided in January 2024), down to a range of $1.6 to $1.68 billion—meaning that Mobileye's 2024 revenue would be nearly half a billion dollars ***less*** than in 2023, and a far cry from the years of consistent revenue growth before. Further, Defendants advised that EyeQ volumes were now expected to be just 28-29 million units for the year, down from the 31-33 million units previously guided — meaning that EyeQ volumes in 2024 would fall ***nearly 25%*** from the 37 million units reported in 2023.

110. During the Company's earnings call that same day, Defendants directly acknowledged a connection between the excess inventory buildup and the new guidance reduction. Defendants explained that the guidance reduction was driven primarily by lower EyeQ volumes in

China, and conceded the excess inventory issue had "***potential[ly] some residual in China.***" Defendants further stated that the "decline in terms of shipments of the second half of the year" in China "could come from multiple sources" including specifically "***some residuals of inventory*** . . . ***we don't have 100% visibility to what is going on in inventory***." These revelations directly contradicted what the market had been told and understood for months. For example, in Deutsche Bank's January 26, 2024 report, the analyst reported its understanding from the Company that the "***excess inventory is expected to be largely cleared in 2Q*** [2024]" and that Mobileye "***is taking multiple measures to better monitor shipments and inventory levels relative to demand.***"

111. Now, however, despite months of these and similar assurances from Defendants that the inventory consumption was on track to return to normal (and that Defendants had the processes to make these determinations accurately), Defendants revealed on August 1, 2024 that (i) EyeQ volumes would collapse further, (ii) Defendants did not have full visibility into China, a critical market for the Company's growth, and (iii) as a result, revenue would be even lower than previously represented.

112. On this news, Mobileye's stock price fell $4.72 per share, or 22.5%, to close at $16.28 per share on August 1, 2024, on unusually heavy trading volume.

113. Analysts were shocked by Defendants' unexpected disclosure and criticized management, linking the stock reaction to Defendants' reduced guidance and projected EyeQ shipments. For instance, analysts from Evercore criticized management's lack of transparency, stating that "***investors will remain HIGHLY FRUSTRATED***." Analysts from TD Cowen bluntly complained that there was "***No way to sugarcoat it—we struggle to rationalize a second material cut to 2024 guidance this year***" and that "***Another significant guide down following the miss entering the year is tough to swallow***." TD linked the news to the continued fallout from the

excess inventory, noting the "still understandable skepticism of visibility into customer order books following the hard 1Q24 reset." Barclays analysts likewise noted that "MBLY mgmt credibility has been challenged," including because "the shock from the January 2024 guide down on an outsized inventory build at customers in MBLY's core EyeQ business was a ***clear negative for the credibility of mgmt with investors*** as it raised questions on their visibility into the business."

114. Within weeks, analysts at Wolfe Research recognized that the revelations had "meaningfully changed" the analysis of Mobileye. "~18 months ago, investors broadly viewed them as a mkt share leader across ADAS . . . ***Now, MBLY is increasingly being seen as a market-share loser in base ADAS*** . . . ***Mgmt's messaging here remains very poor, and we don't see that changing anytime soon***."

115. All told, Mobileye's stock price fell approximately 70% from its Class Period high as the truth was fully revealed at the end of the Class Period, and has not yet recovered.

## V. ADDITIONAL ALLEGATIONS OF SCIENTER

116. A host of facts, in addition to those discussed above, collectively support a strong inference that Defendants knew, or at minimum were extremely reckless in not knowing, the true and omitted facts.

### A. Defendants Knew That The Company Had Departed From Its Ordinary Sales Practices And Forced "Obligations" Onto Its Tier 1 Customers, Which Decoupled Sales From Demand And Resulted In The Inventory Build-up

117. In January 2024, Defendants admitted that during 2022 and 2023 (i.e., the periods just before and during the Class Period), Mobileye had departed from its prior, general practices and "***obligated***" its customers with "***full-year commitment[s]***" for minimum EyeQ volumes decoupled from true market demand. Defendants candidly admitted that these minimum commitments made it "impossible" for Mobileye's customers to "***adjust purchases to demand as***

***they did***" previously, and Defendants forced their customers to accept millions more EyeQ chips than needed. In fact, Defendants pushed inventory onto Mobileye's customers even when its customers told Mobileye that there was no demand for more EyeQ chips. As a result, Defendants' statements that they only shipped inventory based on "market conditions," and that Mobileye's customers had "so much capacity" to take on more product from Mobileye, were simply false.

118. Defendants were able to force the Company's customers into these atypical and unusual commitments because of Mobileye's dominance in the ADAS industry. Mobileye's competitors, customers, and analysts acknowledged Mobileye's market power in the ADAS space. Prior to the Class Period, Qualcomm's CFO described Mobileye as the "incumbent clearly, in ADAS," and Ambarella's CEO noted that Mobileye "***really dominate[s]***" the ADAS market. Shortly after Defendants' channel stuffing scheme was disclosed, the CFO of Magna International, one of Mobileye's top Tier 1 customers, publicly discussed Mobileye's "***ability to push stuff into the supply***." Likewise, FE 1, who worked at Aptiv, one of Mobileye's three largest Tier 1 customers, confirmed that Aptiv was forced to enter into contracts with Mobileye that included a minimum order commitment, because there was no adequate alternative on the market to Mobileye's EyeQ chip. According to FE 1, Aptiv only entered into these extended commitment contracts because there was no other way to ensure that Aptiv would receive enough chips to meet its own obligations.

119. Defendants knew or at minimum were at least severely reckless to the terms and impact from the "obligations" forced on Mobileye's biggest and most critical customers concerning its flagship product. Defendants spoke directly about these subjects in their public comments, including around the cadence of volumes shipped and requests by their customers to adjust volumes. Further, Defendants' personal involvement and awareness is corroborated by

FE 2, a former Mobileye employee who reported to an executive that directly reported to Defendant Shashua. FE 2 explained that the decision to push inventory to the Tier 1 customers "went up to Amnon," (Defendant Shashua), and FE 2's team was told to ensure that Tier 1 customers purchased the amount of product they had committed to. FE 2 stated that there were quarterly meetings that executive management, including Mobileye's CFO (at the time, Defendant Heller), would attend. During these meetings, FE 2 explained, Tier 1 customers or the reports that they provided might be discussed if there were issues with the Tier 1 suppliers or if things were not going as planned.

### B. Defendants Possessed Contemporaneous Knowledge That Mobileye's Customers Had Excess Inventory

120. Multiple facts show that Defendants knew that Mobileye had forced its customers into obligations and shipped millions of EyeQ chips more than there was demand for. Thus, given the existence of the minimum commitment agreements, it is implausible that Defendants would not have (i) known the volume of EyeQ chips it was shipping, (ii) known the production forecast provided to Tier 1 customers by OEMs, and (iii) compared the inventory volume at Tier 1 customers against market demand. Given the ease with which Mobileye obtained detailed information on the inventory levels at its Tier 1 customers, there is a strong inference that Defendants had this same information throughout the Class Period. At minimum, any failure by Defendants to acquire and review this information could only have been reckless, particularly as they continued to personally and directly speak about these issues.

121. ***First***, at all times throughout the Class Period, Defendants knew the volume of EyeQ chips that Mobileye shipped to its Tier 1 customers. By Defendants' own admission, the agreements that Mobileye forced onto its Tier 1 customers had a minimum lengthy volume commitment and further made it "impossible" for customers to "adjust[] . . . the quantities" relative

to fluctuations in demand because the contracts left customers "obligated with commitments." Thus, Defendants knew exactly how much inventory Mobileye ***would*** ship to its customers during both 2022 and 2023 and how much it ***did*** ship.

122. The fact that Tier 1 customers could not change the volume of EyeQ chips ordered under these minimum commitment deals, and that Mobileye had knowledge of how many EyeQ chips it shipped to its customers, was confirmed by FE 1. Indeed, FE 1 stated that Aptiv was not allowed to cancel or reduce any orders that had been made under its minimum commitment deal with Mobileye, even though it wanted to cancel orders to avoid building up excess inventory during the Class Period. Even when demand declined, Mobileye did not allow any volumes to be adjusted.

123. ***Second***, at all relevant times, Defendants knew the production forecast for automobiles using EyeQ chips necessary to analyze the shipment-to-demand cadence, which would have revealed the inventory buildup. Industry practices in the automobile supply chain dictated that Mobileye would receive reports with both short- and long-term forecasts from the Company's Tier 1 customers. As affirmed in a May 2017 article from Automotive Logistics, companies in the automotive supply chain such as Mobileye and its Tier 1 customers "work off forecasts, schedules and orders communicated by the OEM which are cascaded down to each tier of suppliers." These forecasts would include the electronic exchange of information regarding inventory levels and forecasted demand data from OEMs to Tier 1s, that would have been relayed to Mobileye via EDI systems. Several of Mobileye's Tier 1 customers have confirmed that they use such systems.

124. That Mobileye received these sorts of reports is further corroborated by former employees of both Mobileye and one of its three largest customers. According to FE 1, each week, Aptiv provided Mobileye with firm orders, which would have informed Mobileye of immediate,

short-term demand for the EyeQ chip. These weekly reports from Aptiv also included a long-term 18-month forecast. This 18-month forecast was updated each week to Mobileye by Aptiv to include adjustments to future demand.

125. Further, FE 2—Mobileye's former VP of ADAS Business Development who ran the team responsible for winning ADAS business from both OEMs and Tier 1 suppliers—confirmed that the excess inventory at Mobileye's Tier 1 customers existed "across the board" when she left the Company at the end of 2022, and explained that she learned of the excess inventory because her team received reports from the Tier 1 suppliers..

126. ***Third,*** Mobileye had the ability to conduct ongoing analyses of EyeQ volume shipped relative to production forecasts—and Defendants expressly discussed doing so during the Class Period. For example, in Mobileye's 2023 Form 10-K, Defendants stated that Mobileye shipped volume based on "market conditions" and analyzed its own inventory of EyeQ chips based on "future demand and market conditions."

127. Defendants further stated that they analyzed shipment-to-demand data specifically. For instance, on January 26, 2023, Defendant Heller stated during Mobileye's fourth quarter 2022 earnings call that Mobileye's projected "volume level ***corresponds to about 1% global production growth, 4 to 5 points of ADAS production growth***." On April 27, 2023 Defendant Heller publicly referred to customer "inventory levels and considerations versus demand," including as "based on the latest indications from Tier 1[s]." On July 27, 2023, Defendant Shashua stated Mobileye had "***seen the production schedule solidify*** for the second half of the year," and that the "***schedule [was] stabilizing in terms of EyeQ***." Likewise on March 6, 2024 at the Morgan Stanley Technology, Media & Telecom Conference Fireside Chat, Defendant Galves stated that Mobileye conducted "***shipment to demand matching analysis*** … ***on a regular cadence, both on a look back***

***and look forward basis***." On April 25, 2024, at Mobileye's first quarter 2024 earnings call, Defendant Rojansky stated that "***we've actually analyzed the gap between what we actually shipped in Q1 and what we would expect to ship*** if we didn't have the inventory issue." Thus, in these and other statements, Defendants confirmed that—as the market expected—Defendants analyzed production schedules throughout the Class Period, including specifically for the Company's EyeQ chip.

128. ***Fourth,*** throughout the Class Period, Mobileye's three largest Tier 1 customers accounted for an overwhelming majority of Mobileye's annual revenue. This is not a case where there were hundreds of customers, or where reaching out to these parties was difficult or time-consuming. To the contrary, Defendants stressed their regular communication with those (and other) customers. For example, Defendant Shashua stated: "We are in continuous contact with our customers, the Tier 1s about trying to balance out from a quarter-to-quarter." This fact further demonstrates the ease with which Defendants could have (and did) discover the information regarding the inventory buildup at the Company's Tier 1 customers.

129. ***Fifth***, Defendants' shifting explanations for potentially-elevated inventory levels suggest that Defendants were attempting to deceive investors. At the beginning of the Class Period, Defendants claimed that customers had entered 2023 with somewhat elevated inventory levels due to opportunistic purchases by Tier 1 customers in anticipation of pricing increases by Mobileye, and gave investors the impression that customers would not continue to acquire excess inventory untethered from demand. Later, Defendants stated in their SEC filings that customers had increased purchases "in prior periods" in order to avoid potential supply chain constraints. Both explanations were false and misleading. In truth, the increased inventory levels at Tier 1 customers were due to Mobileye's decision to ship millions of excess EyeQ chips. Even before the start of

the Class Period, Defendants had already sold 4-5 million EyeQ chips in excess of market demand, and continued to ship millions more throughout 2023. Given Defendants' claim to investors that they had insight into their customers' inventory levels, and it is implausible that Defendants did not know by ***how much*** inventory had already been elevated beyond demand, or that it continued to stay elevated throughout the Class Period.

130. ***Sixth***, Defendants claimed in January 2024 that they had purportedly discovered the elevated inventory levels in late 2023 pursuant to their "standard planning process" for the upcoming year. It is unreasonable to infer that Defendants' standard planning process would not have uncovered the same information the previous year. Pursuant to this standard planning process, Defendants would have learned in late 2022 (meaning, ***before*** the Class Period) that its customers had already accumulated 4-5 million excess EyeQ chips. There is no reasonable basis to infer that Defendants' planning process changed between 2022 and 2023.

### C. The Concealed Sales Practices Enabled Defendants To Consistently Hit Guidance And/Or Analyst Consensus Expectations

131. Defendants' scheme enabled Mobileye to meet financial performance guidance and/or analyst consensus estimates. Absent their scheme, Mobileye would have missed both its annual revenue guidance and quarterly analyst consensus figures throughout the Class Period. Indeed, in the wake of the January 2024 disclosure, analysts from Deutsche Bank noted that Mobileye's revenue had effectively been overreported since the start of the Class Period, because sales of EyeQ chips were "***inflated compared with real demand***."

132. That Defendants' concealed practices allowed Mobileye to report that it met and even exceeded its financial guidance and analyst consensus expectations during the Class Period further supports a strong inference of scienter.

### D. The EyeQ Is A Core Operation To Mobileye

133. Nearly all of Mobileye's revenue stemmed from sales of the EyeQ chip. As Defendants admitted, the EyeQ was "fundamental to [Mobileye's] leadership position in ADAS." In 2022, the year before the Class Period, Mobileye reported revenue of $1.9 billion, approximately ***89%*** of which came directly from sales of EyeQ chips. During the Class Period, the EyeQ accounted for approximately ***90%*** of the Company's revenue. Given the importance of EyeQ sales to Mobileye's financial success, it is unreasonable to infer that Defendants were unaware that they had sold millions of excess chips to Tier 1 customers. Indeed, throughout the Class Period, Defendants spoke regularly about inventory levels for the EyeQ chip and Mobileye's sales of the chip to its customers.

134. The alternative inference is that Defendants did not have any basis for discussing inventory levels and demand for the EyeQ chip. This inference does not negate or undercut scienter, however, because it would evince an extremely reckless disregard for the underlying facts that made Defendants' statements false or misleading during the Class Period. The core nature of EyeQ chip sales to Mobileye's financial success strengthens the inference of scienter.

135. The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of scienter.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

136. Throughout the Class Period, Defendants made a series of materially false and misleading representations, which were disseminated to investors through conference calls, public filings, press releases, and other public statements. The materially false and misleading statements and omissions made by Defendants during the Class Period are detailed below, along with the reasons why each statement was false or misleading.

### A. Defendants' False And Misleading Statements In The Company's Form 10-K and Forms 10-Q

137. As described below, Defendants made material misrepresentations in the Company's Annual Report filed on Form 10-K on March 9, 2023 (the "2022 Annual Report), the Company's Quarterly Report filed on Form 10-Q on May 11, 2023 (the "Q1 2023 Quarterly Report"), the Quarterly Report filed on August 10, 2023 (the "Q2 2023 Quarterly Report"), the Quarterly Report filed on November 9, 2023 (the "Q3 2023 Quarterly Report").

138. In the 2022 Annual Report, which was signed by Defendants Shashua and Heller, Defendants described the Company's contracts with its customers:

> ***We generally do not have contracts with customers that require them to purchase our solutions in any certain quantity or at any certain price***, and our sales could be less than we forecast if a vehicle model for which we achieved a design win is unsuccessful, including for reasons unrelated to our solutions, if an OEM decides to discontinue or reduce production of a vehicle model or of the use of our solutions in a vehicle model, or if we face downward pricing pressure. . . ***Due to the recent global material shortage, we have been working with our customers to ensure they commit to certain volumes in order to secure quantities. However, we have not committed to supply such volumes and the volumes we supply will depend upon market conditions***.

139. The statements identified in ¶138 were materially false and misleading, and omitted material facts. It was misleading to claim that Mobileye "generally" did not have minimum quantity commitments with its customers, when in fact Mobileye had minimum commitment agreements with at least the customers who generated the overwhelming majority (at least 70%) of the Company's revenue. Moreover, contrary to Defendants' claims that Mobileye had only "recent[ly]" "been working with our customers to ensure they commit to certain volumes" and "generally do not" require customers to purchase "in any certain quantity," Mobileye had required the Company's critical Tier 1 customers to purchase millions of EyeQ units in excess of demand and made it "impossible" for those customers to "adjust the quantities" of EyeQ chips supplied to them by Mobileye to align with market conditions.

140. Further, contrary to Defendants' claims that "the volumes we supply will depend upon market conditions," the volumes that Mobileye shipped depended on the volumes which Mobileye had committed its customers to purchasing. As a result, Mobileye had already shipped at least 4-5 million EyeQ chips in excess of demand before the Class Period, and Mobileye would ultimately ship ***another*** 2-3 million excess EyeQ units during the Class Period.

141. The 2022 Annual Report further stated that:

> We have not executed written agreements with these Tier 1 customers but rather provide our solutions to such customers pursuant to standard purchase orders under our general terms and conditions, ***pursuant to which they are generally not obligated to purchase our solutions in any certain quantity or at any certain price***. . . . Notwithstanding the foregoing, as a result of global shortages, ***some of our customers, including our top three Tier 1 customers, have committed to purchasing minimum quantities of certain solutions in 2023***.

142. The statements identified in ¶141 were materially false and misleading, and omitted material facts. Defendants' statements created the misleading impression that minimum quantity commitments were a limited exception to Mobileye's historical practices, when in fact they were a significant driver of Mobileye's financial performance in 2022 and 2023 that Defendants used to force onto its customers 6-7 million EyeQ units in excess of market conditions, including 4-5 million excess EyeQ units by the start of 2023. The statements further concealed that Defendants had required its customers to enter into these obligations and made it impossible to adjust to market conditions throughout 2023, enabling Mobileye to ship another 2-3 million excess EyeQ units that year and cannibalizing future growth.

143. The 2022 Annual Report also disclosed revenue numbers for the Company's most recent fiscal years:

> For 2022, 2021 and 2020, our revenue was $1.9 billion, $1.4 billion and $967 million, respectively, ***representing year-over-year growth of 35% in 2022 compared to 2021***. We currently derive substantially all of our revenue from our commercially deployed ADAS solutions.

144. The statements identified in ¶143 were materially false and misleading, and omitted material facts. Defendants' statements describing the Company's growth in 2022 were misleading because they failed to disclose that this purported growth was driven by shipping millions of EyeQ chips in excess of market demand. The statements created a misleading impression that Mobileye's growth was organic and reflected underlying demand for Mobileye's product, when in fact Defendants had made it "impossible" for the Company's critical Tier 1 customers to "adjust[] . . . the quantities" of EyeQ chips supplied to them by Mobileye.

145. The 2022 Annual Report and Quarterly Reports also made substantively identical statements concerning demand for Mobileye's products. For instance, the 2022 Annual Report stated:

> ***In addition, in prior periods, certain Tier 1 customers increased their orders for components and parts***, including our solutions, ***to counteract the impact of supply chain shortages for auto parts***, and we expect these Tier 1 customers will utilize accrued inventory on hand before placing new orders to meet the demand of OEMs in current or future periods. As a result, ***some demand for our solutions and the corresponding revenue from these customers were shifted to earlier time periods than otherwise would have occurred*** absent a general supply chain shortage and inflationary environment. We cannot predict when the impact of these factors on global vehicle production will substantially diminish. ***However, ADAS volumes have grown faster in recent years than the overall automotive market as ADAS penetration rates have increased, and we believe that we will continue to benefit from that trend. Our revenue of $1.9 billion for the year ended 2022 was up 35% year-over-year, outperforming the increase of global automotive production***. However, we believe that the expected continued constraint on global automotive production resulting from supply chain shortages and the effects of economic uncertainty will limit our ability to increase our revenue. We expect to continue to capitalize on our strong and collaborative relationships with OEMs and Tier 1s to expand our presence in key markets and capture the long-term growth opportunities in those markets.

146. The statements identified in ¶145 were materially false and misleading, and omitted material facts. It was false and misleading to state that Mobileye's customers had "increased their orders . . . to counteract the impact of supply chain shortages" and that that "some demand" had shifted to earlier time periods. In fact, Mobileye had shipped ***millions*** of excess EyeQ units beyond

market demand. Moreover, customers had not simply "increased their orders," but instead Mobileye had forced on its Tier 1 customers annual minimum quantity commitments that made it "impossible" for those customers to adjust volumes to match demand. For example, FE 1 affirmatively confirmed that Aptiv—one of Mobileye's largest customers—did not want to order more EyeQ units, but actually wanted to cancel orders, and Mobileye would not allow Aptiv to do so. Further, referring only to "prior periods" created the materially misleading impression that volumes shipped now matched demand, when in fact the minimum quantity commitments that Defendants had imposed enabled them to ship in 2023 ***another*** 2-3 million excess EyeQ units beyond market conditions.

### B. Defendants' False And Misleading Misrepresentations In Earnings Releases, Investor Conferences, And Other Public Statements

#### 1. Misrepresentations In The Q4 2022 Earnings Release And Call

147. On January 26, 2023, the first day of the Class Period, Mobileye issued a press release announcing its financial results for the fourth quarter and full-year 2022. The press release stated that "[r]evenue of $565 million increased 59% as compared to fourth quarter of 2021." EyeQ sales accounted for approximately 90% of Mobileye's revenue, and were therefore responsible for almost all of Mobileye's revenue increase. Defendant Shashua also stated that "EyeQ® SoC-related revenue grew 48% in the quarter ***due to a combination of volume and ASP [average sale price] growth***."

148. That same day, Mobileye held an earnings conference call, during which Defendants made additional statements regarding Mobileye's fourth quarter 2022 revenue. For instance, during the call, Defendant Shashua touted Mobileye's "record" year in 2022. Defendant Shashua stated that Mobileye's "***front-facing camera, single-chip ADAS business continues to run like a machine. We grew revenue with every one of our top 10 customers in 2022*** and

continue to win significant new business in this segment." Defendant Shashua similarly told investors that the "***the source of our growth started to shift from pure volume to a combination of volume and higher content per vehicle***."

149. The statements identified in ¶¶147-48 were materially false and misleading, and omitted material facts. Defendants' claims that (i) Mobileye's "ADAS business continues to run like a machine," (ii) Mobileye "grew revenue with every one of our top 10 customers in 2022," and that (iii) the "source" of Mobileye's growth included increased "volume," concealed that volume had grown because Defendants forced Tier 1 customers into obligations to purchase minimum quantities beyond market conditions. Defendants' statements falsely created the impression that Mobileye's performance corresponded to organic growth and demand, when in fact Defendants had shipped millions of its flagship EyeQ chips (and recognized millions of dollars in revenue) beyond the market conditions, cannibalizing future growth.

150. During that call, Defendant Heller discussed Mobileye's guidance for 2023. Specifically, he told investors that Mobileye's guidance assumed "***EyeQ volume that is somewhat below the commitment that we have received from our customers for 2023.*** We want to remain ***conservative*** and acknowledge that the macro uncertainty remains elevated."

151. The statements identified in ¶150 were materially false and misleading, and omitted material facts. It was materially misleading for Defendants to discuss the "commitment" that Mobileye had "received" from its customers, and to claim that Defendants were "conservative" in providing volume guidance based on those commitments. In fact, Defendants had forced Tier 1 customers into obligations to purchase minimum quantities and that made it "impossible" for those customers to adjust to those orders regardless of market conditions. Moreover, it was further misleading to claim that the guidance based on these commitments was "conservative" when in

fact—as Defendants knew but did not disclose—the minimum commitments they had forced customers into enabled Mobileye to ship millions of EyeQ units in excess of true organic demand. In addition, Defendants' statements falsely suggested that the volumes from those commitments could be adjusted or altered throughout the year, when in fact Defendants made it impossible to adjust to market conditions.

152. In addition, Defendant Heller informed investors that Mobileye expected EyeQ revenue to be somewhat lower in Q1 2023 than it was in Q4 2022. Defendant Heller claimed that this was due to "general conservatism on the part of our customers ***as well as some impact from elevated purchases ahead of the EyeQ price increase that went into effect on January 1***."

153. The statements identified in ¶152 were materially false and misleading, and omitted material facts. It was materially misleading for Defendants to claim that EyeQ revenue would be lower in Q1 2023 because customers had increased orders during Q4 2022 in anticipation of price increases. Defendants' statement failed to disclose that Q4 2022 revenue reflected higher volumes because Mobileye's customers were obligated to accept the full quantity of EyeQ chips required under the minimum commitment agreements Mobileye had forced them to agree to. For instance, FE 1 explained that if Aptiv had not ordered all of the chips required under the minimum commitment deals, in November or December, Mobileye would simply deliver, "without question," all of the remaining chips.

154. Defendant Heller also stated on the call that the distribution of Mobileye's revenue was likely to be slightly skewed toward the second half of the year, stating:

> On the positive side, we have commitment from our suppliers at the level we are forecasting, including a second half run rate that supports our 2024 forecast as well. ***In terms of quarterly cadence***, historically, our revenue has ramped up over the course of the year. ***This year is expected to be even more pronounced, with around 41% of revenue expected in the first half of the year***."

155. The statements identified in ¶154 were materially false and misleading, and omitted material facts. It was materially misleading for Defendants to discuss the "quarterly cadence" of revenue because Defendants forced Tier 1 suppliers into extended commitments for volumes substantially in excess of actual demand. Thus, Defendants' discussion of the quarterly cadence misleadingly suggested that Mobileye's shipments would reflect market conditions, when in fact Defendants had made it "impossible" for customers to adjust their volume commitments and would force Mobileye's customers to accept chips by year-end regardless of their demand.

### 2. Misrepresentations During The February 2023 Wolfe Research Conference

156. On February 15, 2023, Defendants spoke at the Wolfe Research Global Auto, Auto Tech, and Mobility Conference. Defendant Galves touted the purported "capacity" that Mobileye's customers had to take on more inventory from Mobileye, stating: "***And our Tier 1s have so much capacity*** to buy cameras, put them into housings, take our chip, put them onto the PCB board and deliver it to the OEM that we think that our ecosystem is also the cost leader pretty significantly. So, it's a very kind of long visibility business, so we feel comfortable with our share."

157. The statements identified in ¶156 were materially false and misleading, and omitted material facts. Defendants' claims that Mobileye's Tier 1 customers had "so much capacity" to "take our chip" concealed that Mobileye had already forced its customers to accept millions more units than they wanted and in excess of market conditions. Moreover, Mobileye had forced them into commitments that pushed millions more excess chips by year-end 2023, when customers had already communicated directly to Defendants that they had excess inventory and did not need additional product. In truth, those customers did ***not*** have capacity to take more chips, and as a result, 2024 orders would fall dramatically compared to 2023, as customers worked through the excess inventory Mobileye had shipped.

### 3. Misrepresentations During The March 2023 Raymond James Conference

158. At the Raymond James Institutional Investors Conference on March 6, 2023, in response to an analyst question on how "visibility looks in kind of the long duration," Defendant Galves touted Mobileye's "long history" of outperforming the market and that the Company "expect[s] that to continue":

> Question – Analyst Brian Gesuale: "That's exciting. Maybe pivoting now to the financials. Let's start maybe with the top line. Take us through kind of your expected kind of growth rates going forward, how your visibility looks in kind of the long duration of a lot of the design wins that you've had."
>
> Answer – Defendant Galves: "***So, we have a long history of kind of outperforming the market. We would expect that to continue***. I think volume growth is going to be there because you've got – we have kind of long visibility. Our programs run for six, seven, eight years. So when we win a design, we kind of understand. I mean, obviously, the car needs to get produced to have the technology. But assuming that cars continue to get produced, ***we have great visibility on our growth. So, I think that that type of growth rate continues."***

159. The statements identified in ¶158 were materially false and misleading, and omitted material facts. Defendant Galves' statement that Mobileye had a "long history of kind of outperforming the market" was materially misleading because it concealed that Mobileye's performance involved years of shipping EyeQ chips beyond market conditions and forcing Tier 1 suppliers to purchase quantities substantially in excess of actual demand. Defendants' statements were further materially misleading because they created the impression that Mobileye's performance corresponded to organic growth and demand, when in fact Defendants had shipped millions of its flagship EyeQ chips (and recognized millions of dollars in revenue) beyond the demand for them.

160. At the conference, Defendant Galves also discussed Mobileye's position in the ADAS market. Defendant Galves stated that because of Mobileye's growth in the ADAS market, it now had "***about 70% market share within that field.***"

161. The statements identified in ¶160 were materially false and misleading, and omitted material facts. As Mobileye's Vice President of Strategy and Business Development later admitted publicly, the calculations used for Defendants' publicly provided market share would require a "correction" because the millions of EyeQ units shipped by Defendants in excess of market conditions had decoupled sales from the true organic size and growth of the market. In 2021 and 2022, Defendants sold approximately 62 million units of EyeQ chips, of which 4-5 million were excess units. As one analyst explained, the "true market" for Mobileye's chips was therefore 57-58 million units. *See* ¶92 (graphic). Mobileye thus inflated its sales figures by more than 7% those years. Then, in 2023, Defendants sold another 37 million units, 2-3 million of which were excess, again inflating sales by approximately 7%.

#### 4. Misrepresentations At The March 2023 Morgan Stanley Conference

162. On March 8, 2023, Defendants spoke at the Morgan Stanley Technology, Media and Telecom Conference, and again fielded questions from analysts regarding Mobileye's position in the ADAS market share. Defendant Galves repeated his prior statements that Mobileye maintained a "very strong position in the ADAS business" and specifically, that it held a "***70% market share***."

163. The statements identified in ¶162 were materially false and misleading, and omitted material facts. As Mobileye's Vice President of Strategy and Business Development later admitted publicly, the calculations used for Defendants' publicly provided market share would require a "correction" because the millions of EyeQ units shipped by Defendants in excess of market conditions had decoupled sales from the true organic size and growth of the market. In 2021 and 2022, Defendants sold approximately 62 million units of EyeQ chips, of which 4-5 million were excess units. As one analyst explained, the "true market" for Mobileye's chips was therefore 57-58 million units. *See* ¶92 (graphic). Mobileye thus inflated its sales figures by more than 7% those

years. Then, in 2023, Defendants sold another 37 million units, 2-3 million of which were excess, again inflating sales by approximately 7%.

### 5. Misrepresentations At The April 2023 Bank Of America Conference

164. On April 4, 2023, Defendants spoke at Bank of America Securities Annual Summit, and again fielded questions from analysts that addressed Mobileye's control over the ADAS market. Once again, Defendant Galves stated that the EyeQ chip held a ***"70% market share"*** in the ADAS business.

165. The statements identified in ¶164 were materially false and misleading, and omitted material facts. As Mobileye's Vice President of Strategy and Business Development later admitted publicly, the calculations used for Defendants' publicly provided market share would require a "correction" because the millions of EyeQ units shipped by Defendants in excess of market conditions had decoupled the volume of units shipped from the true organic size and growth of the market. In 2021 and 2022, Defendants sold approximately 62 million units of EyeQ chips, of which 4-5 million were excess units. As one analyst explained, the "true market" for Mobileye's chips was therefore 57-58 million units. *See* ¶92 (graphic). Mobileye thus inflated its sales figures by more than 7% those years. Then, in 2023, Defendants sold another 37 million units, 2-3 million of which were excess, again inflating sales by approximately 7%.

### 6. Misrepresentations In The Q1 2023 Earnings Release And Call

166. On April 27, 2023, Mobileye issued a press release announcing its financial results for first quarter 2023. This press release was included as an exhibit to Mobileye's Form 8-K filed that day. In the press release, Defendants attributed Mobileye's impressive revenue growth to certain purportedly legitimate business factors. The press release stated that "[r]evenue of $458 million increased 16% as compared to first quarter of 2022. EyeQ® SoC-related revenue grew 48% in the quarter ***due to a combination of volume and ASP [average sale price] growth***."

167. In the same press release, Defendant Shashua stated that:

> The business performed very well in Q1, including 16% revenue growth as both our EyeQ® and SuperVision business lines grew strongly, significantly outperforming underlying global auto production growth.

168. The statements identified in ¶¶166-67 were materially false and misleading, and omitted material facts. Defendants' statements that Mobileye's "EyeQ . . . business line[] grew strongly" was "significantly outperforming underlying global auto production growth," and that this growth was "due to a combination of volume and" average sale price, were materially misleading because they created the impression that Mobileye's performance corresponded to organic growth and demand, when in fact Defendants had shipped millions of its flagship EyeQ chips (and recognized millions of dollars in revenue) beyond the demand for them. In truth, Mobileye's business had grown significantly, and had outperformed underlying auto production growth because, as Defendants later admitted, Defendants had forced Tier 1 suppliers to purchase quantities substantially in excess of actual demand.

169. That day, during the Company's earnings call, Mobileye executives made a number of statements regarding demand for the Company's EyeQ chips and inventory levels at Mobileye's Tier 1 customers. For example, in response to an analyst question regarding the underlying drivers of growth, Defendant Shashua touted the "***continuous contact with customers***" and efforts to match shipments to demand, stating:

> Question – Analyst Samik Chatterjee: "But you also, I think, mentioned some movement of orders from 2Q into the back half, not sure which geography that was meant for. But if we take the China piece aside - China weakness aside, what are the underlying drivers? Would we have seen upside for the full year? Or sort of any color there? What you're seeing in terms of just the business dynamics, and I have a follow-up."
>
> Answer – Defendant Shashua: "Rest of the world, we don't see any change. ***We are in continuous contact with our customers, the Tier 1s about trying to balance out from a quarter-to-quarter.*** But the yearly commitment is unchanged and according to the same guidance that we gave back in January."

170. In response to a question from an analyst on the same call on the timing of EyeQ shipments to customers, Defendant Shashua made statements asserting that Mobileye had insight into Tier 1 customer inventory levels based on "***very good discussions***" with those customers:

> Question – Analyst Mark Delaney: "Anat, you commented, if I heard correctly, about the timing for EyeQ shipments and some that may have been in 2Q pushing into the second half. Could you elaborate a little bit more on what might be happening there? Is that more due to global production schedules? Is that also some of the China issues you've been referring to? Any more context on that topic will be helpful.."
>
> Answer – Defendant Heller "Yes. ***So, it's probably something to do about their inventory level and considerations versus demand. And this is the information that we have***. So, they kind of shifted part of the volume. ***It's not very significant to the second half of the year***."
>
> Answer – Defendant Shashua: "But our – the commitments we have from our Tier 1s is on a yearly basis, not quarterly basis. ***But we are in very good discussions and trying to balance their commitment from quarter-to-quarter rather than lumping it into one or two quarters towards the end of the year***. And we managed quite successfully to reach a point in which the change in second quarter is really minimal."

171. The statements identified in ¶¶169-70 were materially false and misleading, and omitted material facts. It was materially misleading for Defendants to discuss their "continuous contact" and "very good discussions" with Mobileye's Tier 1 customers "about trying to balance [inventory] out from [] quarter-to-quarter" and to avoid "lumping it into one or two quarters towards the end of the year," when Defendants had forced Tier 1 suppliers to purchase quantities substantially in excess of actual demand, which made it "impossible" for the Company's critical Tier 1 customers to "adjust the quantities" of EyeQ chips supplied to them by Mobileye to align with true demand. Defendants' statements were also false because they did force their Tier 1 customers to accept significant numbers of EyeQ chips "towards the end of the year." For instance, as FE 1 explained that if Aptiv had not ordered all of the chips required under the minimum commitment deals, in November or December, Mobileye would simply deliver, "without

question," all of the remaining chips. Mobileye's EyeQ sales corroborate this fact; sales volumes spiked dramatically at year-end. Q4 2022 volumes were 18.2% higher than Q3 2022 volumes, and Q4 2023 volumes were 23.4% higher than Q3 2023 volumes.

### 7. Misrepresentations In The Q2 2023 Earnings Release And Call

172. On July 27, 2023, held its earnings call for the second quarter of 2023. During the call, Defendants Shashua and Rojansky discussed production schedules and demand. Specifically, Defendant Shashua stated:

> On the revenue side, the quarter was in line to better than our expectation. Customers were very cautious in the first half of 2023, which led to below normal growth. ***But we have seen the production schedule solidify for the second half of the year where we expect to grow 16% year-over-year on much higher volumes than the first half.***

173. Defendant Rojansky similarly reassured investors that the decrease in revenue in the second quarter of 2023 was minimal, and reaffirmed Mobileye's prior guidance, stating that "Revenue is tracking in line with our prior guidance, which we are reaffirming today both for the core EyeQ business and SuperVision. ***On EyeQ, schedules have become more solid over the last couple of months and customer requests to move volume around have largely ceased***."

174. The statements identified in ¶¶172-73 were materially false and misleading, and omitted material facts. It was materially misleading for Defendants to state that EyeQ production schedules had solidified and that "customer requests to move volume around have largely ceased" because in truth, Defendants had forced Tier 1 suppliers to purchase quantities substantially in excess of actual demand and made it "impossible" for the Company's critical Tier 1 customers to "adjust[] . . . the quantities" of EyeQ chips supplied to them by Mobileye to align with true demand. In fact, the Company's Tier 1 customers had already accumulated millions of excess EyeQ chips and would continue to accumulate more during the Class Period. Defendants' statements created

a misleading impression that sales corresponded to production schedules and organic demand, and that customers were not taking excess inventory.

175. During the call, Mobileye executives also made a number of statements regarding the Company's visibility into demand for EyeQ chips and Tier 1 inventory levels and assured investors against concerns around Tier 1 and OEM inventory destocking of EyeQ chips. They stated that Mobileye was "no longer seeing" shifts in volumes between quarters and that inventory was "pretty stabilized." Specifically, Defendant Rojansky stated:

> Question – Analyst Ananda Baruah: "Very helpful. And then the quick follow-up is you had actually mentioned, I believe – this might be more of a clarification – the Tier 1 OEM inventory destocking has had some impact in demand. And you had talked about a timeframe over which it will normalize. Can you just clarify the timeframe that you expect that to normalize? And that's it for me. Thanks."
>
> Answer – Defendant Rojansky: "***Now we see schedule stabilizing in terms of EyeQ. So for the beginning of the year, we had requests for shifts of volumes from Q2 to Q3 or Q3 to Q4. We are no longer seeing that. So it is pretty stabilized***. We think that the last two years have been very bumpy in terms of supply chain crisis and production volumes. But of course, it's not the same situation as we entered this year. ***And that is why we see the volume increase***. And the inventory issue, we think, played a role more in the first half of the year."

176. The statements identified in ¶175 were materially false and misleading, and omitted material facts. It was materially misleading for Defendants to state that they had seen production schedules "stabilize" and that they had stopped seeing requests to delay shipments from customers when, in truth, as Defendants later admitted, Defendants had forced Tier 1 suppliers to purchase quantities substantially in excess of actual demand and made it "impossible" for the Company's critical Tier 1 customers to "adjust[] . . . the quantities" of EyeQ chips supplied to them by Mobileye to align with true demand. In fact, the Company's Tier 1 customers had already accumulated millions of excess EyeQ chips and would continue to accumulate more during the Class Period. Thus, Defendants' statements created a misleading impression that inventories had "stabilized" at a level that corresponded to actual demand. It was further misleading to discuss

requests to move volume between quarters and thereby suggest that quarterly shipments corresponded with market conditions when in fact Mobileye would ultimately force its customers to accept volumes regardless of market conditions.

177. In response to the same question on the earnings call, Defendant Shashua further reaffirmed that inventory levels were stable and reflected market conditions, stating:

> ***"Inventory that our customers have piled up in terms of EyeQ and that, as Moran said, has stabilized. We don't see any request to push volumes from quarter to quarter."***

178. The statements identified in ¶177 were materially false and misleading, and omitted material facts. It was materially misleading for Defendants to state that they had seen inventory "stabilize" and that they had stopped seeing requests to delay shipments from customers when, in truth, as Defendants later admitted, Defendants had forced Tier 1 suppliers to purchase quantities substantially in excess of actual demand and made it "impossible" for the Company's critical Tier 1 customers to "adjust[] . . . the quantities" of EyeQ chips supplied to them by Mobileye to align with true demand. In fact, the Company's Tier 1 customers had already accumulated millions of excess EyeQ chips and would continue to accumulate more during the Class Period. Thus, Defendants' statements created a misleading impression that inventories "stabilized" at a level that corresponded to actual demand, when in fact Defendants had decoupled volumes from market conditions.

### 8. Misrepresentations During The September 2023 Goldman Sachs Conference

179. On September 6, 2023, Mobileye attended the Goldman Sachs Communacopia & Technology Conference, at which Defendant Galves also stated once again that Mobileye had "***about 70% market share***" in the ADAS market.

180. The statements identified in ¶179 were materially false and misleading, and omitted material facts. As Mobileye's Vice President of Strategy and Business Development later admitted publicly, the calculations used for Defendants' publicly provided market share would require a "correction" because the millions of EyeQ units shipped by Defendants in excess of market conditions had decoupled the volume of units shipped from the true organic size and growth of the market. In 2021 and 2022, Defendants sold approximately 62 million units of EyeQ chips, of which 4-5 million were excess units. As one analyst explained, the "true market" for Mobileye's chips was therefore 57-58 million units. *See* ¶92 (graphic). Mobileye thus inflated its sales figures by more than 7% those years. Then, in 2023, Defendants sold another 37 million units, 2-3 million of which were excess, again inflating sales by approximately 7%.

**9. Misrepresentations In The Q3 2023 Earnings Release And Call**

181. On October 26, 2023, Mobileye issued a press release announcing its financial results for the third quarter of 2023. This press release was included as an exhibit to Mobileye's Form 8-K filed that day. In the press release, Defendant Shashua attributed Mobileye's impressive revenue growth to certain purportedly legitimate business factors, stating:

> Revenue of $530 million increased by 18% compared to the third quarter of 2022, primarily due to a combination of volume and ASP growth in our EyeQ® chip related revenue.

182. That day, the Company held an earnings call included statements regarding Mobileye's third quarter 2023 revenue. In that earnings call, Defendant Rojansky stated:

> We also exclude stock-based compensation. Starting with Q3 results, we had an excellent quarter with ***revenue up 18% and adjusted operating income up 27% year-over-year***. Overall, ***EyeQ and SuperVision volume increased about 16%***[.].

183. The statements identified in ¶¶181-82 were materially false and misleading, and omitted material facts. While Defendants claimed that EyeQ chip revenue skyrocketed "due to a combination of volume" and average sale price growth, in truth, Defendants had forced Tier 1

suppliers to purchase minimum quantities and made it "impossible" for the Company's critical Tier 1 customers to "adjust[] . . . the quantities" of EyeQ chips supplied to them by Mobileye to align with market conditions. Defendants' statements describing the reasons for Mobileye's growth were also materially misleading because they created the impression that Mobileye's performance corresponded to organic growth and demand, when in fact Defendants had shipped millions of its flagship EyeQ chips (and recognized millions of dollars in revenue) beyond the demand for them.

184. During the earnings call, Defendant Rojansky discussed the Company's guidance for the fourth quarter of 2023. Specifically, Defendant Rojansky described: "***a record level of quarterly EyeQ volume*** and importantly should not be used as the starting point for estimated 2024 volume. ***We'd encourage you to look at the full year 2023 and apply a growth rate to that when thinking about 2024***. ***And consider that the high volume in Q4 would lead to some hangover effect in Q1 similar to the dynamic in the first quarter of 2023***."

185. The statements identified in ¶184 were materially false and misleading, and omitted material facts. It was materially misleading for Defendants to tout their projected "record level" of EyeQ volume sales for the fourth quarter of 2023 without also telling investors that this "record" volume was not the result of market demand, but was instead caused by Mobileye pushing the remaining inventory that the Tier 1 customers were obligated to purchase. For instance, as FE 1 explained, even though Aptiv did not want more EyeQ chips, Mobileye would simply deliver "without question" to Aptiv in November or December all of the remaining chips from the forced commitment for the year.

186. It was also materially misleading for Defendants to encourage investors "to look at the full year 2023 and apply a growth rate to that when thinking about 2024" and assert that the

record volumes of EyeQ sales in the fourth quarter of 2023 would merely cause a "hangover effect" for the first quarter of 2024 and lead to a "similar" dynamic as the first quarter of 2023. By Defendants' own admission, they had learned no later than "late 2023" that its customers would radically curtail their purchases of EyeQ chips from Mobileye in 2024 in order to work through their millions of excess chips. Thus, rather than a small and transient "hangover," Mobileye's revenue for the first quarter of 2024 would collapse dramatically by 50%, and the impact of this issue—which Defendants would admit was years in the making—would depress Mobileye's performance for the following year or more.

**10. Misrepresentations In The Q4 2023 Earnings Release And Call**

187. On January 4, 2024, Mobileye issued a press release announcing its preliminary financial results for the 2023 fiscal year. This press release was included as an exhibit to Mobileye's Form 8-K filed that day. In that press release, Defendants stated that the Company had "become aware of excess inventory at our customers," of which Defendants claimed "***much of this excess inventory reflects decisions by Tier 1 customers to build inventory in the Basic ADAS category due to supply chain constraints in 2021 and 2022 and a desire to avoid part shortages, as well as lower than-expected production at certain OEM's during 2023***."

188. On January 25, 2024, Defendants held their earnings call for the fourth quarter of 2023. During that call, Defendant Rojansky repeated that the excess inventory "***reflects the decision by Tier 1 customers to build the inventory***."

189. The statements identified in ¶¶187-88 were materially false and misleading, and omitted material facts. Defendants' claims that "much of this excess inventory reflects decisions by Tier 1 customers to build inventory" were materially false and misleading because Mobileye's customers did not want to build excess inventory throughout the Class Period. For example, FE 1, who worked at Aptiv and closely monitored its orders with Mobileye, stated directly that Aptiv

always had enough EyeQ and did not want to intentionally overstock inventory. FE 1 further explained that, in fact, Aptiv wanted to cancel orders because it did not want to build up excess inventory of the EyeQ chips, but Mobileye would not allow Aptiv to cancel even if Aptiv showed business was going down.

**11. Misrepresentations In The Q1 2024 Earnings Call**

190. On April 25, 2024, Mobileye held its earnings call for the first quarter of 2024. During that call, Defendants reiterated that EyeQ volumes would normalize in the second half of 2024 and Defendant Shashua further assured investors that the excess inventory that Defendants had previously disclosed was not having any lingering impact on Mobileye's financial performance. Specifically, Shashua stated that "***this should address any open question on whether the excess inventory indicated some weakening of our position and opportunities for a continued growth? It did not***."

191. The statements identified in ¶190 were materially false and misleading, and omitted material facts. Contrary to Defendants' claims, within months, Defendants would dramatically reduce 2024 revenue guidance by hundreds of millions of dollars based on reduced ADAS volumes. Further, as Defendants admitted, they did not have visibility into inventory in the critical China market, where there continued to be "residual" excess inventory issues."

**12. Misrepresentations During The June 2024 Deutsche Bank Conference**

192. On June 11, 2024, Defendants spoke at the Deutsche Bank Global Auto Industry Conference. During that call, an analyst asked Defendant Galves how demand had "been tracking on the base ADAS side in particular," and if there were "any signs of slowing down." Galves assured the analyst that "everything looks really on track at this point," and that "***the market demand has actually been very stable, not just for our product, but overall global production***."

He also stated that Mobileye had "***seen kind of good kind of order indications for the back half*. *So we feel like very much on track*** to what we laid out at the beginning of the year."

193. The statements identified in ¶192 were materially false and misleading, and omitted material facts. Contrary to Defendant Galves' claims, within months Defendants would dramatically reduce 2024 revenue guidance by hundreds of millions of dollars based on reduced ADAS volumes. Further, as Defendants admitted, they did not have visibility into inventory in the critical China market, where there continued to be "residual" excess inventory issues."

## VII. ADDITIONAL LOSS CAUSATION ALLEGATIONS

194. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses. During the Class Period, Lead Plaintiff and the Class purchased or otherwise acquired shares of Mobileye Class A common stock at artificially inflated prices and were damaged thereby when the price of those shares declined when the truth was revealed and when the risks that Defendants concealed with their false statements and omissions materialized. The price of Mobileye shares declined significantly and caused investors to suffer losses when the truth concealed by Defendants was revealed and the artificial inflation in the stock price was corrected.

195. During the Class Period, Defendants made materially false and misleading statements and omissions that artificially inflated and/or maintained artificial inflation in the price of Mobileye Class A common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and the risks concealed by the fraudulent conduct alleged in this complaint were corrected and the truth revealed to the market, the price of Mobileye Class A common stock fell precipitously. As a result of their acquisition of Mobileye Class A common stock during the Class Period—and Defendants' material misstatements and omissions—Lead

Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

| Date | Corrective Event Summary | Closing Stock Price | Price Decline |
|---|---|---|---|
| January 4, 2024 | Mobileye revealed for the first time that the Company's customers held 6-7 million units of excess inventory of the Company's flagship EyeQ product, and guided investors that the Company's Q1 2024 revenue would be down 50% versus the prior period and 2024 financial performance would suffer as customers used this excess inventory rather than purchase additional chips from Mobileye. *See* ¶¶88-95. | $29.97 | -24.5% |
| August 1, 2024 | Despite continued assurances about market demand, Defendants shockingly reduced guidance for the Company's 2024 financial performance 13% lower than the already dramatically reduced-guidance, citing continued reduction in volume for the EyeQ chip that Defendants suggested related in part to "residue" excess inventory, and causing the market's view around Mobileye's market share dominance to meaningfully change. *See* ¶¶109-15. | $16.28 | -22.5% |

196. It was entirely foreseeable that Defendants' acts and materially false and misleading statements and omissions discussed herein would artificially inflate the price of Mobileye Class A common stock. It was also foreseeable to Defendants that their acts would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misstatements was

corrected when the truth was revealed. Thus, the fall in Mobileye's stock price was directly and proximately caused by Defendants' acts and materially false and misleading statements and omissions.

## VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR

197. The PSLRA's statutory safe harbor or the bespeaks-caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions pled in this Complaint.

198. None of the statements complained of herein was a forward-looking statement protected by the safe harbor. Instead, each was a historical statement or statement of purportedly current facts and conditions existing at the time or prior to when each statement was made, or a statement rendered materially misleading for omitting existing facts.

199. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were insufficient to insulate them from liability for their materially false and misleading statements.

200. To the extent the statutory safe harbor otherwise would apply to any materially false and misleading statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew that the particular forward-looking statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Mobileye who knew that the statement was materially false or misleading when made.

201. Moreover, to the extent that Mobileye or the other Defendants issued any disclosures purporting to warn or caution investors of certain "risks," those disclosures were also materially false or misleading because they did not disclose the full scope of the risks and/or that the risks that were the subject of the warnings had already materialized, or that Mobileye and the other Defendants had actual knowledge of undisclosed material adverse facts that rendered the purportedly cautionary disclosures materially false or misleading.

## IX. PRESUMPTION OF RELIANCE

202. At all relevant times, the market for Mobileye's Class A common stock was an efficient market for the following reasons, among others:

(a) Mobileye Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Mobileye filed periodic public reports with the SEC;

(c) Mobileye regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d) Mobileye was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(e) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Mobileye securities; and

(f) Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Mobileye Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

203. As a result of the foregoing, the market for Mobileye's Class A common stock reasonably promptly digested current information regarding Mobileye from all publicly available sources and reflected such information in the price of Mobileye Class A common stock. All purchasers of Mobileye Class A common stock during the Class Period suffered similar injury through their purchase of Mobileye Class A common stock at artificially inflated prices, and a presumption of reliance applies.

204. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X. EXCHANGE ACT CLASS ACTION ALLEGATIONS

205. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Mobileye Class A common stock between January 26, 2023, and August 1, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

206. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mobileye shares were actively traded on the

NASDAQ. As of July 31, 2024, there were over 99 million shares of Mobileye Class A common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds, if not thousands, of members of the proposed Class. Class members who purchased Mobileye common stock may be identified from records maintained by Mobileye or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

207. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

208. Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation. Lead Plaintiff has no interests that conflict with the interests of the Class.

209. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are: (a) whether Defendants' misrepresentations, omissions, scheme and acts, as alleged herein violated the federal securities laws; (b) whether the Executive Defendants are personally liable for the alleged misrepresentations, omissions, and scheme and acts described herein; (c) whether Defendants' misrepresentations, omissions, and scheme as alleged herein caused the Class members to suffer a compensable loss; and (d) the proper way to measure damages.

210. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small such that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XI. EXCHANGE ACT CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Against Mobileye and the Executive Defendants

211. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

212. This Count is asserted on behalf of all members of the Class against Defendant Mobileye and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5.

213. During the Class Period, Defendant Mobileye and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material fact and/or disseminated and/or approved and/or omitted to state material facts necessary to make the false or misleading statements specified above not misleading. Defendants' actions: (i) deceived the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other members of the Class to purchase Mobileye common stock at artificially inflated prices.

214. Defendant Mobileye and the Executive Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails: made various untrue and/or misleading statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and made the above statements intentionally or with a severely reckless disregard for the truth, which did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, the magnitude and source of Mobileye's revenue and earnings results and the true level of demand for Mobileye's EyeQ chip and other products; (ii) artificially inflate and maintain the market price of Mobileye common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Mobileye common stock at artificially inflated prices and suffer losses when the true facts became known.

215. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that, in light of the circumstances under which they were made, the statements contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements not misleading.

216. The Executive Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. The Executive Defendants engaged in this misconduct to conceal Mobileye's true condition from the investing public and to support the artificially inflated prices of the Company's shares. The Executive Defendants' state of mind is imputed to Mobileye.

217. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mobileye's shares. Lead Plaintiff and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for Mobileye shares had been artificially inflated by Defendants' fraudulent course of conduct.

218. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period.

219. By virtue of the foregoing, Mobileye and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violations of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) Against the Exchange Act Defendants**

220. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

221. This Count is asserted on behalf of all members of the Class against the Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5.

222. Defendant Mobileye and the Executive Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) in that they (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Mobileye common stock during the Class Period in an effort to maintain artificially high market prices for Mobileye common stock.

223. Defendant Mobileye and the Executive Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class in connection with the purchase and sale of Mobileye common stock, which did: (i) deceive the

investing public, including Lead Plaintiff and the Class, regarding, among other things, the magnitude and source of Mobileye's revenue and earnings results and the true level of demand for Mobileye's EyeQ chip and other products; (ii) artificially inflate and maintain the market price of Mobileye common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Mobileye common stock at artificially inflated prices and suffer losses when the true facts became known.

224. As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), Mobileye and the Executive Defendants: (i) obligated its customers with minimum purchasing commitments for its critical EyeQ product and made it "impossible" for customers to adjust its orders to changes in market conditions; (ii) shipped over several years millions of excess EyeQ chips beyond market conditions; (iii) cannibalized the Company's future growth as customers refused to purchase additional EyeQ chips until they could work through their inventory buildup at the beginning of 2024; and (iv) falsely concealed the full fallout by assuring investors that sales volumes would rebound.

225. These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Mobileye common stock during the Class Period in an effort to maintain artificially high market prices for Mobileye common stock.

226. As described above, Mobileye and the Executive Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Mobileye and the Executive Defendants engaged in this misconduct to conceal Mobileye's

true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

227. Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Mobileye common stock, which artificial inflation was removed from the stock when the true facts became known. Lead Plaintiff and the Class would not have purchased Mobileye common stock at the prices they paid, or at all, had they been aware that the market prices for Mobileye common stock had been artificially inflated by the Executive Defendants' fraudulent course of conduct. It was also foreseeable to these Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Mobileye's common stock and that the revelation of the truth, would correct the artificial inflation and cause the price of Mobileye securities to decline.

228. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Company's common stock.

229. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c), promulgated thereunder.

## COUNT III

### For Violations of Section 20(a) of the Exchange Act Against the Executive Defendants

230. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

231. This count is asserted on behalf of all members of the Class against Defendants Shashua, Rojansky, Heller, and Galves for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

232. The Executive Defendants acted as controlling persons of Mobileye within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By reasons of their high-level positions of control and authority as the Company's most senior officers, the Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Mobileye during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

233. Each of the Executive Defendants spoke to investors or the public on behalf of the Company during the Class Period. Therefore, each of the Executive Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Mobileye during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

234. As set forth above, Mobileye and the Executive Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

235. By virtue of their positions as controlling persons of Mobileye and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Mobileye Class A common stock. As detailed above, during the respective times, these Executive Defendants served as officers, directors, and/or senior personnel of Mobileye.

236. As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Mobileye Class A common stock.

# PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933

## XII. INTRODUCTION TO THE SECURITIES ACT CLAIMS

237. In this Part of the Complaint, additional Named Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") asserts strict liability and negligence claims based on violations of the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased or acquired Mobileye Class A common stock in Mobileye's Secondary Public Offering (the "Offering"), announced on June 5, 2023 and completed on or about June 12, 2023, and were damaged thereby.

238. In this Part of the Complaint, Oklahoma Firefighters expressly disclaims any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded independently in this Complaint from the Exchange Act claims. For the avoidance of doubt, Oklahoma Firefighters disclaims all allegations of fraud or intentional misconduct included in Part One of this Complaint, and no portion of the Exchange Act fraud-based allegations are realleged or incorporated herein.

239. These claims are brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the Offering.

## XIII. JURISDICTION AND VENUE

240. The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

241. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

242. Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 22 of the Securities Act, 15 U.S.C. § 77v. At all relevant times, Mobileye conducted substantial business here. In addition, many of the acts alleged herein occurred in this District.

243. In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## XIV. THE SECURITIES ACT PLAINTIFF

244. Additional Named Plaintiff Oklahoma Firefighters is a public pension fund that provides retirement allowances and other benefits to firefighters in Oklahoma. Currently, Oklahoma Firefighters manages approximately $3.7 billion in assets. As indicated in the certification filed as Exhibit B to this Complaint, on June 8, 2023, Oklahoma Firefighters purchased 30,115 shares of Mobileye Class A common stock at the Offering price of $42. These purchases were made directly in the Offering, and Oklahoma Firefighters suffered damages as a result of the violations of the Securities Act alleged in this Complaint.

## XV. THE SECURITIES ACT DEFENDANTS

245. Each of the following Securities Act Defendants is statutorily liable under the Securities Act for the materially false and misleading statements and omissions contained in and incorporated in documents presented to investors in connection with the Offering and described herein.

246. Securities Act Defendant Mobileye (“Mobileye” or the “Company”) is incorporated under the laws of the State of Delaware, with its principal executive offices located

in Jerusalem, Israel. Mobileye's Class A common currently stock trades on NASDAQ under the ticker symbol "MBLY." Mobileye was the issuer responsible for the Offering. The Offering Documents (defined below) expressly identified Mobileye as the "Issuer."

247. Securities Act Defendant Amnon Shashua ("Shashua") is the co-founder, President, Director and Chief Executive Officer ("CEO") of Mobileye. Shashua signed the Registration Statement (defined below).

248. Securities Act Defendant Anat Heller ("Heller") was Mobileye's CFO from 2018 until June 26, 2023. Prior to that, she held various positions with the Company beginning in 2016, including as Vice President of Finance, Director of Finance and Corporate Controller. Heller signed the Registration Statement.

249. Securities Act Defendants Shashua and Heller are referred to herein as the "Securities Act Executive Defendants," and together with Mobileye, the "Securities Act Defendants."

## XVI. THE SECONDARY PUBLIC OFFERING

250. In June 2023, Mobileye conducted the Offering, a $1.6 billion secondary public offering of 38.5 million shares of Mobileye Class A common stock. The Offering was conducted pursuant to a Registration Statement that Mobileye filed on Form S-1 on June 5, 2023 (the "Registration Statement"). The Registration Statement was signed by, among others, Securities Act Defendants Shashua and Heller, and was declared effective by the SEC on June 7, 2023. The Registration Statement also incorporated a Prospectus that Mobileye first filed in preliminary form with the Form S-1 on June 5, and then filed and published in final form on June 8, 2023 (the "Prospectus"), which formed part of the Registration Statement. The Prospectus and Registration Statement incorporated by reference several of Mobileye's other SEC filings, including the Company's Annual Report for fiscal year 2022, filed on Form 10-K on March 9, 2023 (the "2022

Annual Report) and the Company's Quarterly Report for the first quarter of 2023, filed on Form 10-Q on May 11, 2023 (the "Q1 2023 Quarterly Report"). Collectively, the Registration Statement and Prospectus (and all documents incorporated by reference) are referred to herein as the "Offering Documents."

251. Oklahoma Firefighters purchased 30,115 shares of Mobileye Class A common stock issued pursuant to the Registration Statement and the Offering. Oklahoma Firefighters purchased these shares directly in the Offering from Underwriter Goldman Sachs & Co. LLC at the public offering price of $42 per share on June 8, 2023, when participation in the Offering was being offered to investors. At no point on June 8, 2023 did Mobileye's Class A common stock trade at $42 per share on the open market. The highest price at which Mobileye's stock price traded on the open market that day was $41.96. Furthermore, Oklahoma Firefighters did not pay any commissions on its purchases of Mobileye common stock in the Offering. Oklahoma Firefighters' purchase settled on June 12, 2023, the date on which the Offering was completed.

## XVII. THE FACTS MISSTATED OR OMITTED IN THE OFFERING DOCUMENTS

### A. Background

252. Mobileye is a technology company that develops and deploys ADAS programs along with other autonomous driving technologies and solutions.

253. Nearly all of Mobileye's revenue comes from the Company's proprietary EyeQ system-on-chip (the "EyeQ"). First launched in 2007, the EyeQ is essentially a combination of hardware and software which allows car manufacturers to implement ADAS features into their vehicles. While the EyeQ is not Mobileye's only product, the Company has stated that the EyeQ is "fundamental to [Mobileye's] leadership position in ADAS" and critical to its financial performance. For instance, in 2022, Mobileye sold approximately 33 million EyeQ chips, which made up 89% of its reported revenue of $1.9 billion. Almost all of the Company's remaining

revenue comes from sales of Mobileye's SuperVision system, a more advanced autonomous driving system which itself utilizes EyeQ technology. In other words, EyeQ chips drive nearly all of Mobileye's revenue.

254. Mobileye primarily sells the EyeQ chip to "Tier 1" automotive suppliers, who function essentially as intermediaries between Mobileye (i.e., a "Tier 2" supplier) and car manufacturers (known as Original Equipment Manufacturers or "OEMs"), which include companies such as Ford or Volkswagen.

255. The Offering Documents stated that the Company's revenue was concentrated and relied significantly on a handful of Tier 1 customers, including Aptiv PLC, Magna International, Valeo, and ZF Group. The overwhelming majority of Mobileye's revenue comes from these Tier 1 customers: in both 2022 and 2023, ZF Group, Valeo, and Aptiv were Mobileye's three biggest customers and generated ***approximately 70% of Mobileye's revenue***.

256. The Securities Act Defendants at all times received regular reports about inventory and demand from the Company's customers because, over decades, participants throughout the automotive supply chain (including suppliers like Mobileye and its Tier 1 customers, as well as the OEM manufacturers) have developed and implemented standards and practices to coordinate and streamline the distribution of components needed to manufacture automobiles.

257. These supply chain management practices typically include the electronic exchange of information, including inventory levels and forecasted demand data between suppliers, in order to optimize inventory levels commensurate with manufacturing demand. Tier 1 customers typically place orders using Electronic Data Interchange ("EDI") systems, a specialized electronic industry platform that replaced paper-based documents for purchase orders or invoices and allows for instant electronic communication up and down the supply chain.

258. The onset of the COVID-19 pandemic in 2020 and the accompanying supply chain shortages caused participants to further focus on the importance of managing inventory levels across the supply chain. For example, according to a November 2021 report issued by OpenText, an information management solutions company, the "COVID-19 pandemic exposed major vulnerabilities in widely used business models. For industries across the world, standard approaches such as just-in-time and build-to-order were found wanting. To build resilience and agility, the focus has turned to demand planning and forecasting to better match inventory to actual customer requirements." As another example, in 2023, the Automotive Industry Action Group ("AIAG")—an automotive trade associations that, among other things, sets forth industry standards and practices to execute on the industry standards to provide regular exchange of inventory and demand information—issued a "Best Practices for Responding to Supply Chain Disruptions" guide, in which AIAG stressed the need to "establish specific parts forecast vs. firm orders [] to avoid oversupply of outdated/soon-to-be-outdated parts," engage in "transparent communication with the suppliers," use "EDI messaging," and generally to "proactively communicate with suppliers on current expectations."

259. While there are several different processes used in supply chain management across the automotive industry, these systems all share key features, including that information concerning inventory levels and demand forecasts be shared exchanged frequently. As described below, Mobileye's major customers all utilized some form of communication with other supply chain participants and/or otherwise expressly affirmed their observance of the industry standards described above, meaning that the Securities Act Defendants at all times received regular reports about inventory and demand from customers.

260. ***ZF Group***. Mobileye's largest Tier 1 customer, ZF Group, publicly provides a "Global Logistics Directive," which applies to "all production materials and the associated spare parts purchased by the locations of ZF Group worldwide," as well as "to all suppliers providing those production materials and associated spare parts to ZF." Under this directive, ZF expressly adopts for use with suppliers different standards for communication regarding inventory and demand levels. As the Global Logistics Directive makes clear, "The overall obligation of ZF's suppliers is to secure the delivery of ZF. This requires supplier to make a regular comparison between the MRP [material requirement planning] data from ZF and supplier's available short-, mid- and long-term capacities . . . Supplier shall take also such additional demand data into consideration for its capacity planning." Under each standard, described as "call-off procedures," the supplier is given detailed information regarding ZF's demand needs.

261. ***Valeo***. Another of Mobileye's three largest Tier 1 customers, Valeo, states in its publicly available materials that it implements EDI communications to regularly report inventory and demand information to its suppliers. For example, the publicly-available Valeo Supply Agreement Schedule that Valeo used in the ordinary course with its Tier 2 suppliers (as Mobileye would be considered), Valeo each week provides its Tier 2 suppliers with materials requirement forecasts for the following two months, at minimum.

262. ***Aptiv***. Another of Mobileye's top Tier 1 customers, Aptiv, stated in its "Customer Specific Requirements" effective June 20, 2022—which applied to "Suppliers that provide direct products or materials for Aptiv," i.e., Mobileye—that the supplier needs to be certified "as a capable and compliant EDI trading partner," meaning, use the industry standard EDI protocol. The requirements further indicate that Aptiv provided information to suppliers as to expected production scheduling for the next 2-4 weeks, as well as information beyond four weeks "for

planning purposes." FE 1,[5] an Aptiv former employee, corroborated that Aptiv used EDI with Mobileye, including specifically to provide Mobileye with both (i) 18-month forecasts, which projected demand over the long-term, and (ii) firm orders every two weeks, ensuring that Mobileye knew Aptiv's immediate demand for the EyeQ chip.

263. ***Magna.*** Finally, as to Magna—another of Mobileye's largest Tier 1 customers—Mobileye had in July 2014 attached to its public Form F-1 filed with the SEC a purchase schedule between the Company and Magna, which expressly provided that Magna would on a regular basis provide Mobileye with a "items identified as 'FORECAST' on a Purchase Schedule [that] are for planning purposes," thus indicating Mobileye and Magna complied with industry-standard communications around inventory and demand.

264. Magna's insistence on these practices is further corroborated by Magna's publicly-available "Magna Global Supply Chain Requirements" manual, dated March 30, 2017, which was "applicable to all suppliers providing materials, products and services to any Magna manufacturing facility" (i.e., Mobileye). That manual sets forth specific requirements that forecasting information be sent "to the suppliers through their regularly scheduled releases."

265. Moreover, Magna is a member of AIAG, the automotive trade association described above that sets forth industry standards and practices to execute on the industry standards to provide regular exchange of inventory and demand, including issuing the "best practices" in 2023 that specifically advised "to avoid oversupply of outdated/soon-to-be-outdated parts" through

[5] FE 1 worked as a Procurement Manager from August 2003 until March 2011; a Central Procurement and Customer Logistics Manager from March 2011 until May 2017; and a Production Planning and Customer Logistics Manager from May 2017 until February 2024. In each role at Aptiv, she focused on logistics, including procurement, production planning, supply chain, and customer service. FE 1 specifically said that she had direct communication with Mobileye at times, and that her group had to monitor Mobileye very closely.

"transparent communication with the suppliers," the use of "EDI messaging," and "proactively communicat[ion] with suppliers on current expectations."

**B. Mobileye's Offering Documents Described And Assured Investors About Mobileye's EyeQ Revenue, Volumes, And Customers**

266. As the Company's primary driver of revenue, the Offering Documents discussed the Company's EyeQ chips at length, stating to investors that the Company had sold approximately 62 million EyeQ chips during 2021 and 2022 (the two years before the Offering). The Offering Documents further indicated a 20% increase in sales volumes from 2021 to 2022, conveying the demand growth for the EyeQ chip, and discussed the nature of these sales from Mobileye's participation in the automotive supply chain and relationships with its Tier 1 customers.

267. Among other things, the Offering Documents stated that Mobileye "generally d[id] not have contracts with customers that require them to purchase our solutions in any certain quantity," though they had "been working with our customers to ensure they commit to certain volumes," and that some of the Company's customers had agreed to purchase "minimum quantities" of "certain solutions" in 2023 as a result of "global shortages." The Offering Documents did not clearly disclose how many of the customers had entered these commitments, which of Mobileye's "solutions" were involved, or the volume or value of the quantities at issue.

268. Significantly, the Offering Documents specifically stated that the Company had no commitment on its side to ship any set quantity of its product to the Tier 1 customers, and further assured investors that Mobileye would ship volumes only "depend[ing] upon market conditions." These disclosures communicated to investors that the volumes shipped by Mobileye had—and would continue to—correspond to market conditions.

269. Given these assurances, the Offering Documents did not give investors the impression that Mobileye faced any material risk from its customers accruing excess inventory.

To the contrary, in a June 5, 2023 report issued concerning the Offering, investment analysts at Wells Fargo stated that a risk to Mobileye was the ***opposite***—that "[t]he company has had past issues securing adequate supply to ***meet demand***."

270. Analysts and the mainstream media continued for months after the Offering to reiterate Mobileye's growth without any indication they perceived any risk from the quantities that the Company had shipped and committed to ship to its customers. For example, on January 3, 2024, *CNBC* published an article describing Mobileye as "the stock that'll be the 'last man standing' in autonomous driving," which quoted and referred extensively to several securities analysts (including Deutsche Bank and RBC Capital) who were anticipating significant upside for the value of Mobileye and its stock. Neither the *CNBC* article nor any of the analysts it referenced gave any indication of awareness—much less concern—that Mobileye's shipments had for years exceeded demand, or of the risks to its valuable "long-term growth prospects" from shipping volumes beyond market conditions.

**C. The Offering Documents Misstated And Omitted Material Information**

271. In reality—and contrary to the Offering Documents—Mobileye had for the last several years entered into minimum quantity commitments with customers that comprised at least 70% of Mobileye's revenue, including its top three Tier 1 customers. As the Securities Act Defendants later acknowledged, these obligations made it "impossible" for Mobileye's Tier 1 customers "to adjust purchases to demand."

272. These minimum commitment deals resulted in significant inventory buildups at Mobileye's Tier 1 customers. Moreover, based on these contracts, and contrary to the assurances in the Offering Documents, Mobileye did ***not*** ship volumes based on "market conditions," and had not done so for the past several years. Rather, Mobileye had sold millions of EyeQ chips in excess of market demand. As the Securities Act Defendants later admitted, approximately 4-5 million of

the 62 million EyeQ chips shipped in 2021-2022—approximately 6-8% of the Company's shipped volume for those two years—were in excess of true demand for those chips and simply built up at Mobileye's customers.

273. Further, because these practices were still continuing at the time of the Offering (though not disclosed in the Offering Documents), Mobileye shipped that year another ~2-3 million ***more*** EyeQ chips beyond market demand, comprising ~5-8% of the volume shipped by Mobileye that year.

274. For example, Aptiv, one of Mobileye's three largest customers, had by the time of the Offering already accumulated large volumes of excess inventory. FE 1, who worked at Aptiv, one of Mobileye's largest Tier 1 customers, explained how the minimum commitment deals between Mobileye and Aptiv operated. According to FE 1, because there was no alternative for the EyeQ chip, there was "no other way" for Aptiv to ensure its access to the EyeQ chips it needed other than agreeing to the minimum commitment agreements demanded by Mobileye, and Mobileye could do whatever it wanted. The contracts did not allow Aptiv to adjust the quantity of chips purchased under the agreement, even as end demand from car manufacturers decreased. FE 1 explained that Aptiv did not really like to have these agreements because then they lose flexibility with cancelling and following up with customers' demands. FE 1 also explained that Aptiv could not cancel any orders it made pursuant to the minimum commitment contracts. This meant that Aptiv ultimately had to accept more EyeQ chips than it wanted or needed. FE 1 confirmed that even if Aptiv showed Mobileye that business was going down and that the OEMs (Aptiv's direct customers) were placing fewer orders, Mobileye would not allow Aptiv to adjust the volumes of its orders.

275. According to FE 1, Aptiv wanted to cancel orders because it did not want to build up excess inventory of the EyeQ chips, but Mobileye "forced us to make overstock" because Mobileye would not allow any cancellations. While Aptiv would postpone orders in the short-term, it was obligated to accept the full sum of EyeQ chips agreed to under the minimum commitment contract before the end of the year. FE 1 explained that if Aptiv did not affirmatively order enough EyeQ chips to meet its minimum commitment requirement, Mobileye would simply deliver the remaining chips, "without question," in November or December.

276. Indeed, consistent with FE 1's account, Mobileye's EyeQ sales volumes spiked dramatically at the ends of 2022 and 2023. Specifically, Q4 2022 volumes were 18.2% higher than Q3 2022 volumes, and Q4 2023 volumes were 23.4% higher than Q3 2023 volumes. This directly contradicted the assurances in the Offering Documents that Mobileye would only ship inventory based on "market conditions" and the misimpression that the Company's revenue growth was tethered to growing demand and Mobileye's market dominance. The impact from having shipped millions more EyeQ units beyond demand for years reversed years of revenue growth.

277. A senior Mobileye former employee in a key position further confirmed that the Defendants had knowingly shipped excess inventory before the Offering. FE 2 was Mobileye's Vice President of ADAS Business Development from September 2020 until the end of 2022, when she left the Company.[6] FE 2 reported to Mobileye's Executive Vice President, Eres Dagan, who in turn reported directly to Defendant Shashua. In her role as VP of ADAS Business Development, FE 2 was responsible for winning ADAS business from both OEMs and Tier 1 suppliers. FE 2 confirmed that the excess inventory at Mobileye's Tier 1 customers existed "across the board"

[6] FE 2 worked in several roles at Mobileye since joining the Company in 2010, and was Mobileye's Vice President of ADAS Business Development from September 2020 until the end of 2022, when she left the Company. In that role, she focused on securing business from Tier 1 customers and OEMs.

during her tenure, and that the inventory buildup was already "significant" when she left the Company at the end of 2022. FE 2 explained that she learned of the excess inventory because the team that she oversaw received reports from the Tier 1 suppliers. FE 2 explained that during the COVID-19 pandemic, some of the OEMs that Mobileye worked with reduced the number of units that they wanted to acquire. Despite this development, Mobileye told the Tier 1 suppliers that they still had to buy the amount of product that they had previously committed to, and that they should just keep it and store it for the future. FE 2 explained that these conversations with Tier 1 suppliers were already happening when she left the Company at the end of 2022. Members of FE 2's team were responsible for leading the discussions with the Tier 1 customers and reported to FE 2. FE 2 explained that Dagan (who reported directly to the c-Suite) told her that the conversations with the Tier 1 suppliers should be handled in that manner. FE 2 stated directly that Securities Act Defendant Shashua was aware of the excess inventory, stating that the decision to push inventory to the Tier 1 customers "went up to Amnon" (Defendant Shashua).

278. FE 2's team would report to her that those conversations with the Tier 1 suppliers took place, and FE 2 would report to more senior executives if something was not as planned. FE 2's team was told that they needed to ensure that Tier 1 customers purchased the amount of product they had previously committed to. Thus, Mobileye told the Tier 1s that they cannot ***not*** buy those amounts. FE 2 explained that usually, however, those conversations (which FE 2 confirmed were happening before she left the Company, i.e., during 2022) with the Tier 1 suppliers did not go well because the Tier 1 suppliers were not very satisfied with Mobileye's requests for them to take on the volume. FE 2 recalled escalating instances to her supervisor (who reported directly to the c-Suite) in which Tier 1 suppliers did not want to buy the same amount of volume. However, as noted above, FE 2 explained that Mobileye told the customers that they had to buy

the amount of product that they had previously committed to, and that they should just keep it and store it for the future.

279. Thus, FE 2 also confirmed that Securities Act Defendant Heller would have been aware of the excess inventory. Specifically, FE 2 explained that each Tier 1 supplier would update Mobileye if there was a change in their needs for product. FE 2 stated that there were quarterly meetings that executive management, including Mobileye's CFO (at the time, Defendant Heller) would attend. During these meetings, FE 2 explained, anything out of the ordinary at the Company would be discussed, which could include the Tier 1 customers or the reports from the Tier 1 customers when there were issues or things were not going as planned. FE 2 explained that the excess inventory was, in part, obvious to her because OEMs were reducing their orders and Tier 1 suppliers were still being encouraged to order the same amount of product.

280. FE 1 confirmed that Aptiv, one of Mobileye's biggest Tier 1 customers, regularly provided Mobileye with information concerning its demand and forecast. FE 1's account corroborates that Defendants—who knew at all times the volumes it shipped to Aptiv and the other Tier 1s—knew about the growing excess inventory at Aptiv. FE 1 explained that Aptiv provided Mobileye with firm orders for the following two weeks along with 18-month forecasts, showing that the demand for EyeQ chips was far below the volume that Mobileye was forcing Aptiv to purchase. Because of these routine forecasts that were provided to Mobileye as part of standard industry practices, FE 1 explained, Mobileye would have known that it was pushing more inventory than its Tier 1 customers could sell to OEMs.

281. Investors in the Offering did not know the truth about these practices or the risks they created. The market's unawareness is evidenced by, among other things, the stunned reactions from analysts in response to the Company's surprise revelations in January 2024 (months after the

Offering) that (i) it had shipped 6-7 million EyeQ chips in excess of its customers' underlying demand over the past several years, including 4-5 million excess EyeQ units in 2021-2022 (before the Offering), and (ii) it had required its customers to "make full-year commitment[s]" in 2022 and 2023 that had given those customers "less ability from their side to adjust purchases to demand as they did pre-COVID period" and that made it "***impossible***" for Mobileye's customers to "adjust[] the quantities" to match market conditions because they were "obligated with commitments" to Mobileye. For example, analysts at Deutsche Bank immediately noted in response to these disclosures that Defendants had provided "no advance notice of any building inventory issues," and recognized that this excess inventory revealed that Mobileye's revenue had for years been "***inflated compared with real demand***."

282. As another example confirming that the market had not previously known the full scope and risks around the Company's shipments beyond market conditions, numerous other analysts reduced their 2024 earnings estimates for Mobileye by approximately ***25%*** immediately after Mobileye revealed the excess inventory for the first time.

| Analyst | 2024 Estimates Before January 4, 2024 Corrective Disclosure | Reduced 2024 Estimates After January 4, 2024 Corrective Disclosure | % Reduction in 2024 Estimates |
|---|---|---|---|
| Deutsche Bank | Revenue: $2.562b<br>EPS: $0.96 | Revenue: $1.885b<br>EPS: $0.35 | Revenue: -27%<br>EPS: -64% |
| TD Cowen | Revenue: $2.44b<br>EPS: $0.70 | Revenue: $1.890b<br>EPS: $0.36 | Revenue: -23%<br>EPS: -49% |
| Morgan Stanley | Revenue: $2.52b<br>EPS: $0.81 | Revenue: $1.875b<br>EPS: $0.29 | Revenue: -26%<br>EPS: -64% |
| Bank of America | Revenue: $ $2.785b<br>EPS: $0.80 | Revenue: $ 1.830-1.96b<br>EPS: $0.36 | Revenue: -32%<br>EPS: -55% |
| Canaccord Genuity Capital Markets | Revenue: $2.64b<br>EPS: Did not report | Revenue: $1.83B-$1.96b<br>EPS: Did not report | Revenue: -28%<br>EPS: Did not report |

283. Likewise, consistent with other analyst reports issued around the time of the Offering, Goldman Sachs had not listed in its analyst reports around that time risks to Mobileye

from excess inventory issues. However, in its analyst reports beginning ***after*** Mobileye disclosed the excess inventory accrual at its customers in January 2024, Goldman Sachs added to its "Key downside risks" for the first time the risk from "***supply chain and inventory visibility at tier 1s.***"

## XVIII. THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS

284. The Offering Documents contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. Specifically, the Offering Documents contained the following materially untrue and misleading statements and omissions by the Securities Act Defendants.

### A. Untrue Or Misleading Statements Concerning Mobileye's Customer Contracts

285. The 2022 Annual Report, which was signed by Securities Act Defendants Shashua and Heller and incorporated by reference into the Offering Documents, stated:

> ***We generally do not have contracts with customers that require them to purchase our solutions in any certain quantity or at any certain price***, and our sales could be less than we forecast if a vehicle model for which we achieved a design win is unsuccessful, including for reasons unrelated to our solutions, if an OEM decides to discontinue or reduce production of a vehicle model or of the use of our solutions in a vehicle model, or if we face downward pricing pressure. . . ***Due to the recent global material shortage, we have been working with our customers to ensure they commit to certain volumes in order to secure quantities. However, we have not committed to supply such volumes and the volumes we supply will depend upon market conditions***.

286. The statements identified in ¶285 were materially false and misleading, and omitted material facts. It was misleading to claim that Mobileye "generally" did not have minimum quantity commitments with its customers, when in fact Mobileye had minimum commitment agreements with at least the customers who generated the overwhelming majority (at least 70%) of the Company's revenue. Moreover, contrary to the claims in the Offering Documents that Mobileye had only "recent[ly]" "been working with our customers to ensure they commit to certain

volumes" and "generally do not" require customers to purchase "in any certain quantity," Mobileye had required the Company's critical Tier 1 customers to purchase millions of EyeQ units in excess of demand and made it "impossible" for those customers to "adjust the quantities" of EyeQ chips supplied to them by Mobileye to align with market conditions.

287. Further, contrary to the claims in the Offering Documents that "the volumes we supply will depend upon market conditions," the volumes that Mobileye shipped depended on the volumes which Mobileye had committed its customers to purchasing. As a result, Mobileye had already shipped at least 4-5 million EyeQ chips in excess of demand before the Offering, and Mobileye would ultimately ship ***another*** 2-3 million excess EyeQ units during 2023 (i.e., the year of the Offering).

288. The 2022 Annual Report further stated that:

> We have not executed written agreements with these Tier 1 customers but rather provide our solutions to such customers pursuant to standard purchase orders under our general terms and conditions, ***pursuant to which they are generally not obligated to purchase our solutions in any certain quantity or at any certain price***. . . . Notwithstanding the foregoing, as a result of global shortages, ***some of our customers, including our top three Tier 1 customers, have committed to purchasing minimum quantities of certain solutions in 2023***.

289. The statements identified in ¶288 were materially false and misleading, and omitted material facts. Defendants' statements created the misleading impression that minimum quantity commitments were a limited exception to Mobileye's historical practices, when in fact they were a significant driver of Mobileye's financial performance that Defendants used to ship to its customers at least 6-7 million EyeQ units in excess of market conditions, including 4-5 million excess EyeQ units by the time of the Offering. The statements further concealed that Defendants had required its customers to enter into these obligations and made it impossible to adjust to market conditions throughout 2023, enabling Mobileye to ship another 2-3 million excess EyeQ units that year and cannibalizing future growth.

### B. Untrue Or Misleading Statements Concerning Mobileye's Growth

290. The 2022 Annual Report incorporated by reference into the Offering Documents disclosed that:

> For 2022, 2021 and 2020, our revenue was $1.9 billion, $1.4 billion and $967 million, respectively, ***representing year-over-year growth of 35% in 2022 compared to 2021***. We currently derive substantially all of our revenue from our commercially deployed ADAS solutions.

291. The statements identified in ¶290 were materially false and misleading, and omitted material facts because they created the misleading impression that Mobileye's growth was organic and reflected true market demand for Mobileye's solutions. In fact, the purported growth stated in the Offering Documents was driven by shipping millions of EyeQ chips in excess of market demand, as the contracts between Mobileye and its Tier 1 customers made it "impossible" for the Company's customers to "adjust the quantities" of their orders to match true market demand. Mobileye had already shipped at least 4-5 million EyeQ chips in excess of demand by the time of the Offering.

### C. Untrue Or Misleading Statements Concerning Demand For Mobileye's Products

292. The 2022 Annual Report and the Q1 2023 Quarterly Report incorporated by reference into the Offering Documents each made substantively identical statements concerning demand for Mobileye's products. For instance, the 2022 Annual Report stated:

> ***In addition, in prior periods, certain Tier 1 customers increased their orders for components and parts***, including our solutions, ***to counteract the impact of supply chain shortages for auto parts***, and we expect these Tier 1 customers will utilize accrued inventory on hand before placing new orders to meet the demand of OEMs in current or future periods. As a result, ***some demand for our solutions and the corresponding revenue from these customers were shifted to earlier time periods than otherwise would have occurred*** absent a general supply chain shortage and inflationary environment. We cannot predict when the impact of these factors on global vehicle production will substantially diminish. ***However, ADAS volumes have grown faster in recent years than the overall automotive market as ADAS penetration rates have increased, and we believe that we will continue to benefit***

> ***from that trend. Our revenue of $1.9 billion for the year ended 2022 was up 35% year-over-year, outperforming the increase of global automotive production***. However, we believe that the expected continued constraint on global automotive production resulting from supply chain shortages and the effects of economic uncertainty will limit our ability to increase our revenue. We expect to continue to capitalize on our strong and collaborative relationships with OEMs and Tier 1s to expand our presence in key markets and capture the long-term growth opportunities in those markets.

293. The Q1 2023 Quarterly Report similarly stated:

> ***In addition, in prior periods, certain Tier 1 customers increased their orders for components and parts***, including our solutions, ***to counteract the impact of supply chain shortages for auto parts***, and we expect these Tier 1 customers will utilize accrued inventory on hand before placing new orders to meet the demand of OEMs in current or future periods. As a result, ***some demand for our solutions and the corresponding revenue from these customers were shifted to earlier time periods than otherwise would have occurred*** absent a general supply chain shortage and inflationary environment. We cannot predict when the impact of these factors on global vehicle production will substantially diminish. ***However, ADAS volumes have grown faster in recent years than the overall automotive market as ADAS penetration rates have increased, and we believe that we will continue to benefit from that trend. Our revenue of $458 million in the three months ended April 1, 2023 was up 16% year-over-year, outperforming the increase of global automotive production.*** However, we believe that the expected continued constraint on global automotive production resulting from supply chain shortages and the effects of economic uncertainty will limit our ability to increase our revenue. We expect to continue to capitalize on our strong and collaborative relationships with OEMs and Tier 1s to expand our presence in key markets and capture the long-term growth opportunities in those markets.

294. The statements identified in ¶¶292-93 were materially false and misleading, and omitted material facts. It was false and misleading to state that Mobileye's customers had "increased their orders . . . to counteract the impact of supply chain shortages" and that that "some demand" had shifted to earlier time periods. In fact, Mobileye had shipped ***millions*** of excess EyeQ units beyond market demand. Moreover, customers had not simply "increased their orders," but instead Mobileye had required its Tier 1 customers to enter annual minimum quantity commitments that made it "impossible" for those customers to adjust volumes to match demand. For example, FE 1 affirmatively confirmed that Aptiv—one of Mobileye's largest customers—did

not want to order more EyeQ units, but actually wanted to cancel orders, and Mobileye would not allow Aptiv to do so. Further, referring only to "prior periods" created the materially misleading impression that volumes shipped as of the Offering now matched demand, when in fact the minimum quantity commitments that Defendants had imposed enabled them to ship in 2023 (i.e., the year of the Offering) ***another*** 2-3 million excess EyeQ units beyond market conditions.

### D. The Offering Documents Violated Regulation S-K By Failing To Disclose Material Adverse Trends And The Risks Facing Mobileye

295. In addition to making several untrue statements, the Offering Documents failed to disclose material information required to be disclosed by Items 303 and 105 of Regulation S-K. Item 303 (17 C.F.R. § 229.303) requires the disclosure of "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303. Item 105 of SEC Regulation S-K (17 C.F.R. § 229.105) required that Mobileye disclose the "material factors that make an investment in the registrant or offering speculative or risky."

296. Accordingly, the Offering Documents were required—but omitted—to disclose that Mobileye's revenue and profits were at risk because, among other things: (i) Mobileye had already shipped to its customers 4-5 million excess EyeQ units beyond their demand; (ii) Mobileye had and continued to have minimum quantity commitments with its biggest and most important customers that made it "impossible" for the Company's critical Tier 1 customers to "adjust[] . . . the quantities" of EyeQ chips supplied to them by Mobileye to align with market conditions, and as a result Mobileye's customers would continue to accrue millions of excess units of EyeQ chips

after the Offering; and (iii) Mobileye required its Tier 1 customers to take on excess inventory regardless of demand and despite customer complaints. These risks posed by the existing excess inventory already accrued at its customers, and that customers would accrue more inventory beyond demand, were reasonably likely to cause Mobileye's reported financial information not to be indicative of its future operating results or its future financial condition.

297. Likewise, Mobileye's sales practices were reasonably likely to have an unfavorable impact on Mobileye's net sales or revenues or income, and made an investment in the Offering risky, because Mobileye's contractual arrangements and sales practices caused its customers to accrue excess inventory beyond market conditions and demand. As a result, Mobileye would lose revenue once those customers stopped buying additional EyeQ chips, and instead worked through their accumulated inventory.

298. These trends and uncertainties were known to the Securities Act Defendants for the reasons described above. *See* ¶¶252-83.

## XIX. THE SECURITIES ACT DEFENDANTS FAILED TO EXERCISE REASONABLE CARE OR CONDUCT A REASONABLE INVESTIGATION IN CONNECTION WITH THE OFFERING

299. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects. Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

300. Due diligence is a critical component of the issuing and underwriting process. Directors and Officers (such as the Securities Act Defendants) are able to perform due diligence because of their expertise and access to the Company's non-public information.

301. Securities Act Defendants Shashua and Heller signed the Registration Statement, failed to conduct a reasonable investigation into the statements contained in the Registration Statement and the documents incorporated therein by reference, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. Had Shashua and Heller conducted a reasonable investigation, they would have known that the Offering Documents contained material misstatements and omissions about Mobileye's contracts with its customers, Mobileye's sales practices, and channel inventory levels at the Company's Tier 1 customers. Various sources of information available to Defendants Shashua and Heller would have informed them that the Offering Documents contained material misstatements and omissions, including but not limited to: (i) data provided to Mobileye by its Tier 1 customers, including through industry standard electronic data interfaces and other routine communications; and (ii) direct communications with customers, as described by FE 2. Defendants Shashua and Heller had extensive industry expertise and yet failed to reasonable inquire as to the Company's misstatements and omissions.

## XX. SECURITIES ACT CAUSES OF ACTION

**COUNT IV**

**For Violations of Section 11 of the Securities Act Against The Securities Act Defendants**

302. Oklahoma Firefighters repeats and realleges the allegations above in ¶¶237-301 relating only to the Securities Act claims as if fully set forth herein.

303. For purposes of this Count, Oklahoma Firefighters affirmatively states that it does not allege that the Securities Act Defendants committed intentional or reckless misconduct or that the Securities Act Defendants acted with scienter or fraudulent intent. This claim is based solely

in strict liability and negligence. Any allegations of fraud or fraudulent conduct or motive are specifically disclaimed and excluded.

304. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Oklahoma Firefighters and members of the Class who purchased or otherwise acquired the securities issued in the Offering and were damaged thereby. The Securities Act Defendants' liability under this Count is predicated on the participation of each Securities Act Defendant in conducting the Offering based on the Offering Documents, which contained untrue statements and omissions of material fact.

305. Mobileye is the issuer for the Offering, as expressly stated in the Offering Documents. As the issuer of the shares, Mobileye is strictly liable to Oklahoma Firefighters and the Class for the misstatements and omissions contained in the Offering Documents. Securities Act Defendants Shashua and Heller signed the Registration Statement pursuant to which the Offering was conducted.

306. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

307. Oklahoma Firefighters and the Class have suffered damages. The value of Mobileye common stock has declined substantially as a result of the Securities Act Defendants' violations.

308. Less than one year has elapsed from the time that Oklahoma Firefighters discovered or reasonably could have discovered the facts upon which these claims are based to the time that these claims were brought. Less than three years has elapsed between the time that the securities

upon which this Count is brought were offered to the public through the Offering and Oklahoma Firefighters brought these claims.

309. By reason of the foregoing, the Securities Act Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Oklahoma Firefighters and the other members of the Class.

**COUNT V**

**For Violations of Section 15 of the Securities Act Against Securities Act Defendants Shashua and Heller**

310. Oklahoma Firefighters repeats and realleges the allegations above in ¶¶237-301 relating only to the Securities Act claims as if fully set forth herein.

311. For purposes of this count, Oklahoma Firefighters affirmatively states that it does not allege that Securities Act Defendants Shashua and Heller committed intentional or reckless misconduct or that they acted with scienter or fraudulent intent. This claim is based solely in strict liability and negligence. Any allegations of fraud or fraudulent conduct or motive are specifically disclaimed and excluded.

312. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Oklahoma Firefighters and members of the Class who purchased or otherwise acquired the securities issued in the Offering and were damaged thereby.

313. As set forth in Count Four above, Mobileye is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the Offering Documents.

314. Securities Act Defendants Shashua and Heller were at all relevant times controlling persons of Mobileye within the meaning of Section 15 of the Securities Act. Shashua and Heller served as the most senior executive officers and/or directors of Mobileye at the time of the Offering. Shashua and Heller participated at all relevant times in the operation and management

of Mobileye, and conducted and participated, directly and indirectly, in the conduct of Mobileye's business affairs. As directors and officers of a publicly owned company, Shashua and Heller had a duty to disseminate accurate and truthful information with respect to Mobileye. Because of their positions of control and authority as directors and officers of Mobileye, Shashua and Heller were able to, and did, control the contents of the Offering Documents, which contained materially untrue statements and omissions of material fact.

315. By reason of the foregoing, Securities Act Defendants Shashua and Heller are liable under Section 15 of the Securities Act to Oklahoma Firefighters and the other members of the Class who acquired Mobileye Class A common stock in the Offering.

316. As a direct and proximate result of Securities Act Defendants Shashua and Heller's conduct, Oklahoma Firefighters and the other members of the Class suffered damages in connection with their purchases or acquisitions of Mobileye Class A common stock in the Offering.

317. By reason of the foregoing, to the extent that culpable participation is a required element of a Section 15 claim, the Defendants named in this Count were culpable participants in the violations of Section 11 of the Securities Act as alleged in Count Four, based on their having signed the Registration Statement and having otherwise participated in the process that allowed the Offering to be successfully completed. The Securities Act Defendants named in this Count are liable for the aforesaid wrongful conduct and are liable, to the same extent Mobileye is liable under Section 11 of the Securities Act, to Oklahoma Firefighters and members of the Class who purchased or otherwise acquired Mobileye Class A common stock in the Offering, and who were damaged thereby.

## XXI. SECURITIES ACT CLASS ACTION ALLEGATIONS

318. Oklahoma Firefighters brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Mobileye Class A common stock in the Offering. Excluded from the Class are Securities Act Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Securities Act Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Securities Act Defendants have or had a controlling interest.

319. The members of the Class are so numerous that joinder of all members is impracticable. Mobileye shares were actively traded on the NASDAQ. 38.5 million shares of Mobileye Class A common stock were issued and sold as part of the Offering. While the exact number of Class members is unknown to Oklahoma Firefighters at this time and can only be ascertained through appropriate discovery, Oklahoma Firefighters believes that there are at least hundreds, if not thousands, of members of the proposed Class. Class members who purchased Mobileye common stock may be identified from records maintained by Mobileye or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

320. Oklahoma Firefighters' claims are typical of Class members' claims, as all members of the Class were similarly affected by the Securities Act Defendants' wrongful conduct in violation of federal laws as complained of herein.

321. Oklahoma Firefighters will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation. Oklahoma Firefighters has no interests that conflict with the interests of the Class.

322. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are whether the misrepresentations and omissions in the Offering Documents as alleged herein violated the Securities Act and whether the Securities Act Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein.

323. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small such that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

**THE FOLLOWING SECTION APPLIES TO BOTH THE EXCHANGE ACT AND SECURITIES ACT CLAIMS**

## XXII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the securities laws, in an amount to be proven at trial, including interest thereon;

(c) Awarding all other remedies available under Sections 10(b) and 20 of the Exchange Act and Sections 11 and 15 of the Securities Act;

(d) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e) Awarding such equitable/injunctive or other and further relief as the Court may deem just and proper.

## XXIII. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: November 22, 2024

Respectfully submitted,

*/s/ Jesse L. Jensen*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

John Rizio-Hamilton
Avi Josefson
Jesse L. Jensen
Mathews R. de Carvalho
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
johnr@blbglaw.com
avi@blbglaw.com
jesse.jensen@blbglaw.com
mathews.decarvalho@blbglaw.com