```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                      :    24cv310 (DLC)
IN RE MOBILEYE GLOBAL SECURITIES      :
LITIGATION                            :    OPINION AND
                                      :      ORDER
--------------------------------------- X
```

APPEARANCES:

For lead plaintiff The Retirement Plan for Chicago Transit
Authority Employees, additional named plaintiff Oklahoma
Firefighters Pension and Retirement System, and the proposed
class:
Jesse Lee Jensen
John Rizio-Hamilton
Avi Josefson
Mathews R. de Carvalho
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020

For defendant Mobileye Global Inc.:
Dana Meredith Seshens
Daniel Jacob Schwartz
Marie Killmond
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

DENISE COTE, District Judge:

Investors in Mobileye Global Inc. ("Mobileye" or the
"Company") have brought this putative securities class action
against the Company and several of its senior executives. Lead
plaintiff alleges that the defendants made misleading statements
concerning a purported channel-stuffing scheme, which
artificially inflated the price of Mobileye's stock during the
class period, which began in early 2023. The defendants have

moved to dismiss the Second Amended Complaint ("SAC").  The
defendants' motion to dismiss is granted.

## Background

The following facts are drawn from the SAC and documents
incorporated into the SAC by reference.  See Bellin v. Zucker, 6
F.4th 463, 473 (2d Cir. 2021).  Although the SAC is lengthy, it
is necessary to describe only those allegations that are
relevant to allegations on which the lead plaintiff relies in
its opposition to this motion to dismiss.  The SAC's factual
allegations are accepted as true for purposes of deciding this
motion, and all reasonable inferences are drawn in the lead
plaintiff's favor.

Mobileye, founded in 1999, is a technology company and
industry leader in advanced driver-assistance systems ("ADAS").
ADAS refers to automated safety features such as lane departure
or obstacle warnings.  The individual defendants, Amnon Shashua,
Moran Shemesh Rojansky, Anat Heller, and Daniel Galves are
current and former Company executives.

Approximately 90% of Mobileye's revenue derives from sales
of its "EyeQ" silicon chips, which contain hardware and software
to implement ADAS in automobiles.  Mobileye sells EyeQ chips to
"Tier 1" suppliers of automobile Original Equipment
Manufacturers ("OEMs") such as Ford.  In 2022 and 2023, three of

Mobileye's Tier 1 customers generated roughly 70% of Mobileye's revenue.

The events at issue here occurred in the aftermath of the global COVID-19 pandemic.  In October 2022, Mobileye held an initial public offering ("IPO").  In June 2023, Mobileye held a secondary public offering ("SPO") for Mobileye's then-largest shareholder to resell a portion of its shares.

The central claim in this lawsuit concerns annual contracts ("Contracts") that Mobileye required some of its Tier 1 customers, including its three largest such customers, to enter in 2022 and again in 2023.  The Contracts required those customers to buy a minimum number of Mobileye's EyeQ chips. Mobileye used the Contracts to help protect itself from the aftershocks of the COVID-19 pandemic, in particular to mitigate some of the supply chain risk.

The SAC characterizes the Contracts as a "channel-stuffing scheme".  Through the Contracts, the SAC asserts, Mobileye "shipped millions of units (and recognized hundreds of millions of dollars in revenue) above true market demand for the product."  That "untethering" of supply from demand allowed Mobileye to engage in the successful SPO.  The SAC alleges that, once Mobileye's customers were freed of the Contracts at the end of 2023, they drastically reduced their orders until they worked

through the excess inventory that Mobileye had forced them to buy.

The SAC asserts that when the defendants revealed the truth about the excess inventory and its impact on its projected sales, in two corrective disclosures in January and August 2024, the stock price plummeted. In the wake of the first disclosure, Mobileye's stock price dropped from $39.72 to $29.97, and following the August 2024 disclosure, the stock price declined from $21 to $16.28.

In opposing the motion to dismiss, the lead plaintiff has organized its allegations around four themes: (1) the impact of the minimum-commitment contracts; (2) historical sales data; (3) market share estimates; and (4) following the first corrective disclosure in January 2024, a misrepresentation regarding the source of customers' excess inventory. To support its claims, the lead plaintiff relies on statements made by the Company in annual and quarterly SEC filings, during earnings calls, and at conferences held during the Class Period, which runs from January 26, 2023 to August 1, 2024.

The statements on which the parties principally rely in connection with this motion are presented below in chronological order. Certain passages contain the alleged misrepresentations to which the SAC points; other passages contain the contextual

material on which the defendants rely in bringing their motion
to dismiss.

I.    2022 Disclosure of 2022 Contracts and Excess Inventory

In its October 18, 2022 IPO Registration Statement, the
Company discussed the impact of the pandemic on the automobile
industry, its suppliers, and its customers, including the excess
inventory phenomenon.  Among other things, it explained that in

> prior periods, certain Tier 1 customers increased
> their orders . . . to counteract the impact of supply
> chain shortages . . . and we expect these Tier 1
> customers will utilize accrued inventory on hand
> before placing new orders . . . .  As a result, some
> demand for our solutions and corresponding revenue
> from these customers were shifted to earlier time
> periods than otherwise would have occurred absent a
> general supply chain shortage and inflationary
> environment.

(Emphasis supplied.)  Mobileye disclosed as well that its "top
three Tier 1 customers" had committed to purchasing "minimum
quantities of certain solutions in 2022."

II.    February 2023 Discussion of 70% Market Share

On February 15, 2023, Galves was interviewed by an analyst
during the Wolfe Research Global Auto, Auto Tech, and Mobility
Conference.  The analyst began the interview by describing
Mobileye's business, including the fact that it had "69% of the
world's ADAS market share, 90% of the market for vision-based
ADAS".  In response to a question about Mobileye's ability to
sustain "this kind of 70% share" over the next several years,

Galves described the Company's growth since 2017.  He noted that the Company would not get revenue if the cars that needed their technology did not get produced.  He added, however, that

> our Tier 1s have so much capacity to buy cameras, put them into housings, take our chip, put them onto the PCB board and deliver it to the OEM that we think that our ecosystem is also the cost leader pretty significantly.  So, it's a very kind of long visibility business, so we feel comfortable with our share.

III. 2022 Form 10-K

Central to the SAC's allegations is the 2022 Form 10-K, filed on March 9, 2023.  In a section addressing risks associated with customer orders, Mobileye reported that it did not generally have firm commitment contracts with its customers and had not made a commitment to supply any particular volume of its products:

> We generally do not have contracts with customers that require them to purchase our solutions in any certain quantity or at any certain price, and our sales could be less than we forecast. . . .  Due to the recent global material shortage, we have been working with our customers to ensure they commit to certain volumes in order to secure quantities.  However, we have not committed to supply such volumes and the volumes we supply will depend upon market conditions.

(Emphasis supplied.)

In the next section, however, which was devoted to the company's dependence on a limited number of Tier 1 customers, the 10-K explained that the Company did have "some" minimum commitment contracts.  That section of the filing identified its

three largest Tier 1 customers by name and explained that in
2022 they accounted for over 70% of the company's revenue, which
had also been true in 2021.  It explained that, "as a result of
global shortages, some of our customers, including <u>our top three
Tier 1 customers, have committed to purchasing minimum
quantities of certain solutions in 2023</u>."  (Emphasis supplied.)
A few sentences later it warned that "[i]n the future, our
current Tier 1 customers may decide not to purchase our
solutions."

The 2022 Form 10-K also cautioned, reiterating a statement
from the IPO, that Tier 1 customers may use accumulated
inventory and reduce future orders.  It stated:

> [I]n prior periods, certain Tier 1 customers increased
> their orders for components and parts, including our
> solutions, to counteract the impact of supply chain
> shortages for auto parts, and we expect these <u>Tier 1
> customers will utilize accrued inventory on hand
> before placing new orders</u> to meet the demand of OEMs
> in current or future periods.  As a result, <u>some
> demand</u> for our solutions and the corresponding revenue
> from these customers were <u>shifted to earlier time
> periods</u> than otherwise would have occurred absent a
> general supply chain shortage and inflationary
> environment.

(Emphasis supplied.)

In a later section, addressed to key factors affecting the
Company's performance, there is a detailed discussion of the
global demand for automobiles and the impact of that demand on
Mobileye's business.  There, Mobileye repeated that it expected

"Tier 1 customers will utilize accrued inventory on hand before placing new orders to meet the demand of OEMs in current or future periods." It also discussed the uncertainties it was facing:

> We cannot predict when the impact of these factors on global vehicle production will substantially diminish. However, ADAS volumes have grown faster in recent years than the overall automotive market as ADAS penetration rates have increased, and we believe that we will continue to benefit from that trend. Our revenue of $1.9 billion for the year ended 2022 was up 35% year-over-year outperforming the increase of global automotive production. However, we believe that the expected <u>continued constraint on global automotive production resulting from supply chain shortages and the effects of economic uncertainty will limit our ability to increase our revenue</u>. We expect to continue to capitalize on our strong and collaborative relationships with OEMs and Tier 1s to expand our presence in key markets and capture the long-term growth opportunities in those markets.

(Emphasis supplied.)

IV.  2023 Quarterly Earnings Calls

Three earnings calls that followed the filing of the 2022 Form 10-K include discussions of importance to this motion. During an April 27, 2023 earnings call, the Company made additional statements regarding its Contracts with its Tier 1 customers and its efforts to balance shipments to customers from quarter to quarter. In response to an analyst question, Shashua responded:

> We are in continuous contact with our customers, the Tier 1s about trying to balance out from a quarter-to-quarter. But the <u>yearly commitment is unchanged</u> and

according to the same guidance that we gave back in
January.

(Emphasis supplied.)

Shashua referred to the Contracts again during the April 27
call.  He explained that Mobileye was in conversations with its
Tier 1 customers to try to spread their annual purchase
commitment across quarters:

> But our -- the commitments we have from our Tier 1s is
> on a yearly basis, not quarterly basis.  But we are in
> very good discussions and trying to balance their
> commitment from quarter-to-quarter rather than lumping
> it into one or two quarters towards the end of the
> year.  And we managed quite successfully to reach a
> point in which the change in second quarter is really
> minimal.

On July 27, Mobileye held an earnings call for the second
quarter of 2023, during which Shashua and Rojansky again
discussed customers' production schedules and shifts in
quarterly volume.  Shashua stated:

> On the revenue side, the quarter was in line to better
> than our expectation.  Customers were very cautious in
> the first half of 2023, which led to below normal
> growth.  But we have seen the production schedule
> solidify for the second half of the year where we
> expect to grow 16% year-over-year on much higher
> volumes than the first half.

Rojansky added:

> Revenue is strictly in line with our prior guidance,
> which we are reaffirming today both for the core EyeQ
> business and SuperVision.[1]  On EyeQ, schedules have
> become more solid over the last couple of months and

---

[1] Mobileye's SuperVision system is an autonomous driving system.

customer requests to move volume around have largely
seized [sic].

Later in the call, an analyst asked for "clarification" on
whether "the Tier 1 OEM inventory destocking has had some impact
in demand," and over what "timeframe" Mobileye expected it to
"normalize." Rojansky responded:

> Now, we see schedules stabilizing in terms of EyeQ.
> So if at the beginning of the year, we had requests
> for shift of volumes from Q2 to Q3 or Q3 to Q4. We
> are no longer saying [sic] that. So it's pretty
> stabilized. We think that the last 2 years have been
> very bumpy in terms of the supply chain prices and
> production volumes. But of course, it's not the same
> situation as we enter this year. And that's why we
> see the volume increase and inventory issue we think,
> played a role more in the first half of the year.

Finally, in response to the same question, Shashua stated that

> [i]nventory that our customers have piled up in terms
> of EyeQ . . . has stabilized. We don't see any
> request to push volumes from quarter to quarter.

In the Company's third-quarter earnings call, held on
October 26, Rojansky noted that "EyeQ volumes are tracking in
line with our prior guidance" and "are expected to be a bit more
than 20% above Q3 levels." Rojansky observed, however, that
"this implies a record level of quarterly EyeQ volume and
importantly, should not be used as the starting point for
estimated 2024 volumes." Rojansky referred to the issue of
excess inventory, which would impact orders at the beginning of
2024. He "encourage[d] [investors] to look at the full year
2023 and apply a growth rate to that when thinking about 2024,"

and noted that "the high volume in Q4 would lead to some hangover effect in Q1 similar to the dynamic in the first quarter of 2023."

V.    2024 Excess Inventory Disclosures

A.    January 2024 Disclosure

On January 4, 2024, Mobileye issued a press release announcing its preliminary financial results for the 2023 fiscal year.  The Company stated that as part of its standard planning process for 2024, it had "become aware of excess inventory at our customers."  It explained that

> much of this excess inventory reflects decisions by
> Tier 1 customers to build inventory in the Basic ADAS
> category due to supply chain constraints in 2021 and
> 2022 and a desire to avoid part shortages, as well as
> lower than-expected production at certain OEM's during
> 2023.

Mobileye disclosed that the Company "expect[ed] Q1 revenue to be down approximately 50%, as compared to the $458 million revenue generated in the first quarter of 2023," but that it expected revenue to normalize over the rest of 2024.  This, the SAC alleges, resulted in a stock price decline from $39.72 to $29.97.

On January 25, during an earnings call, Rojansky stated that the Company had learned as part of its standard planning process that there were "6 to 7 million units of excess

inventory of EyeQ chips at our customers."  The Company understood

> that much of this excess inventory reflects [the] decision by Q1 customers to build [their] inventory . . . due to supply chain constraints and a desire to avoid parts shortages in 2021 and 2022, as well as lower than expected production in certain OEMs during 2023.

Rojansky disclosed in that same January 2024 earnings call that some of the excess inventory was due to the minimum-commitment contracts.  In relevant part, Rojansky stated:

> [I]n 2022 and 2023, actually the ordering process changed.  So we needed to make full year commitment to our chief supplier.  So we asked our customers to do the same and make full year commitment for the years, both 2022 and 2023, which led to less ability from their side to adjust purchases to demand [as] they did in pre-COVID period.

In the April 25 earnings call, Shashua explained that defendants had "continue[d] to make meaningful progress" in terms of "business development and executing on our strategy." Shashua added, that

> this should address any open question on whether the excess inventory indicated some weakening of our position and opportunities for a continued growth?  It did not.

On June 11, Mobileye attended the Deutsche Bank Global Auto Industry Conference.  During that call, an analyst asked Galves how demand had "been tracking on the base ADAS side in particular," and if there were "any signs of slowing down." Galves responded that "everything looks really on track at this

point," and that "the market demand has actually been very
stable, not just for our product, but overall global
production."  He added that Mobileye had "seen kind of good kind
of order indications for the back half.  So we feel like very
much on track to what we laid out at the beginning of the year."

B.    August 2024 Disclosure

The second corrective disclosure occurred on August 1,
2024, when the Company reduced revenue guidance for the 2024
fiscal year by another 13%.  In the press release and
accompanying earnings call that day, the Company cited factors
"almost exclusively related to China", including (1) weakening
global production forecasts, primarily due to continued shared
losses in China, (2) a decline in orders from Chinese OEMs, and
(3) to a lesser extent, a delay of a high-volume ADAS launch
outside of China.

As for the excess inventory issue, the Company explained
that "most of the excess inventory at [the] Tier 1 customers"
had been in North America and Europe, not China, and "most" of
the excess inventory had been "digested" in the first quarter of
2024.  The Company acknowledged, nevertheless, that there was
still a lingering "inventory . . . residual in China" on which
defendants did not have "100% visibility":

> The second half, we see a decline in terms of
> shipments of the second half of the year.  Now it
> could come from multiple sources.  One of them is some

13

```
residuals of inventory that -- we don't have 100%
visibility to what is going on in inventory.  Some of
it is -- could be a market share loss where we get
desourced and with a local solution instead of ours.
```

The SAC alleges that, following the August 2024 guidance

reduction, Mobileye's stock price declined from $21 to $16.28.

VI.  The Automotive Supply Chain and Lead Plaintiff's
     Confidential Witnesses

     The SAC alleges that it is standard industry practice for

Tier 1 suppliers to "engage in a near-constant exchange of

information, which allows each part of the supply chain to

manage its inventory levels."  This "typically" involves the use

of Electronic Data Interchange ("EDI"), an electronic platform

that allows for instant communication of purchase orders and

invoices.  The SAC asserts, therefore, that the defendants "at

all times received regular reports about inventory and demand

from customers."

     In support of this assertion, the SAC describes

conversations with two confidential witnesses, "FE 1" and "FE

2".  FE 1 is a former customer logistics manager of Aptiv, one

of Mobileye's top three Tier 1 customers.  According to FE 1,

Aptiv used EDI to provide Mobileye with both 18-month forecasts,

which projected demand over the long-term, and firm orders every

two weeks.

     FE 2 is a former Mobileye employee who served as Vice

President of ADAS Business Development from September 2020 until

the end of 2022.  FE 2 reported to a Mobileye Executive Vice President, who in turn reported to defendant Shashua.  According to FE 2, all of Mobileye's Tier 1 customers provided reports to Mobileye that updated the Company on a change in their purchasing needs.  When she left the Company at the end of 2022, which was before the start of the Class Period, Mobileye was telling Tier 1 customers that they had to buy the amount of product to which they had previously committed and that they should store it for the future.

## VII. Procedural History

This putative class action was filed on January 16, 2024. On July 12, Retirement Plan for Chicago Transit Authority Employees was appointed as lead plaintiff.  The lead plaintiff filed its first amended complaint on September 13, which the defendants moved to dismiss.  After having been warned that it would likely not have a further opportunity to amend, the lead plaintiff filed the SAC on November 22.  The SAC alleges violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(a),(b), and (c) thereunder, 17 C.F.R. §§ 240.10b-5(b); § 11 of the Securities Act 1933 (the "Securities Act"), 15 U.S.C. § 77k; and "control person" liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Defendants moved to dismiss the SAC on

December 20, 2024.  The motion became fully submitted on
February 21, 2025.

## Discussion

To survive a motion to dismiss brought under Rule 12(b)(6),
"a complaint must contain sufficient factual matter, accepted as
true, to state a claim to relief that is plausible on its
face." Doe v. Franklin Square Union Free School Dist., 100
F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009)).  "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th
87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678).  In
determining if a claim is sufficiently plausible to withstand
dismissal, a court "must accept as true all allegations in the
complaint and draw all reasonable inferences in favor of the
non-moving party." Doe, 100 F.4th at 94 (citation omitted).  A
court evaluating a motion to dismiss in a securities fraud
action may consider those facts stated on the face of the
complaint as well as

> any written instrument attached to the complaint,
> statements or documents incorporated into the
> complaint by reference, legally required public
> disclosure documents filed with the SEC, and documents
> possessed by or known to the plaintiff upon which it
> relied in bringing the suit.

<u>Tongue v. Sanofi</u>, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

Defendants argue that the SAC fails to adequately plead a § 10(b) claim because it fails to allege (1) statements that qualify as material misrepresentations, or other deceptive acts supporting a scheme liability claim; (2) scienter; and (3) loss causation.  Because the SAC fails to identify a material misrepresentation or other deceptive acts supporting scheme liability, it is not necessary to assess the adequacy of the assertions regarding scienter and loss causation.  In addition, the SAC fails to plead a § 11 claim under the Securities Act.

I.   Legal Standard for Section 10(b)

The lead plaintiff's core claim is brought under § 10(b) of the Exchange Act and its implementing regulation, Rule 10b-5(b). Rule 10b-5 provides:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce, or of the mails or of any
> facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to
> defraud,
> (b) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to
> make the statements made, in the light of the
> circumstances under which they were made, not
> misleading, or
> (c) To engage in any act, practice, or course of
> business which operates or would operate as a fraud or
> deceit upon any person, in connection with the
> purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim for relief under

§ 10(b) and Rule 10b-5, a plaintiff must properly allege:

> (1) a material misrepresentation or omission by the
> defendant; (2) scienter; (3) a connection between the
> misrepresentation or omission and the purchase or sale
> of a security; (4) reliance upon the misrepresentation
> or omission (5) economic loss; and (6) loss causation.

In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 417

(2d Cir. 2023) (citation omitted).

    In contrast to Rule 10b-5(b), the "scheme subsections" of

Rules 10b-5(a) and (c) "do not require the defendant to make a

misstatement or omission" but instead "require only deceptive

conduct."  Plumber & Steamfitters Loc. 773 Pension Fund v.

Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021).  Accordingly,

to state a scheme liability claim, a plaintiff must plead: "(1)

that the defendant committed a deceptive or manipulative act,

(2) in furtherance of the alleged scheme to defraud, (3) with

scienter, and (4) reliance."  Id. (citation omitted).  To ensure

that claims of scheme liability do not "evade the pleading

requirements imposed in misrepresentation cases," a plaintiff

must plead "something beyond misstatements and omissions," that

is, "something extra that makes a violation a scheme."  Sec. &

Exch. Comm'n v. Rio Tinto plc, 41 F.4th 47, 53-54 (2d Cir.

2022).

    Finally, claims for securities fraud brought under § 10(b)

and Rule 10b-5(b) for misleading statements or omissions are

subject to a heightened pleading standard pursuant to the
Private Securities Litigation Reform Act ("PSLRA").  Because
claims pursuant to subsections (a), (b), and (c) each sound in
fraud, plaintiffs must comply with Rule 9(b), Fed. R. Civ. P.,
in bringing each of these claims.  The PSLRA requires a
complaint alleging misstatements or omissions to "specify each
statement alleged to have been misleading, [and] the reason or
reasons why the statement is misleading."  15 U.S.C. § 78u-
4(b)(1).  Rule 9(b) requires that the plaintiff "state with
particularity the circumstances constituting fraud."  Altimeo
Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd., 19 F.4th 145, 150 (2d
Cir. 2021) (citation omitted).

　　　"A statement is materially misleading when the defendants'
representations, taken together and in context, would have
misled a reasonable investor."  Id. at 151 (citation omitted).
"To be material, a statement must, in the view of a reasonable
investor, have significantly altered the total mix of
information available."  Plumber & Steamfitters Local 773
Pension Fund, 11 F.4th at 100-01 (citation omitted).

　　　Rule 10b-5(b) makes it unlawful to "omit material facts in
connection with buying or selling securities when that omission
renders statements made misleading."  Macquarie Infrastructure
Corp. v. Moab Partners, L.P., 601 U.S. 257, 259 (2024).  Rule
10b-5(b) does not, however, apply to "pure omissions," which

occur "when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." Id. at 263. Even "a duty to disclose" certain information "does not automatically render silence misleading under Rule 10b-5(b)." Id. at 265. Rather, Rule 10b-5(b) requires "identifying affirmative assertions" before "determining if other facts are needed to make those statements 'not misleading.'" Id. at 264.

Ordinarily, statements of opinion are non-actionable under Rule 10b-5(b). Statements of opinion are actionable where a plaintiff pleads that "(1) the speaker did not hold the belief she professed, (2) the supporting fact[s] she supplied were untrue, or (3) the speaker omitted information whose omission makes the statement misleading to a reasonable investor." In re Shanda Games Ltd. Sec. Litig., 128 F.4th at 43 (citation omitted). "The standard for opinion liability presents no small task for an investor seeking to plead that an opinion is misleading." New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 42 (2d Cir. 2023) (citation omitted). Accordingly, to adequately plead a misleading statement of opinion,

> [t]he investor must identify particular (and material)
> facts going to the basis for the issuer's opinion --
> facts about the inquiry the issuer did or did not
> conduct or the knowledge it did or did not have --
> whose omission makes the opinion statement at issue
> misleading to a reasonable person reading the
> statement fairly and in context.

Tongue, 816 F.3d at 209 (quoting Omnicare, Inc. v. Laborers
Dist. Council Constr. Ind. Pension Fund, 575 U.S. 175, 194
(2015)).  A reasonable investor understands, however, that
"opinions sometimes rest on a weighing of competing facts," and
that it "is not necessarily misleading when an issuer knows, but
fails to disclose, some fact cutting the other way."  Tongue,
816 F.3d at 210 (citation omitted).  In addition, "[g]eneric,
indefinite statements of corporate optimism" or "puffery"
typically are not actionable.  Abramson v. Newlink Genetics
Corp., 965 F.3d 165, 173 (2d Cir. 2020).

     Finally, forward-looking statements are not actionable
under the PSLRA "if (1) the forward-looking statement is
identified and accompanied by meaningful cautionary language,
(2) the forward-looking statement is immaterial, or (3) the
plaintiff fails to prove that the forward-looking statement was
made with actual knowledge that it was false or misleading."  In
re Vivendi, 838 F.3d 223, 245 (2d Cir. 2016) (citation omitted).
"[A] forward-looking statement is protected . . . if any of the
three prongs applies."  Id. at 245-46.

II.  Application

     The SAC fails to plead a § 10(b) claim with the
particularity required by the PSLRA and Rule 9(b).  In
particular, the SAC fails to allege any material misstatement or

any deceptive conduct supporting scheme liability.  Accordingly, the SAC's § 10b claims are dismissed.

In opposition to this motion to dismiss, the lead plaintiff has identified four sets of statements which it asserts constitutes material misrepresentations.  Each will be addressed in turn.

A.    Statements about Minimum-Commitment Contracts

The lead plaintiff primarily challenges as false or misleading statements in the 2022 Annual Report and other SEC filings that, it argues, created the "impression" that the Company's sales reflected demand for its products.  The lead plaintiff contends this impression was false since its Tier 1 customers who were bound by the 2022 and 2023 Contracts did not actually need as much of the Company's products as they purchased and instead used their purchases to build up their inventory.  The lead plaintiff identifies two words as principally creating this false impression.  Both appear in the 2022 Form 10-K.  They are that the Company "generally" did not have minimum-commitment contracts with its customers, and that "some" customers had committed to minimum purchases of the Company's products.  The SAC fails to plead that either of these statements was false or misleading.

The 2022 Annual Report explained that, while the Company generally sold its products through purchase orders, its three

largest customers, who were jointly responsible for over 70% of its revenue, had "committed to purchasing minimum quantities of certain solutions in 2023."  In connection with the 2022 IPO, the Company had already disclosed that it had such contracts with the same customers for the year 2022.  In making this first claim, therefore, the lead plaintiff has cherry picked statements in the 2022 Annual Report and ignored the document's detailed description of both the pandemic-era pressures on the automotive industry and business practices that the Company adopted in response to the supply chain disruptions that accompanied the pandemic.

Indeed, Mobileye's 2022 Form 10-K warns explicitly against drawing the very "impression" identified by the lead plaintiff. It explains that a "risk" to Mobileye's business was that Tier 1 customers who had increased their orders "to counteract the impact of supply chain shortages . . . will utilize accrued inventory on hand before placing new orders to meet the demand of OEMs in current or future periods."  Mobileye had already disclosed that very risk to investors in its October 18, 2022 IPO Registration Statement.  And it repeated the disclosure in its successive SEC filings.  These robust disclosures thus explained both the existence of the Contracts and the

possibility that Mobileye's customers' accrued inventory would dampen future demand.[2]

Lead plaintiff makes essentially three arguments to support this portion of its claim.  First, it contends that the 2022 Form 10-K statements were misleading because defendants simultaneously assured investors that "the volumes we supply will depend upon market conditions."  In lead plaintiff's view, this statement created the impression that the company's sales reflected demand.  The lead plaintiff is confusing a statement about the company's ability to buy products from its own suppliers with the Company's description of its sales to its customers.  In this and other portions of the 2022 Form 10-K, the Company described the then-existing global semiconductor shortage, which made it difficult for Mobileye to produce its EyeQ product.  The statement that Mobileye's "supply" would "depend upon market conditions" did not refer to market forces driving demand from its own customers but to Mobileye's ability to supply EyeQ chips and fill the orders it received.

---

[2] Each disclosure began by saying that "in prior periods, certain Tier 1 customers increased their orders for components and parts."  Lead plaintiff seizes on this reference to the past to argue that defendants "falsely suggested that shipments now matched demand when in fact Mobileye would continue to ship millions more excess units."  Read in context, that is neither a fair nor necessary inference.

Lead plaintiff next argues that the misleading impression created in the 2022 Form 10-K was "reinforced" by four statements that certain defendants made during 2023, specifically during a February 15 conference call, at a conference on March 6, and at April 27 and July 27 earnings calls. Lead plaintiff does not contend that any one of these four statements was false or misleading in and of itself. Indeed, each of the four statements was consistent with the 2022 Form 10-K statement that some customers, including the top Tier 1 customers, had committed to buy minimum quantities of the Company's products. None of the challenged statements, whether considered individually or collectively, served to create any false impression about a relationship between the Company's revenue and the market's demand for its products.

Finally, lead plaintiff relies on the SAC's descriptions of the interviews with FE 1 and FE 2, arguing that their accounts corroborate the SAC's theory of falsity. Specifically, FE 1 explained that his former employer Aptiv, one of Mobileye's top-three Tier 1 customers, would try to postpone orders, but Mobileye "forced [Aptiv] to make overstock" and, if Aptiv was not on pace to meet its minimum commitment requirement, Mobileye would deliver the remaining chips "without question," at the end of the calendar year. And FE 2 stated that up until her departure from the company in late 2022, Mobileye held its Tier

1 customers to the Contracts, telling them if they did not use
the product they should "store it for the future."  These
allegations are consistent with Mobileye's public disclosures
that Aptiv and other Tier 1 customers had signed minimum-
commitment contracts in 2022 and 2023 and that they may use
excess inventory to meet future demand.[3]

 B. Revenue Statements

 The SAC's next theory of liability is related to its first.
It contends that the Company created a false impression that its
growth in sales was due to market demand.  The SAC asserts that
the Company should have disclosed that its Contracts were
cannibalizing future revenue since its customers were using
their purchases to increase their inventory.  Notably, the lead
plaintiff does not assert that any of the Company's reported
financial results were inaccurate, including the revenue
figures.

 As already discussed, the 2022 Form 10-K and the Company's
other SEC filings disclosed that in 2022 and 2023 the Company

---

[3] In addition, lead plaintiff contends that courts have
"repeatedly held that misleading statements around inventory
levels are actionable."  The cases lead plaintiff cites,
however, involve misrepresentations made about a defendant's own
inventory, not its clients' inventory.  See Novak v. Kasaks, 216
F.3d 300, 311-12 (2d Cir. 2000); City of Providence v.
Aeropostale, Inc., 2013 WL 1197755, at *4-5 (S.D.N.Y. Mar. 15,
2013).

and its three largest customers had entered minimum-commitment contracts, that its Tier 1 customers had increased orders to counteract the impact of supply chain shortages, and that the Company expected that Tier 1 customers would use accrued inventory before placing new orders. It warned as well that it could not predict the future, but that the continued constraints on the global automotive market "will limit our ability to increase our revenue." The SEC filings are integral to the SAC and when they are considered in their entirety, the SAC fails to allege that the Company's statements regarding its financial performance were misleading.

Accepting that Mobileye's statements might have been "literally accurate," the lead plaintiff contends that the statements on historical financial performance became misleading through their context and manner of presentation. It is true that "statements of literal truth can become, through their context and manner of presentation, devices which mislead investors." In re Shanda Games, 128 F.4th at 44 (citation omitted); see also McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990). The SAC, however, has not plausibly pleaded that such occurred here. A statement that is literally true must be "susceptible to quite another interpretation by the reasonable investor" to "properly be considered a material misrepresentation." Kleinman v. Elan

Corp., plc, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted).
Lead plaintiff does not explain why the Company's financial
disclosures, which it concedes to be "technically true", are
susceptible to any other interpretation.

The lead plaintiff also challenges the Company's statements
in earnings calls on January 26, April 27, and October 26, 2023,
attributing Mobileye's revenue growth to a combination of volume
and average sale price growth.  But the SAC does not plausibly
plead that this was false either.  There is no allegation in the
SAC that these two phenomena -- volume and price -- did not
contribute to Mobileye's revenue growth, and those statements
could not plausibly mislead a reasonable investor when
considered alongside the repeated disclosures in SEC filings
regarding the existence of the Contracts and the potential
impact on the Company's future revenue that their customers'
reliance on their accrued inventory would have.

To support its argument that the Company's revenue figures
were misleading, the lead plaintiff relies as well on the
reaction of analysts to the Company's January 4, 2024 disclosure
that it expected its first quarter revenue to be down
"approximately 50%" from revenue in the first quarter of 2023
because its Tier 1 customers would be using their excess
inventory.  Analysts expressed surprise that the Company had not
more quickly identified and better prepared for this slowdown in

28

demand.  An analyst's disappointment with the Company's prior projections, however, does not make the Company's prior revenue reports misleading.  Fraud by hindsight is not a recognized basis for liability.  See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 188 (2d Cir. 2014).

Finally, the lead plaintiff emphasizes statements made during the July 27, 2023 earnings call.  It contends that these statements were false and not protected as either forward-looking statements or statements of opinion.[4]  The SAC does not plausibly plead that any description by the speakers of what they were hearing or observing was false or misleading.  To the extent they were describing their expectations for the future, those statements were protected by adequate warnings.

As described above, the speakers during this mid-year earnings call explained that customers "were very cautious" in the first half of 2023, "which led to below normal growth.  But we have seen the production schedule solidify for the second half of the year."  They added that revenue was "tracking in line with our prior guidance" and that "EyeQ schedules have

---

[4] The SAC recites many financial projections that appear in the Company's SEC filings, but in opposition to this motion the lead plaintiff does not argue that those projections are actionable. As the defendants point out, the projections are quintessential forward-looking statements and/or statements of opinion that are not actionable.  In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 170 (2d Cir. 2021).

become more solid over the last couple of months and customer requests to move volume around have largely ceased." The SAC fails to plead that any part of these statements was either false or misleading. While the lead plaintiff focuses attention on the remark that the Company had seen the production schedule solidifying, that comment in fact refers to the schedules that were being set for the next six months, and not to an historical fact. To underscore that this was a forward-looking statement, it was immediately coupled with a statement of corporate optimism, to wit, that in the second half of the year, Mobileye "expect[ed] to grow 16% year-over-year on much higher volumes than the first half."

C.   Market Share Statements

In its third category of allegations, the SAC asserts that the estimates by Mobileye executives at conferences and earnings calls in 2023 that the company's share of the ADAS market was "about 70%", were false. It alleges that the sales figures had been inflated by the channel-stuffing scheme, which in turn inflated the calculation of the company's market share. This is an iteration of the claim regarding the accuracy of the company's revenue figures and it also fails to state a claim.

Before analyzing this set of allegations, however, a few observations are in order. A company's estimate of its market share depends on its understanding of its market and of the

extent to which it is a successful competitor within that market.  Other than through its allegations about the channel-stuffing scheme, the SAC does not suggest that the information which informed Mobileye's estimate of its market share was unavailable to others.  Indeed, in the very first discussion of market share on which the SAC relies, it is not the Company but the interviewer who identifies the Company's market share as 70%.  The interviewer then asks Galves whether Mobileye will be able to sustain that market share.  When an estimate of market share is based largely on publicly available data, the statement is not generally susceptible to a claim of fraud.  See In re Philip Morris, 89 F.4th at 420 ("We have rejected the proposition that a mere dispute about the proper interpretation of data can form a basis for liability under section 10(b) and Rule 10b-5." (citation omitted)).  Moreover, the SAC has not plausibly pleaded that the Company did not honestly hold the expressed opinion about its market share or that the speaker omitted facts making the statement misleading to a reasonable investor.  See In re Shanda Games, 128 F.4th at 43.

And even more to the point, the SAC fails to plead that the Company's market share differed from what it and the interviewer estimated it to be.  The lead plaintiff reasons that Mobileye's channel stuffing scheme inflated its sales figures by 7% in 2022 and 2023, and on this basis concludes that Company inflated its

market share by 7%.  The SAC, however, provides no basis for
this equivalency.

     To support its argument, the lead plaintiff relies almost
exclusively on the SAC's assertion that the Company admitted in
a January 25, 2024 earnings call that its market share would
require a "correction."  The actual statement, which is
incorporated by reference into the SAC, cannot be fairly read as
an admission that the Company had misrepresented its market
share.  During that earnings call, there was a lengthy and
complex discussion of the Company's success in penetrating
markets in the West, China and India, as well as its hopes for
the future.  One executive, whose name is not given, opined that
the recently discovered excess inventory issue probably made no
"significant" change to "our market share forecast on the global
level" because he thought that the inventory had probably been
accumulated over about "three years".  In the speaker's view, it
accounted "for maybe 1% or 2% of the market share regulation
[sic] that we've had in the past."  This is not an admission
that the 2023 estimates of the Company's market share were false
or misleading at the time they were made, much less that they
were materially inaccurate.

     D.   Excess Inventory Statement

     The fourth and final alleged misrepresentation was made in
the January 4, 2024 press release in which the Company disclosed

that it had become aware that its customers held "excess"
inventory.  Its claim again hinges on the use of a single word.
The SAC alleges that the Company misrepresented the reasons for
the existence of the excess when it used the word "much".
Mobileye's press release stated that, based on its discussions
with its customers,

> we understand that <u>much</u> of this excess inventory
> reflects decisions by Tier 1 customers to build
> inventory in the Basic ADAS category due to supply
> chain constraints in 2021 and 2022 and a desire to
> avoid part shortages, as well as lower than-expected
> production at certain OEM's during 2023.

(Emphasis supplied.)  The SAC asserts that it was Mobileye's
Contracts that were responsible for the excess inventory and not
the reasons given in the press release.

For several reasons, this portion of the SAC's claim also
fails.  First, Mobileye had repeatedly disclosed the existence
of the Contracts.  Indeed, it referred to them again during the
earnings call that occurred just a few weeks after the press
release was issued.  As a result, the market knew and could add
information about the Contracts to the mix of information
provided in the press release.

Second, the SAC provides no reason to doubt that the press
release accurately reported the conversations the Company had
with its customers.  And, as importantly, the existence of the
Contracts is intertwined with the pandemic's "supply chain

constraints" to which the press release alludes.  Mobileye's Tier 1 customers were concerned about having a dependable supply from Mobileye, and in turn Mobileye was concerned about its supplier filling its own orders.  Conversely, Mobileye's supplier wanted a firm commitment from Mobileye and Mobileye wanted one as well from its largest customers.  The Contracts were one business solution to address elements of supply chain uncertainty.

In challenging the January 2024 statement, lead plaintiff relies heavily on its two informants.  But nothing said by these informants alters this analysis.  FE 1 worked as a customer logistics manager at Aptiv, which was responsible for 15% of Mobileye's revenue.  FE I reports that Aptiv did not want to build up excess inventory but that Mobileye's Contracts "forced us to make overstock".  FE 2 was Mobileye's Vice President of ADAS Business Development until the end of 2022.  Her team at Mobileye apparently told her that Tier 1 customers were "not very satisfied" with the Contracts.  In addition, in the fourth quarter of 2023, the Chief Financial Officer of Magna, a small Tier 1 customer of Mobileye,[5] stated that, unlike Mobileye, Magna could not "push stuff into the supply into our customers." These allegations do little beyond confirming that Mobileye had

---

[5] Magna was not one of the top-three Tier 1 customers with whom Mobileye had a Contract.

minimum-supply contracts with some of its Tier 1 customers and
that those Contracts had a role in at least one of those
customers, Aptiv, accumulating excess inventory.  These
allegations do not permit a finding that Mobileye made a
misrepresentation in its press release by using the word "much"
when describing its understanding of the reasons for the excess
inventory.

  E. The SAC fails to plead scheme liability.

  The SAC additionally asserts claims under Rules 10b-5(a)
and (c).  In essence, the SAC alleges that the defendants used
their market power to defraud investors by requiring customers
to sign minimum purchasing commitments which made it
"impossible" for customers to adjust their orders to changes in
market conditions.  The SAC fails to plead a scheme to defraud
under either subsection of Rule 10b.

  First, the SAC fails to allege that the Company engaged in
deceptive conduct beyond the alleged misstatements and
omissions.  Entry into annual, minimum-commitment contracts is a
lawful business practice and the lead plaintiff does not contend
otherwise.  The fact that the Company entered into such
Contracts with its top three customers in 2022 and 2023 was also
publicly disclosed.

  Lead plaintiff argues that it has alleged conduct apart
from the alleged false statements, specifically that defendants

35

used their "dominant position" to force key customers into contracts that allowed Mobileye to "'push' inventory untethered to actual demand."  But again, the existence of the Contracts was fully disclosed, as was the Company's commanding position in the market.  The SAC does not plead any "extra" deceptive conduct.

In support of its argument that defendants' conduct may form the basis for scheme liability, lead plaintiff relies on SEC v. Farnsworth, 692 F. Supp. 3d 157 (S.D.N.Y. 2023). Farnsworth is inapposite.  There, the defendants engaged in a market manipulation scheme which they did not publicly disclose. Id. at 189-90.  In contrast, the Company enforced Contracts that were both legal and publicly disclosed.

F.   The control person claims fail.

Finally, claims of "control person" liability under § 20(a) of the Exchange Act depend on establishing a primary violation under § 10(b) and Rule 10b-5.  The failure to allege any primary violations means that the SAC's control person claims also fail. See In re Philip Morris, 89 F.4th at 429.

III. Section 11 of the Securities Act

The defendants have also moved to dismiss the SAC's § 11 claims, which are premised on the June 5, 2023 SPO and its Offering Documents.  Section 11 of the Securities Act imposes civil liability on issuers and signatories, such as officers of

the issuer and underwriters, of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k. The statute imposes "absolute" liability -- and thus does not require a showing of scienter -- as long as a plaintiff "establishes one of three bases for liability: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 172 (2d Cir. 2021) (citation omitted). Where the allegations underlying a § 11 claim sound in fraud, however, the heightened pleading standard of Rule 9(b) applies. Id. at 173.

It is unnecessary to decide whether the heightened pleading standard applies to the SAC's Securities Act claims. Even under Rule 8(a), Fed. R. Civ. P., the § 11 claims fail.

The lead plaintiff argues that the 2022 Form 10-K and other SEC filings incorporated into the SPO's Offering Documents contained three misstatements and an omission. The three misstatements have already been addressed; as described above, the SAC has failed to plausibly plead a misstatement as to any of them. The three alleged misstatements are: 1) statements touting revenue growth and claiming that Mobileye shipments

depend "upon market conditions"; 2) statements that customer orders "in prior periods" had shifted "some" demand earlier in time; and 3) statements describing Mobileye's "general" practice as not signing minimum-commitment contracts and disclosing that it did sign such contracts with "some" of its customers.

Therefore, the only portion of the § 11 claim that requires additional analysis is that portion which contends that the SPO's Offering Documents contained material omissions in violation of Items 303 and 105 of Regulation S-K, 17 C.F.R. §§ 229.303(a)(3)(ii), 229.105.  Item 303 of Regulation S-K requires in pertinent part "the disclosure of any known trends the registrant reasonably expects will have a material impact on" a registrant's financial results.  Stadnick v. Vivint Solar Inc., 861 F.3d 31, 39 (2d Cir. 2017) (citation omitted). "Disclosure is required where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." Id. (citation omitted).  Item 105 of Regulation S-K imposes a duty to disclose "the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105.  Events that are not "reasonably likely to be material under Item 303" are not among the "most significant factors" rendering an offering speculative or risky for purposes

of Item 105.  Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d
479, 484 n.4 (2d Cir. 2011) (citation omitted).[6]

The lead plaintiff alleges that pursuant to Items 303 and
105 the defendants had a duty to disclose in the SPO's Offering
Documents that Mobileye's revenues and profits were "at risk"
because Mobileye had "shipped millions of excess EyeQ by the
time of the [SPO] and made it impossible for customers to adjust
orders to market conditions."  As the lead plaintiff recognizes,
however, the SPO's Offering Documents incorporated Mobileye's
Forms 10-K and Forms 10-Q, including those documents' lengthy
discussions of Risk Factors.  As already explained, Mobileye
repeatedly disclosed the existence of the Contracts and that
there was "no guarantee" that customers would continue to make
purchases "in any certain quantity."  It also disclosed the
risks that its customers would use accrued inventory before
placing more orders for its products and that continued
constraints on the global automotive market "will limit our
ability to increase our revenue."  These and many other
disclosures described known trends and investment risks.
Accordingly, Mobileye provided "ample warning" of the risks in

---

[6] Hutchinson's discussion of Item 503 applies to Item 105.  On
March 20, 2019, the SEC adopted amendments to certain disclosure
requirements in Regulation S-K, moving what was previously Item
503 to Item 105.  FAST Act Modernization and Simplification
of Regulation S-K, 2019 WL 1437180, at *1 (12688-89) (Apr. 2,
2019).

the SPO's offering documents.  See <u>Stadnick,</u> 861 F.3d at 39.  To the extent that the lead plaintiff relies on events and knowledge that existed after the filing of the SPO to plead its claim, that effort fails.  Section 11 claims require disclosure based on what is known at the time of filing.  Lead plaintiff's § 11 claim thus fails too.

## Conclusion

The defendants' December 20, 2024 motion to dismiss is granted.  The Clerk of Court shall enter judgment for the defendants and close the case.

Dated:     New York, New York
           April 15, 2025

                              _____
                                  DENISE COTE
                         United States District Judge